BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Tel:    (858) 914-2001
Fax:    (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com

COTCHETT, PITRE & MCCARTHY, LLP
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Tel:    (650) 697-6000
Fax:    (650) 697-0577
jcotchett@cpmlegal.com
mmolumphy@cpmlegal.com
tredenbarger@cpmlegal.com
giajung@cpmlegal.com

*Attorneys for Plaintiff R. Andre Klein*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| R. ANDRE KLEIN, on behalf of himself and all other stockholders of APPLE INC., <br><br> Plaintiff, <br><br> vs. <br><br> TIMOTHY D. COOK, WILLIAM V. CAMPBELL, MILLARD ("MICKEY") DREXLER, ARTHUR D. LEVINSON, ROBERT A. IGER, ANDREA JUNG, FRED D. ANDERSON, ESTATE OF STEVEN P. JOBS, deceased, and DOES 1–30, inclusive, <br><br> Defendants, <br><br> - and – <br><br> APPLE INC., a California corporation, <br><br> Nominal Defendant. | Case No.  14-cv-3634 EJD <br><br> **FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> 1. **VIOLATIONS OF THE EXCHANGE ACT OF 1934;** <br><br> 2. **BREACH OF FIDUCIARY DUTY;** <br><br> 3. **GROSS MISMANAGEMENT;** <br><br> 4. **WASTE OF CORPORATE ASSETS; AND** <br><br> 5. **BREACH OF THE DUTY OF HONEST SERVICES** <br><br> **DEMAND FOR JURY TRIAL** |

First Amended Verified Shareholder Derivative Complaint

Plaintiff R. Andre Klein, derivatively on behalf of Apple Inc. ("Apple" or the "Company"), alleges the following based upon the investigation of Plaintiff and his counsel, including a review of legal and regulatory filings, press releases, and media reports about Apple.[1]

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action seeking to remedy the wrongdoing committed by Apple's senior directors and officers who have caused millions of dollars in damages to Apple and its shareholders.  Plaintiff asserts claims under federal law for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and under state law for breach of fiduciary duty, gross mismanagement, corporate waste, and breach of the duty of honest services.

2.      Apple's co-founder and former Chief Executive Officer ("CEO"), Steve Jobs (now deceased), and other Apple executives and directors entered into unlawful, anti-competitive non-solicitation agreements with executives at other companies, such as Adobe Systems ("Adobe"), Google, Inc. ("Google"), and Intel Corporation ("Intel"). Pursuant to these agreements, which violated United States antitrust laws, the Individual Defendants caused Apple to agree not to recruit the employees of other companies, and *vice versa*.  In an order dated August 8, 2014 in *In re High-Tech Employee Antitrust Litigation*, No. 11-cv-2509 LHK (N.D. Cal.), the Honorable Lucy H. Koh rejected a proposed $324.5 million settlement as inadequate and unfair based in part on the strength of the evidence against Jobs.  Devoting five pages of her 32-page order to discussing the evidence against Jobs, Judge Koh identified him as "a, if not the, central figure in the alleged conspiracy" to engage in anti-poaching practices because "[s]everal witnesses, in their depositions, testified to [Jobs's] role in the anti-solicitation agreements."

---

[1] In compliance with Section III of this Court's Standing Order for Civil Cases, a copy of a red-lined document showing the changes made to the previously filed complaint is attached as **Exhibit A**.

3.　　　In California, non-compete agreements are generally void and unenforceable, in addition to potentially violating antitrust laws.

4.　　　The United States Department of Justice ("DOJ") began investigating Apple's hiring practices in 2009.  The DOJ filed a complaint against Apple, Adobe, Google, Intel, Intuit, and Pixar on September 24, 2010, alleging that these companies' private agreements restrained trade, which was *per se* unlawful under the antitrust laws.  The DOJ found the agreements "facially anticompetitive because they eliminated a significant form of competition to attract high tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."  The DOJ stated that the agreements "disrupted the normal price-setting mechanisms that apply in the labor setting."

5.　　　 The DOJ announced a settlement of the action on its website on September 24, 2010.  (A final judgment in the action was entered on March 17, 2011.)  In its September 24, 2010 press release announcing the settlement, the DOJ noted:

> The agreements challenged here restrained competition for affected employees without any procompetitive justification and distorted the competitive process," said Molly S. Boast, Deputy Assistant Attorney General in the Department of Justice's Antitrust Division.

6.　　　The DOJ's press release further stated:

> In the high technology sector, there is a strong demand for employees with advanced or specialized skills, the department said.  One of the principal means by which high tech companies recruit these types of employees is to solicit them directly from other companies in a process referred to as, "cold calling."  This form of competition, when unrestrained, results in better career opportunities, the department said.

> According to the complaint, the companies engaged in a practice of agreeing not to cold call any employee at the other company.  The complaint indicates that the agreements were formed and actively managed by senior executives of these companies.

7.      Despite the DOJ's investigation, Apple did not disclose to its shareholders the details of the DOJ's investigation.  None of Apple's proxy statements, quarterly filings, and annual filings disclosed the DOJ investigation, the settlement reached in September of 2010, or the final judgment signed on March 17, 2011.  The Company's proxy statement filed on January 10, 2014 also failed to disclose the DOJ investigation, settlement, and final judgment.  Similarly, the Company's 8K, 10Q, and 10K filings from October 2010 to August 2014 do not mention the DOJ's investigation, settlement, or final judgment.

8.      Documents in the public domain confirm the existence of illegal non-solicitation agreements between Apple and other companies and demonstrate explicit agreements to enter into illegal agreements.

9.      In February 2005, Jobs demanded that Sergey Brin, Google's co-founder, instruct his employees to stop recruiting from Apple.  According to Brin, Jobs told him, "***If you hire a single one of these people that means war***" (emphasis added) (Figure 1).

**Figure 1**



From:       Sergey Brin <sergey@google.com> on behalf of Sergey Brin
Sent:       Thursday, February 17, 2005 8:20 PM
To:         emg@google.com; joan@google.com; Bill Campbell
Cc:         arnnon@google.com
Subject:    Re: FW: [Fwd: RE: irate call from steve jobs]

So I got another irate call from jobs today.
I don't think we should let that determine our hiring strategy but thought I would let you know.
Basically, he said "if you hire a single one of these people that means war".
I said I could not promise any outcome but I would discuss it with the executive team again.
I asked if he expected us to withdraw offers and he said yes.

In reviewing the data below again, I do think this could be treated as not just an employee referral since he referred essentially a whole team.  So a compromise would be to continue with the offer we have made (to [Redacted]) but not to make offers to any of the others unless they get permission from Apple.

In any case, lets not make any new offers or contact new people at Apple until we have had a chance to discuss.

--Sergey

10.     The next day, Bill Campbell (member of Apple's Board of Directors and Google's then-Senior Advisor and mentor to Schmidt) e-mailed Jobs to confirm that Schmidt "***got directly involved and firmly stopped all efforts to recruit anyone from Apple***" (emphasis added).  Campbell added that Jobs will be "rightfully pissed" to hear that Google had made an offer to an Apple employee (Figure 2).

**Figure 2**

Subject: google
Date: Fri, 18 Feb 2005 18:24:09 -0800
From: "Campbell, Bill" <bill_campbell@intuit.com>
To: "Steve Jobs (sjobs@apple.com)" <sjobs@apple.com>
Message-ID: <BEE0888C52AAFA4A8EE285BFD2FE4C390AE762B1@mtvex02.mv.intuit.com>

Steve

I am heading out of town in the AM (off to Montana) and wanted to give you the latest of what I heard from Google after talking to Eric Schmidt.. Eric told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple. Unfortunately (and you will be rightfully pissed), they had already extended an offer to Dave. When I talked to Eric, he simply felt that he could not rescind the offer, but felt that it was doubtful that Dave would take the offer since Google stopped recruiting the other two members of his team.

I am not leaving until 11:00AM if you want to talk.

Bill

11.     In March 2007, Eric Schmidt, then Google's CEO and member of Apple's Board of Directors, e-mailed Jobs to let him know that Google would terminate "within the hour" a recruiter who had contacted an Apple employee in violation of the "do not call" policy between Apple and Google.  Schmidt apologized, adding: "Should this ever happen again please let me know immediately and we will handle.  Thanks!!  Eric."  Jobs then forwarded this e-mail to Danielle Lambert, Apple's Vice President of Human Resources, adding a smiley face (Figure 3).

///

///

///

///

**Figure 3**

> **Date:** March 9, 2007 10:05:26 AM PST
> **To:** Danielle Lambert <lambert@apple.com>
> **Subject: Fwd: Google recruiters calling into Apple - isolated incident**
>
> :)
> Steve
>
>
> Begin forwarded message:
>
> **From:** Eric Schmidt <eschmidt@google.com>
> **Date:** March 9, 2007 8:21:25 AM PST
> **To:** sjobs@apple.com
> **Subject: Google recruiters calling into Apple - isolated incident**
>
> Steve, as a followup we investigated the recruiter's actions and she violated our policies.  Apologies again on this and I'm including a portion of the email I received from our head of recruiting.  Should this ever happen again please let me know immediately and we will handle.  Thanks !! Eric
>
> *********************
> From Google recruiting to me:
> On this specific case, the sourcer who contacted this Apple employee should not have and will be terminated within the hour.  We are scrubbing the sourcer's records to ensure she did not contact anyone else.
>
> In general, we have a very clear 'do not call' policy (attached) that is given to every staffing professional and I reiterate this message in ongoing communications and staffing meetings.  Unfortunately, every six months or so someone makes an error in judgment, and for this type of violation we terminate their relationship with Google.

12.  An August 2007 e-mail reveals that Jobs was made aware of the illegal nature of the non-solicitation agreements.  In an e-mail from Ed Colligan—former President and CEO of Palm, Inc.—to Jobs, Colligan stated, "***Your proposal that we agree that neither company will hire the other's employees*** … ***is not only wrong***, ***it is likely illegal***" (emphasis added) (Figure 4).  Colligan's e-mail later revealed that Apple had threatened Palm with a patent lawsuit if an Apple employee were to accept a job offer at Palm.

**Figure 4**

> From: Ed Colligan
> Sent: Friday, August 24, 2007 6:30 PM
> To: 'sjobs@apple.com'
> Subject: Your proposal
>
> Steve:
>
> I have thought long and hard about our conversation on Wednesday, and
> I thought it important to let you know my position on the issues we discussed.
> I hope we can resolve our differences, but it has to be on terms that
> are right not only for our respective companies, but for the
> individuals potentially affected.  Your proposal that we agree that
> neither company will hire the other's employees, regardless of the

> individual's desires, is not only wrong, it is likely illegal. I even
> thought about coming back with a proposal about limiting recruitment
> efforts, but frankly, I did not think it was something you would agree to do.

13.     Jobs's conduct is a reminder that even widely-respected businessmen can knowingly commit unlawful acts in the zealous pursuit of profits.  In this case, Jobs and the other Individual Defendants knowingly caused Apple to enter into agreements that violated California law and U.S. antitrust laws.  Jobs "was a walking antitrust violation," said Herbert Hovenkamp, a professor at the University of Iowa College of Law and an expert in antitrust law.  "I'm simply astounded by the risks he seemed willing to take." *See* Paul M. Barrett and Brad Stone, "Apple, Google, and the Hubris of Silicon Valley's Hiring Conspiracy." BLOOMBERG, May 1, 2014.  In the August 8, 2014 order denying preliminary approval of the $324.5 million proposed settlement in *High-Tech Employee Antitrust Litigation*, Judge Koh set forth evidence showing that Jobs "played a central role in enforcing the [anti-solicitation] agreements" after brokering them.  Specifically, Judge Koh identified e-mails from both Jobs and Campbell showing their direct, hands-on involvement in the anti-poaching practices.

14.     While the Individual Defendants caused Apple to violate antitrust laws, they also caused Apple to issue materially false and misleading proxy statements.  Specifically,

the Individual Defendants caused Apple to omit from its 2012, 2013, and 2014 proxy statements information regarding their misconduct in connection with Apple's anti-poaching practices.  Instead, these proxy statements touted the Individual Defendants' "significant and diverse management experience, including strategic and financial planning, public company financial reporting, compliance, risk management and leadership development."  But these proxy statements failed to disclose, among other things, that the Individual Defendants caused Apple to engage in anti-poaching practices, that the DOJ had been investigating Apple's potential violations of antitrust laws, and that the Individual Defendants' conduct may lead to criminal changes and civil liability against and cause substantial damages to Apple.  Based on the false and misleading information in those proxy statements, Apple recommended that the Individual Defendants be re-elected as Apple directors year after year.  As a result of their recommendations, the Individual Defendants were re-elected to Apple's Board.  Had the true information been revealed or disclosed to shareholders in Apple's proxy statements in 2012, 2013, and 2014, such information would have been material due to the substantial likelihood that a reasonable shareholder would consider such information important in deciding how to vote.  As discussed in detail below, the Individual Defendants violated § 14(a) of the Exchange Act.

## JURISDICTION AND VENUE

15.     The Court has subject-matter jurisdiction in this action arising under Article III of the United States Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder.  The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state-law claims.

16.     Venue is proper pursuant to the Exchange Act.  Apple's headquarters are located in Cupertino, California, and the false statements were made in this District.  Defendants' breaches of fiduciary duties, gross mismanagement, and waste of corporate assets occurred in this District.  Each Defendant has sufficient contacts with California as

a Director and/or Officer of Apple to make proper the exercise of personal jurisdiction over them.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Apple maintains its principal executive offices in this District, one or more of the defendants resides in this District, a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts— occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**DIVISIONAL ASSIGNMENT**

18.     In accordance with Local Rule 3-2(c), this action has been properly assigned to the San Jose Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of Santa Clara.

**THE PARTIES**

**I.     Plaintiff**

19.     Plaintiff R. Andre Klein is now and has continuously been a shareholder of Apple, at the time of the transactions that form the basis of this Complaint to the present. Plaintiff first acquired Apple stock on January 15, 2009 and has continuously held such shares from such date to the present.  Plaintiff brings this action derivatively on behalf of Apple.

**II.     Nominal Defendant**

20.     Nominal Defendant Apple Inc. is a California corporation headquartered in Cupertino, California.  The Company's stock is publicly traded on The NASDAQ under ticker symbol "AAPL."  The Company was formerly known as Apple Computer, Inc. but changed its name to "Apple Inc." on January 9, 2007 by amending Article I of its Restated Articles of Incorporation.

### III.    The Individual Defendants
#### A.    Defendant Cook

21.    Defendant Timothy D. Cook ("Cook") has been Apple's CEO since August 2011 and a member of its Board of Directors since 2005.  Before being named CEO, he was Apple's Chief Operating Officer from October 2005 until August 2011; Executive Vice President of Worldwide Sales and Operations from January 2002 to October 2005; and Senior Vice President of Worldwide Operations from February 1998 to January 2002.

22.    Defendant Cook has also been a member of Nike, Inc. ("Nike")'s Board of Directors since 2005.  He served as Chair of the Board's Compensation Committee and a member of the Nominating and Corporate Governance Committee.  In 2009, Apple's "Hands Off (Do Not Call List)" included not only technology companies, but also companies such as Nike.  The list reads, "Nike (Common board members)," which suggests that Cook's concurrent role on both the Boards of Apple and Nike facilitated the illegal non-solicitation agreement between the companies.

23.    Defendant Cook and Jobs had a very close relationship because Cook had executed Jobs's vision for Apple since 1998.  *Steve Jobs*—an authorized biography of Jobs written by Walter Issacson—"paints a picture of Cook as Jobs'[s] ideal counterpart because he was calm, decisive and didn't want to be in the public eye."  Cook joined Apple in 1998 and quickly earned the trust of Jobs, who had recently taken back control of the company he helped create after being ousted 12 years earlier.  When Jobs first returned to Apple in 1997, he oversaw Apple's supply chain, though he handed that facet of the business over to Cook to focus on a broader strategy for the company.  "I trusted him to know exactly what to do," Jobs told Isaacson, indicating that Jobs and Cook shared the same vision, allowing them to work together at a "high strategic level."[2]

---

[2] Mikey Campbell, *Steve Jobs trusted Tim Cook to "know exactly what to do,"* APPLE INSIDER, Oct. 21, 2011, *available at* http://appleinsider.com/articles/11/10/21/jobs_trusted_cook_ to_know_ exactly_what_to_do (last visited Aug. 7, 2014).

### B.   Defendant Campbell

24.     Defendant William ("Bill") V. Campbell ("Campbell") served as Chairman of Apple's Board of Directors from August 1998 until his sudden resignation on July 17, 2014, and was an executive advisor to Jobs during his life.  Campbell was Jobs's neighbor.  He has also been a member of the Board's Audit and Finance Committee since August 1997 and Compensation Committee since August 2001.  Campbell has a long history with, and strong ties to, Apple.  He joined Apple as Vice President of Marketing in July 1983 and added the title of Vice President of Sales in January 1984.  He became Executive Vice President in September 1984, during which his responsibilities expanded to include distribution, service, and support.  He was named Group Executive of the United States in June 1985.  Campbell founded Claris Corporation in 1987, serving as its President and CEO until Apple acquired it in 1990.

25.     Defendant Campbell is also Chairman of Intuit, Inc. ("Intuit"), where he was President and CEO from April 1994 to July 1998, and Interim CEO from September 1999 to January 2000.  In 2009, Apple's "Hands Off (Do Not Call List)" included Intuit.  The list reads, "Intuit (Common board members)," which suggests that Campbell's concurrent role on both the Boards of Apple and Intuit facilitated the illegal non-solicitation agreement between the companies.  In July 2013, Intuit agreed to pay $11 million to settle the claims against it in the *High-Tech Employee* Action.

26.     Defendant Campbell was also Google's Senior Advisor and "consigliere" to Eric Schmidt—Google's current Executive Chairman and former CEO until 2010.[3] Campbell advised Google co-founders Sergey Brin and Larry Page to hire Schmidt as Google's CEO in 2001.  Schmidt stated, "[Campbell's] contribution to Google - it is literally not possible to overstate.  He essentially architected the organizational structure."[4]  Apple and Intuit were both on Google's "Special Agreement Hiring Policy, Protocol for 'Do Not

---

[3] Jennifer Reingold, *The Secret Coach*, CNN MONEY, July 21, 2008, *available at* http://www.kellogg.northwestern.edu/faculty/uzzi/ftp/teaching%20materials/recent%20 articles/Networks/The%20secret%20coach%20Fortune.pdf (last visited Aug. 7, 2014).

[4] *Id.*

Cold Call' and 'Sensitive Companies'" list, effectively March 6, 2005 and April 10, 2006, respectively.  Google was similarly on Apple's "Hands Off (Do Not Call List)" in 2009.  In April 2014, Apple, Google, Intel and Adobe agreed to settle the claims against them in the *High-Tech Employee* Action for what is reported to be $324 million.

27.     Campbell was part of a small group of intertwining high-level executives in Silicon Valley that negotiated the illegal non-solicitation agreements between Apple, Google, Intel, and Intuit, among other companies.  For example: (1) Campbell informed Jobs that "Eric Schmidt told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple"; (2) Campbell suggested that Google agree to enter into an illegal non-solicitation agreement with Intuit, of which Campbell was Chairman of the Board; (3) Campbell e-mailed Google's co-founder Sergey Brin to report, "Steve Jobs called me again and is pissed that we are still recruiting his browser guy"; (4) Schmidt e-mailed Campbell indicating that he directed a for-cause termination of another Google recruiter who had attempted to recruit an executive of eBay, which was on Google's do-not-cold-call list; and (5) Campbell enforced the Google-Intel agreement when he agreed by e-mail with Google's executives that they should call Paul Otellini (CEO of Intel and member of Google's Board of Directors) before making an offer to an Intel employee.

## C.     Defendant Drexler

28.     Defendant Millard ("Mickey") Drexler ("Drexler") was a Member of Apple's Board of Directors from 1999 to 2015 and was on the Board's Compensation Committee. Drexler and Jobs had a close working relationship.  Drexler helped design the layout of the Apple stores seen around the world.  "At the time of Jobs'[s] death in October [2011], the pair had worked together for more than a decade, with each serving on each other's board, sharing advice and insights."

29.     Defendant Drexler has also been the CEO and Chairman of J.Crew's Board of Directors since 2003.  In 2009, Apple's "Hands Off (Do Not Call List)" not only included technology companies but other companies, such as J.Crew.  The list reads, "JCrew (Common board members)," which suggests that Drexler's concurrent role as Chairman on

both the Boards of Apple and J.Crew facilitated the illegal non-solicitation agreement between the companies.

30.      Before J.Crew, Defendant Drexler was the CEO of The Gap, Inc. ("Gap") from 1995 until 2002, and Gap's President from 1987 to 1995.  In 1999, Jobs tapped Drexler to build a retail presence for Apple.  At the time, trying to sell computers in a lust-worthy retail environment was presumed ridiculous, so Jobs tracked down his most important weapon, Drexler, who was considered the smartest executive in retail.  When Drexler joined Apple's Board in 1999, Jobs announced, "We've got a great board and Mickey's going to make it even better."

31.      The working relationship between Defendant Drexler and Jobs expanded when Jobs joined Gap's Board later in 1999 during Drexler's leadership at the company. Drexler and Jobs served on Gap's Board together for three years until 2002.   It was Jobs who informed Drexler that he was about to be fired from Gap in May 2002.  "He was so empathetic with me when I got fired, 'cause he was on the Gap board,'" Drexler recalled. "And ... he said, 'It happened to me.  I feel badly for you'" in reference to the Apple Board's decision to oust him from the Company in 1985.   In 2012, after Jobs'[s] death, Drexler offered an insider's perspective on Jobs'[s] vision, suggesting that the two remained close until the end of Jobs'[s] life.  Speaking at an Innovation Uncensored conference, he stated, "Look at the car industry; it's a tragedy in America.  Who is designing the cars?  [Jobs's] dream before he died was to design an iCar."

**D.      Defendant Levinson**

32.      Defendant Arthur D. Levinson ("Levinson") has been Chairman of Apple's Board of Directors since November 2011, replacing Jobs upon his death; Co-Lead Director of the Board since 2005; and a member of the Board since 2000.  He was a member of the Board's Audit Committee since 2000 and a member of the Board's Compensation Committee from 2001 through 2003 and from 2020 to 2023.  Levinson was a close friend

and colleague of Jobs.[5]  Jobs asked Levinson to join Apple's Board when Levinson was Chairman and CEO of Genentech Inc. ("Genentech"), a biotechnology corporation, and has been one of the Company's most visible leaders for a long time.[6]

33.    Defendant Levinson has also been Chairman of Genentech's Board of Directors since 1999 and was its CEO between 1995 and 1999.  Levinson has therefore concurrently served on the boards of Apple and Genentech for 15 years.  In 2009, Apple's "Hands Off (Do Not Call List)" not only included technology companies but other companies, such as Genentech.  The list reads, "Genentech (CEO sits on our board)," which suggests that Levinson's concurrent role on both the Boards of Apple and Genentech facilitated the illegal non-solicitation agreement between the companies.

34.    Levinson has a long history and close ties with Google.  Levinson is a founding investor and the current CEO of Calico, an independent biotech company and Google venture, established in 2013.  Levinson was also a member of Google's Board of Directors from 2004 to 2009 while he was a Director of Apple and Genentech.  Apple and Genentech were both on Google's "Special Agreement Hiring Policy, Protocol for 'Do Not Cold Call' and 'Sensitive Companies'" list, effectively March 6, 2005, and April 10, 2006, respectively.  Google was similarly on Apple's "Hands Off (Do Not Call List)" in 2009.

35.    Levinson and Eric Schmidt—Google's current Executive Chairman and then-CEO—served on the boards of Apple and Google together from 2006 to 2009.  In 2009, the FTC launched an investigation into whether Levinson's and Schmidt's membership on the two boards violated antitrust laws.  Facing a federal probe, Schmidt resigned from Apple's Board in August 2009, and Levinson resigned from Google's Board in October 2009.  When Levinson resigned from Google's Board, Schmidt stated, "Art [Levinson] has been a

---

[5] Kurt Wagner, *Art Levinson, Apple's Chairman, Talks Life After Steve Jobs*, CNN MONEY, Feb. 20, 2013, *available at* http://tech.fortune.cnn.com/2013/02/20/apples-chairman-talks-life-after-steve/ (last visited Aug. 7, 2014).

[6] Ben Parr, *Meet Art Levinson, Apple's New Chairman*, MASHABLE, Nov. 14, 2011, *available at* http://mashable.com/2011/11/15/arthur-levinson-apple/ (last visited Aug. 7, 2014).

key part of Google's success these past five years, offering unvarnished advice and vital counsel on every big issue and opportunity Google has faced."

36.     Lucy P. Marcus, CEO of Marcus Venture Consulting and an expert on corporate governance and board ethics, said of Levinson's dual role as Apple Director and Calico's CEO: "There is something about this that feels uncomfortable . . . If there is a conflict of interest, Levinson would have to step out of Apple's boardroom during those discussions."[7]   Marcus' comment echoes concerns surrounding illegal non-solicitation agreements made possible by board intermixing.

### E.     Defendant Iger

37.     Defendant Robert A. Iger ("Iger") was a member of Apple's Board of Directors from 2011 to 2019.  He has also been the Chairman and CEO of The Walt Disney Company ("Disney") since 2012 and its President and CEO since 2005.  He was its Chief Operating Officer from 2000 to 2005.  Disney acquired Pixar in 2006.  Pixar was established in 1979 as part of the computer division of Lucasfilm before it spun out as a corporation in 1986 with funding by Jobs, who became its majority shareholder.

38.     Iger and Jobs developed a friendship over the years that deepened when Disney acquired Pixar.  In March 2005, when Iger found out he would become the next CEO of Disney but before it was made public, he called his family and then Jobs.  Iger said, "I didn't know him very well at the time.  But there was something that struck me that it would be important to tell him before the world knew."[8]   Iger worked closely with Jobs, first securing the rights for distribution of Disney/ABC Television Group programming in Apple iTunes and later spearheading Disney's $7.4 billion acquisition of Pixar when Jobs was its CEO.  The acquisition solidified Iger's and Jobs's friendship and turned Jobs into

---

[7] Sam Gustin, *Google's Calico Could Pose a Conflict for Apple Chairman Arthur Levinson*, TIME, Sept. 18, 2013, *available at* business.time.com/2013/09/18/googles-calico-could-pose-a-conflict-for-apple-chairman-arthur-levinson/ (last visited Aug. 7, 2014).

[8] Brook Barnes, *Iger on Steve Jobs: "He Pushed You,"* THE NEW YORK TIMES, Oct. 6, 2011, available at http://mediadecoder.blogs.nytimes.com/2011/10/06/iger-on-steve-jobs-he-pushed-you/?_php=true&_type=blogs&_r=0 (last visited Aug. 7, 2014).

Disney's largest shareholder with a 7.4 percent stake and seat on its Board of Directors.[9] During Jobs's lifetime, Iger would call Jobs on Saturdays to see if a Disney movie Jobs saw the night before had "sucked"—a phrase Jobs was not afraid to use.  When Jobs died, Iger released this statement: "Jobs was a great friend as well as a trusted advisor . . . Disney has lost a member of our family, and I have lost a great friend."

39.     Defendants Cook, Campbell, Drexler, Levinson, Iger, Jung, Anderson, and Jobs are collectively referred to as the "Individual Defendants."  The Individual Defendants and Apple are sometimes collectively referred to as "Defendants."

### F.     Defendant Jung

40.     Defendant Andrea Jung ("Jung") is a Director of Apple and has been a director since January 2008.  Jung was Apple's co-lead director from 2009 to 2011.  Jung knowingly or recklessly approved Apple's anti-competitive "no poaching" policies, despite knowledge that such agreements were unlawful and would subject Apple to significant harm.  Jung has been a member of the Board's Compensation Committee since the end of 2009 and has been the Compensation Committee Chair since 2011.

### G.     Defendant Anderson

41.     Defendant Fred D. Anderson ("Anderson") was an Apple Director from June 2004 to October 2006, and served as Apple's Executive Vice President and Chief Financial Officer from April 1996 to June 2004.  Anderson knowingly or recklessly approved Apple's anti-competitive "no poaching" policies, despite knowledge that such agreements were unlawful and would subject Apple to significant harm.

### H.     Defendant Jobs

42.     Defendant the Estate of Steven P. Jobs, deceased ("Jobs") is Steve Jobs's estate.  Jobs was a co-founder of Apple and served as an executive officer and director of Apple for most of the Company's existence, up until his death on October 5, 2011.  While

---

[9] Kim Herrera, *Apple Leadership Post-Steve Jobs: What Art Levinson & Bob Iger's Bring to the Board*, ARRIVE PREPARED, Nov. 16, 2011, *available at* http://blog.highbeambusiness.com /2011 /11/apple-leadership-post-steve-jobs-what-art-levinson-bob-iger%E2%80%99s-bring-to-the-board/ (Aug. 7, 2014).

serving as Chief Executive Officer and a director of Apple, Jobs personally spear-headed the unlawful anti-poaching agreements described herein, despite knowingly or recklessly disregarding the fact that the agreements were unlawful and would expose Apple to significant liability and damages.  The claims asserted herein against Jobs's estate are brought only against the insurance companies that maintained the applicable directors' and officers' liability policies that covered Jobs during the applicable time he served as an executive officer and director of Apple.  Plaintiff seeks only a recovery up to the applicable limits of such policies, and does not seek any amounts from the Estate of Steven P. Jobs. In accordance with applicable California law, the summons and complaint in this case were served on such insurance companies.

**IV.    Doe Defendants**

43.    Except as described herein, Plaintiff lacks sufficient knowledge of the true names of Defendants sued as Does 1 through 30, inclusive, and, therefore, Plaintiff sues these Defendants by such fictitious names.  Following further investigation and discovery, Plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained.  These fictitiously named Defendants are Apple's officers, other members of management, employees and/or consultants or third parties who were involved in the wrongdoing detailed herein.  These Defendants aided and abetted, and participated with and/or conspired with the named Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

**V.    Unnamed Participants**

44.    Numerous individuals and entities participated actively during the course of and in furtherance of the wrongdoing described herein.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals, to advance the objectives of the scheme and to provide the scheme to benefit Defendants and themselves to the detriment of Apple.

## VI.   Aiding and Abetting

45.     At all relevant times, Defendants were agents of the remaining Defendants, and in doing the acts alleged herein, were acting within the course of scope of such agency. Defendants ratified and/or authorized the wrongful acts of each of the other Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

46.     At all relevant times, Defendants pursued a conspiracy, common enterprise, and common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy, common enterprise, and common course of conduct complained of was, *inter alia*, to benefit the defendants personally to the detriment of Apple, by engaging in illegal, fraudulent, and wrongful activities.  Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of therein, and was aware of his/her overall contribution to, and furtherance of, the conspiracy, common enterprise and common course of conduct.  Defendants' acts of conspiracy include, *inter alia*, all of the acts that Defendants are alleged to have committed in furtherance of the wrongful conduct complained of herein.

### STATEMENT OF FACTS

## I.   The Individual Defendants' Conduct Stifled the Market for Labor in Silicon Valley, thus Impairing Innovation

47.     In the high technology sector, there is a strong demand for employees with advanced or specialized skills.   One of the principal means by which high tech companies like Apple recruit these types of employees is to solicit them directly from other companies in a process referred to as, "cold calling."  This form of competition, when unrestrained, results in better career opportunities.

48.     During the relevant time period, Apple engaged in a practice of agreeing not to cold call any employee at the other companies.  The agreements were formed and actively managed by senior executives of Apple and the other companies.

49.     Apple and the other companies' actions reduced their ability to compete for high tech workers and interfered with the proper functioning of the price-setting mechanism that otherwise would have prevailed in competition for employees.   None of the agreements was limited by geography, job function, product group or time period.  Thus, they were broader than reasonably necessary for any collaboration between the companies, the department said.

## II.     In Order to Benefit Themselves, the Individual Defendants Agreed with Their Counterparts from Competing Companies to Refrain from Recruiting from Each Other

50.     Jobs did not like the active movement of employees because he did not want to lose good employees and have to pay new employees more money.  As a result, some of the biggest names in Silicon Valley, including Defendants sued herein, entered into agreements where they agreed not to compete in the market for highly skilled employees by halting the practice of recruiting each other's employees.  These agreements were *per se* illegal under the antitrust laws.  Jobs directly called the top executives at other companies if he had evidence or suspicions that their companies were poaching employees from Apple.  Jobs controlled, or had an Apple Director sit on, the board of each company that was actively involved or participated in the conspiracy.

51.     By at least early 2004 until at least 2010, Apple, through its highest-ranking executives, entered into agreements with its competitors not to directly solicit each other's employees.  These agreements were concealed from the public, including the companies' shareholders, and the public pronouncements from Defendants were that they aggressively pursued talent.  The agreements not to recruit from other firms were enforced by the highest-level employees and Board members at Apple.

52.     Apple's illegal non-solicitation agreements with other companies were not limited by geography, job function, product group, or time period.  For example, an e-mail from one Apple personnel to another suggests that illegal non-solicitation agreements covered all positions, including Sous Chef, which is not considered a high-skilled job traditionally.  The e-mail states Apple personnel discussed the "sensitivity" of this issue

and decided, "We are not recruiting these folks, they are actively seeking us out."

Additionally, the e-mail confirms the existence of an illegal non-solicitation agreement

between Google and Apple by revealing, "I have heard some rumblings in the last couple of

months that Google may not necessarily be honoring their part of the hands-off policy . . ."

(Figure 5).

**Figure 5**

Subject: Fwd: Sous Chef application
Date: Tue, 03 Jun 2008 08:21:39 -0700
From: Mark Bentley <mbentley@apple.com>
To: Danielle Lambert <lambert@apple.com>
Message-ID: <C85278AC-622D-4543-AD67-56F386FB2D3E@apple.com>

Heads up that we are getting a few folks from Google submitting their resumes to our website ( for the Dickman openings ).    I spoke to Julie Gaither about the sensitivity around this a few weeks ago, and she gets it loud & clear ( as does John evidently ).    We are not recruiting these folks, they are actively seeking us out.

Please let me know if you want recruiting to be handling this differently?   Also, just as a side note, I have heard some rumblings the last couple of months that Google may not necessarily be honoring their part of the hands-off policy, although I don't have any hard evidence.    I know we have lost a couple of people recently from HW to them, but I believe both were fairly unhappy folks, so it's hard to say how things actually got initiated.

Mark

### A.   The Conspiracy Began with Express Illegal Agreements Between Pixar and Lucasfilm

53.    The illegal non-solicitation agreements did not begin with Apple.  In fact,

they began with an agreement between senior executives of Pixar and Lucasfilm.  Apple's

co-founder and former CEO Jobs, however, has a long history with Pixar.  Jobs purchased

Lucasfilm's computer graphics division, established it as an independent company, and

called it Pixar in 1986.  Jobs was also Pixar's CEO until 2006.

54.    Beginning no later than January 2005, while Jobs was Pixar's CEO, senior

executives at Pixar and Lucasfilm entered into various illegal non-compete agreements.

For example, they agreed not to cold call each other's employees; notify each other when

making an offer to an employee of the other company, if that employee applied on his or her own; and if either company made an offer to such an employee of the other company, neither company would counteroffer above the initial offer.  The latter agreement had the intent and effect of eliminating "bidding wars," in which an employee could use multiple rounds of bidding between Pixar and Lucasfilm to increase his or her total compensation.

55.     In July 2005, Sharon Coker—Lucasfilm's Director of Human Services—e-mailed Lori McAdams—Pixar's then-Vice President of Human Resources and Administration, asking for confirmation that Pixar made an offer to one of Lucasfilm's systems engineers.  Coker also sought confirmation of McAdam's understanding that Pixar could not make a counteroffer once it made an offer (Figure 6).

**Figure 6**

| | |
|---|---|
| From: | Sharon Coker <Sharon.Coker@lucasfilm.com> |
| Sent: | Thursday, July 28, 2005 2:33 PM |
| To: | Lori McAdams |
| Subject: | Need confirmation |

Cliff believes that one of our systems engineers, Robert Molholm, has been extended an offer by Pixar.  Can you confirm?  And can I also confirm your understanding that once you have extended an offer, you will not counter?  Thanks!

Sharon Coker

Director, Human Resources

Lucasfilm Entertainment Co. Ltd.

415-662-7785

56.     An e-mail from one Lucasfilm personnel to another several years later in April 2007 confirms that the agreement between Pixar and Lucasfilm was in effect for years: "***We have a standing agreement with Pixar, which I believe to be an informal 'gentleman's agreement' forged a few years ago*** . . . to call each other, HR to HR, whenever we extend an offer to someone who works for the other company . . .

***We have agreed that we want to avoid bidding wars.*** Pixar will give our

employee their final best offer before calling us" (emphasis added) (Figure 7).

**Figure 7**



From:       Sharon Coker
Sent:       Tuesday, April 17, 2007 2:55 PM
To:         Jan van der Voort
Subject:    Pixar agreement

We have a standing agreement with Pixar, which I believe to be an informal "gentleman's agreement" forged a few years ago (Mich knows the history of it), to call each other, HR to HR, whenever we extend an offer to someone who works for the other company. At the point that I receive that call, in the instance where Pixar is job offering a Lucas employee, I notify the Exec, HRM and manager of our employee that an offer has been made. We are free to approach the employee (or not) and have a "save" conversation with them if we want to retain them. Pixar will not give us details on the comp or job role they have offered, but if the employee shares it and we want to counter, we can do so, and Pixar will not give the employee a different or additional offer. We have agreed that we want to avoid bidding wars. So Pixar will give our employee their final best offer before calling us.
Other:
-Lori MacAdams is the VP of HR at Pixar. She is my contact and her telephone number is 510-922-3564. Her e-mail address is lmacadams@pixar.com. Lori is a former head of HR at Lucas...about 7 or 8 years ago, and still has many friends here, including Steve C and Lori Aultman
-The other value in this call is that we will sometimes lose the employee to Pixar, but can negotiate release date if we need to. There is sometimes flexibility on this issue, and sometimes not.
-We do not have this arrangement with any other studio
-Recruiting here should be made familiar with this agreement, so that if we offer a Pixar employee, we follow the protocol. (This was one of those things that probably fell through the crack when we split HR and Recruiting here...at one time the recruiters knew this, but we have made so many changes...not sure it ever even came up between BZ and me). We should also inform the candidate that we will be making that call, so that they can talk to their manager at Pixar first if they want to.
-Part of the agreement is not to solicit each other's employees. These guidelines are intended for the situation where a Pixar employee has responded on their own to one of our job postings directly (or visa versa). Our employees are hands off to each other in terms of soliciting talent.

Jan, let me know if you want to get the calls from Lori (and visa versa) or if you want BZ to assume that role, and then I will make an e-mail introduction and handoff.

57.     Later that year, in December 2007, McAdams e-mailed Jan van der Voort of

Lucasfilm clarifying the illegal non-solicitation agreement between Pixar and Lucasfilm:

"it's ok for us to interview and make offers to each other's employees, we just don't ever

directly solicit talent . . . we just have a courtesy call when the offer is made, and then we

don't counter each other" (Figure 8).  McAdams also attached Pixar's hiring policy with

respect to Lucasfilm candidates, which refers to the two companies' "gentleman's

agreement" (Figure 9).

///

///

///

///

///

///

**Figure 8**

| From: | Lori McAdams <lmcadams@pixar.com> |
|---|---|
| Sent: | Tuesday, December 11, 2007 9:50 PM |
| To: | jan.vandervoort@lucasfilm.com |
| Subject: | ▇▇▇▇▇▇▇ |
| Attach: | Lucasfilm candidates.doc;ATT00686.htm |

Hi Jan,

I hope this message finds you well. Funny that we went for so long without finding a reason to connect, and here it turns out I have a second item for you. At least this time I think it'll sound like good news to you.

We have a current intern, ▇▇▇▇ who is interested in being considered for a position with Lucasfilm. ▇▇ let his managers know that he'd need an okay from us to be hired at LFL. I wanted to let you know that of course it's fine with us for you to consider ▇▇. His specific situation is that he'll be finished with his work on our 2008 film in April, and unfortunately we don't have a regular fulltime position to offer him. With our full support, we hope he'll explore other studios and find a spot that's right. If you could please let your Associate Recruiter Rosie Server know we're okay with your considering him, that'd be great (I assume that's a real person and not an applicant bot! :-) )

What I wanted to highlight in general is that it's okay for us to interview and make offers to each other's employees, we just don't ever directly solicit talent. So if someone applies to LFL on their own from Pixar, by all means you should consider them. We just have a courtesy call when the offer is made, and then we don't counter each other. The same is true in reverse. In case it's helpful, attached is a document I wrote up awhile back to help our team here know how it works. Feel free to read it and know that we know that LFL reciprocates.

If you have any questions, please give me a call. I hope we can meet in person in the new year. Thanks much,

--Lori

///

///

///

///

///

///

///

///

///

///

///

**Figure 9**

**Lucasfilm candidate process**

Our gentleman's agreement with the Lucas companies has been as follows:

- When we receive a resume and/or reel from a current Lucasfilm employee, our Recruiting team reviews it and if we feel they are qualified for an open position, we contact the candidate, usually by phone.  (Many of our Lucas candidates come through Pixar employee referrals since it's a small world here in Northern California.)  HR/Recruiting never solicits Lucas employees ourselves.

- In that initial phone conversation, we let the candidate know that we will consider them, but if it should turn out that we want to make them an offer, they will need to notify their manager at Lucasfilm, and we will follow up with a phone call to Lucasfilm HR (or in some cases particular senior managers) to let them know we have made an offer to the candidate.  We let the candidates know this up front because if they are apprehensive about this process, we don't want to waste their time or ours in interviewing them.

- If the candidate wishes to be considered, we then put them through our regular interview process and make a decision on whether or not we want to extend an offer.

- When an offer is made, we ask the Lucasfilm employee to notify their manager and then we follow up with a call to Lucasfilm HR (usually the HR Director) and/or in many cases, Colum Slevin, Dir. of CG at ILM (since most the candidates are from ILM), or Gail Currey at Lucasfilm Animation.

- Once we have had the conversation with LFL, we never counter if the candidate comes back to us with a better offer from Lucasfilm.

- Lucasfilm honors this process & agreement in return (the calls from LFL come to Lori)

58.     Pixar and Lucasfilm entered into illegal non-solicitation agreements through direct and explicit communications among senior executives.  Pixar even drafted the written terms of the agreements and sent those terms to Lucasfilm.  Pixar and Lucasfilm provided these written terms to management and certain senior employees with the relevant hiring or recruiting responsibilities.

59.     After entering into the agreements, senior executives of both Pixar and Lucasfilm monitored compliance and policed violations.  For example, in 2007, Pixar twice contacted Lucasfilm regarding suspected violations of their agreement.  Lucasfilm

responded by changing its conduct to confirm to its illegal non-solicitation agreements with Pixar.  During the conspiracy, Jobs' position as both Apple's CEO and Pixar's CEO paved the road for the conspiracy between Pixar and Lucasfilm to spread to Apple and approximately other companies.

**B.    Apple Enters Into an Express Illegal Agreement with Pixar**

60.    Steve Jobs was a major player in entering into and monitoring the illegal agreement.  Jobs had a long history with Pixar.  Jobs had purchased Pixar—Lucasfilm's computer graphics division—and established it as an independent company called Pixar in 1986.  He became and remained Pixar's CEO until 2006.  While Jobs was Pixar's CEO, he and other senior executives at Pixar entered into at least three non-solicitation agreements with Lucasfilm's senior executives.  Beginning no later than February 2004, Apple entered into an illegal non-recruit agreement with Pixar.  Senior executives of both companies agreed not to cold call each other's companies.  Jobs continued to exert substantial control over Pixar when it entered into the agreement with Apple.  When Jobs died, John Lasseter and Ed Catmull of Pixar issued a joint statement, saying, Jobs "was an extraordinary visionary, our very dear friend and the guiding light of the Pixar family . . . He will forever be part of the Pixar's DNA."

61.    An e-mail from Rob Cook—Pixar's then-Vice President of Software Engineering—to Jobs in February 2004 first sheds documentary evidence on their agreement not to recruit each other's employees.  Cook's e-mail informed Jobs that "[a]n Apple employee has applied for the job of project coordinator . . . Since she's a support person instead of an engineer, I'm hoping this won't be a problem.  Would it be OK for us to make her an offer?"  Jobs consented.  (Figure 10).

///
///
///
///
///

**Figure 10**

>> From: Steve Jobs <sjobs@apple.com>
>> Date: February 8, 2004 3:32:21 PM PST
>> To: Rob Cook <rob@pixar.com>
>> Subject: Re: Renee Adam
>>
>> Yea, its fine.
>>
>> Steve
>>
>>
>>
>> On Feb 8, 2004, at 3:30 PM, Rob Cook wrote:
>>
>> Steve,
>>
>> An Apple employee has applied for the job of project coordinator,
>> which is basically an administrative assistant to our project
>> managers. Since she's a support person instead of an engineer, I'm
>> hoping this won't be a problem.
>>

██████████████████████████████████████

>>
>> Would it be OK for us to make her an offer?
>>
>> Rob

62.     Rob expressed excitement over Jobs's authorization and hinted that Pixar was facing difficulties with, and not looking forward to, the idea of recruiting another project manager in light of the illegal non-solicitation agreement:  "Hooray!  I know this doesn't sound like a big deal, but sometimes it can be surprisingly hard to find great support people, and we weren't cherishing the thought of having to keep looking."  A subsequent e-mail from "EC" in the same e-mail thread between Jobs—probably from an Apple employee—stressed, "The key is to stay away from the engineers" (Figure 11).

///
///
///
///
///
///

**Figure 11**

| From: | EC |
|---|---|
| Sent: | Sunday, February 8, 2004 6:46 PM |
| To: | Rob Cook <rob@pixar.com> |
| Subject: | █████████████ |

The key is to stay away from the engineers.

On Feb 8, 2004, at 3:41 PM, Rob Cook wrote:

> Hooray!
>
> I know this doesn't sound like a big deal, but sometimes it can be
> surprisingly hard to find great support people, and we weren't
> cherishing the thought of having to keep looking.
>
> Rob
>
>
> Begin forwarded message:
>
>> From: Steve Jobs <sjobs@apple.com>
>> Date: February 8, 2004 3:32:21 PM PST
>> To: Rob Cook <rob@pixar.com>
>> Subject: Re: Renee Adam
>>
>> Yea, its fine.
>>
>> Steve
>>

63.     The following year, Howard Look—Pixar's then-Vice-President of Software—e-mailed Apple personnel in November 2005, confirming that the illegal non-solicitation agreement between Apple and Pixar was still in effect and suggesting that Pixar was facing continued difficulties with recruiting due to the agreement.  Look informed Apple that Pixar was "**having a hard time finding world class s/w dev candidates** with Objective-C/Cocoa experience, and **we of course cannot recruit out of Apple**.  Do you have any leads on candidates?" (emphasis added) (Figure 12).

**Figure 12**

| From: | Howard Look <howard@pixar.com> |
|---|---|
| Sent: | Wednesday, November 9, 2005 11:39 AM |
| To: | William Stein <wstein@apple.com>; Scott Forstall <forstall@apple.com>; Brett Halle <brett@apple.com> |
| Bcc: | Howard Look <howard@pixar.com> |
| Subject: | Rock star Objective-C/Cocoa people? |

Hi Will, Scott and Brett,

We having a hard time finding world-class s/w dev candidates with Objective-C/Cocoa experience, and we of course cannot recruit out of Apple.

Do you have any leads on candidates?

Any leads on great contractors that might want to do some quick & dirty UI prototypes for us, maybe a 6 month stint?

Thanks,
Howard

64.     The illegal non-solicitation agreement between Apple and Pixar was still going strong in April 2007.  An e-mail between from Lori McAdams—Pixar's then-Vice President of Human Resources and Administration—to others at Pixar with the subject "Apple gentleman's agreement" stated, "I just got off the phone with Danielle Lambert [Apple's Vice President of Human Resources], and we agreed that effective now, **we'll follow a gentleman's agreement with Apple that is similar to our Lucasfilm agreement** ….  Danielle will ask her Recruiting team to follow the same procedure."  This e-mail confirms the mutuality of the Apple-Pixar express illegal agreement and the existence of Pixar-Lucasfilm express illegal agreement.  The e-mail also explains the agreement between Apple and Pixar in detail, as shown by the substance of the emails (Figure 13).

**Figure 13**

| From: | Lori McAdams <lmcadams@pixar.com> |
|---|---|
| Sent: | Monday, April 30, 2007 1:44 PM |
| To: | recruitingdivas <recruitingdivas@pixar.com> |
| Cc: | Erica Perkins-Youman <ericapy@pixar.com>; Jannine Hemphill <jhemphill@pixar.com>; Stephanie Sheehy <ssheehy@pixar.com> |
| Subject: | Apple gentleman's agreement |

Hi all,

I just got off the phone with Danielle Lambert, and we agreed that effective now, we'll follow a gentleman's agreement with Apple that is similar to our Lucasfilm agreement.

That is:

* we won't directly solicit any Apple employee (including outside recruiters if we use them)
* if a current Apple employee submits a resume, we will consider them like any other candidate
* any candidate we bring in for interviews should be told of our gentleman's agreement early on in the process
* at the point we make an offer, I'll call Danielle and let her know who was made an offer and where he/she works
* we should keep a good paper/digital trail to demonstrate the person approached us in case we need it

Danielle will ask her Recruiting team to follow the same procedure, but given their scale, this isn't likely to apply to the retail organizations.

I will talk with Ed about this at my next 1-1 to confirm he's comfortable with it, but feel free to work this way unless/until you hear differently.

Thanks!

--Lori

65.     In July 2009, Pixar appeared on Apple's "Hands Off (Do Not Call List)," attached to an e-mail between Apple personnel, which demonstrates that the illegal non-solicitation agreement between Apple and Pixar had been going on for at least five years (Figure 14).  The competition for talent in Silicon Valley between Apple and Pixar was effectively squelched for at least half a decade.

**Figure 14**

From:    David Alvarez <david.alvarez@apple.com>
To:      Jonathan Geyer <jgeyer@apple.com>
Subject: List
Received(Date):    Thu, 9 Jul 2009 17:25:08 -0700
Handsofflist.doc

Hands Off (Do Not Call List) :

Microsoft – Mountain View (exchange group and Mac group)
Garmin
Palm
Adobe (Software partner)
Aspyr
AMD/ATI
Best Buy
CDW
Cingular
Comp USA (product re-seller)
Foxconn
Genentech (CEO sits on our board)
Google
Ingram Micro
Intel
Intuit (Common board members)
JCrew (Common board members)
Mac Zone
Nike (Common board members)
Nvidia
PC Connection
PC Mall
Pixar
Lucas
Quanta
Tech Data
Zones

### C.    Apple Enters Into an Express Illegal Agreement with Google

66.    Google and Apple agreed in early 2005 not to recruit each other's employees. At the time, Defendant Campbell was a member of Apple's Board of Directors and Google's Senior Advisor (not to mention Chairman of Intuit's Board of Directors).

67.    The earliest public documentation of the illegal non-solicitation agreement between Apple and Google are e-mails from Sergey Brin—Google's co-founder—to Google's Executive Management Group and Joan Braddi—Google's VP of Search Services—

describing threats that Jobs had made against Google upon suspicion that Google was recruiting Apple employees working on the Safari browser.

68.     In Brin's February 13, 2005 e-mail with the subject "**irate call from steve jobs**" to the Executive Management Group and Braddi, Brin reported that he "got a call from steve jobs today who was very agitated . . . it was about us recruiting from the safari team.  he was sure we were building a browser and were trying to get the safari team" (emphasis added).  Brin revealed that **Jobs "made various veiled threats,"** and Brin soothed him by telling him "we were not building a browser and that to my knowledge we were not systematically going after the safari team in particular" (emphasis added).  Brin's e-mail served to confirm "what we want to do about partners/friendly companies and recruiting . . . [Jobs] told me he was cool with us hiring anyone who came to us but was angry about systematic solicitation.  i don't know if there is some systematic safari recruiting effort htat [sic] we have" (Figure 15).  Brin's e-mail suggests that Jobs initiated Apple's illegal non-solicitation agreement with Google in early 2005.  (Figure 16).

**Figure 15**



From: Sergey Brin [mailto:sergey@google.com]
Sent: Sunday, February 13, 2005 1:06 AM
To: Emg@Google. Com; Joan Braddi
Subject: irate call from steve jobs

so i got a call from steve jobs today who was very agitated.
it was about us recruiting from the safari team.
he was sure we were building a browser and were trying to get the safari team.
he made various veiled threats too though i am not inclined to hold them against him too much
as he seemed beside himself (as eric would say).

anyhow, i told him we were not building a browser and that to my knowledge we were not systematically
going after the safari team in particular.  and that we should talk about various opportunities.
i also said i would follow up and check on our recruiting strategies wrt apple and safari.  he seemed soothed.

so i just wanted to check what our status was in various respects and what we want to do about partners/friendly
companies and recruiting.  on the browser, i know and told him that we have mozilla people working here ...
largely on firefox.  i did not mention we may release an enhanced version but i am not sure we are going to yet.
on recruiting i have heard recently of one candidate out of apple that had browser expertise so i guess he would
be on safari.  i mentioned this to steve and he told me he was cool with us hiring anyone who came to us but was
angry about systematic solicitation.  i don't know if there is some systematic safari recruiting effort htat we have.

so please update me on what you know here and on what you think we should have as policy.
on another note,                                                    Redacted - Not Responsive

69.     Later that month, on February 13, 2005, Jobs again called Brin with a threat, as a result, Brin agreed to stop recruiting from Apple.  In another e-mail from Brin to the Executive Management Group and Braddi, Brin memorializes that he "got another irate call from jobs today," threatening **"if you hire a single one of these [Apple] people that means war"** (emphasis added).  Additionally, Brin asked Jobs if he "expected [Google] to withdraw offers and he said yes."  Brin's e-mail reveals that he told Jobs that he will "discuss it with the executive team again."  Brin instructed the Executive Management Group and Braddi not to "make any new offers or contact new people at Apple until we had a chance to discuss."

**Figure 16**



From:      Sergey Brin <sergey@google.com> on behalf of Sergey Brin
Sent:      Thursday, February 17, 2005 8:20 PM
To:        emg@google.com; joan@google.com; Bill Campbell
Cc:        arnnon@google.com
Subject:   Re: FW: [Fwd: RE: irate call from steve jobs]

So I got another irate call from jobs today.
I don't think we should let that determine our hiring strategy but thought I would let you know.
Basically, he said "if you hire a single one of these people that means war".
I said I could not promise any outcome but I would discuss it with the executive team again.
I asked if he expected us to withdraw offers and he said yes.

In reviewing the data below again, I do think this could be treated as not just an employee referral since he referred essentially a whole team.  So a compromise would be to continue with the offer we have made (to [Redacted]?) but not to make offers to any of the others unless they get permission from Apple.

In any case, lets not make any new offers or contact new people at Apple until we have had a chance to discuss.

--Sergey

70.     To ensure compliance with the agreement, Google placed Apple on its internal "Do Not Call" list, which instructed Google employees not to cold call Apple employees.  Apple also informed its relevant personnel about its agreement with Google and instructed them not to cold call Google employees.  Senior executives of Google and Apple monitored compliance with the agreement and policed violations.

71.     On February 18, 2005, Defendant Campbell (member of Apple's Board of Directors, Google's Senior Advisor and mentor to its then-CEO, Eric Schmidt, and

Chairman of Intuit's Board of Directors) e-mailed Jobs from his Intuit e-mail account to provide an update on Apple's illegal hiring agreement with Google.  Defendant Campbell's e-mail stated that **Schmidt** "**told [Campbell] that he got directly involved and firmly stopped all efforts [at Google] to recruit anyone from Apple**" (Figure 17).

**Figure 17**

Subject: google
Date: Fri, 18 Feb 2005 18:24:09 -0800
From: "Campbell, Bill" <bill_campbell@intuit.com>
To: "Steve Jobs (sjobs@apple.com)" <sjobs@apple.com>
Message-ID: <BEE0888C52AAFA4A8EE285BFD2FE4C390AE762B1@mtvex02.mv.intuit.com>

Steve

I am heading out of town in the AM (off to Montana) and wanted to give you the latest of what I heard from Google after talking to Eric Schmidt.. Eric told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple. Unfortunately (and you will be rightfully pissed), they had already extended an offer to Dave. When I talked to Eric, he simply felt that he could not rescind the offer, but felt that it was doubtful that Dave would take the offer since Google stopped recruiting the other two members of his team.

I am not leaving until 11:00AM if you want to talk.

Bill

72.    The next day, Danielle Lambert—Apple's Vice President of Human Resources—circulated an internal memorandum to all of Apple's recruiters in the U.S., reflecting that Apple and Google agreed not to recruit each other's employees.  Lambert instructed, "Please add Google to your 'hands-off' list," and requested recruiters to apprise her of any violations by Google (Figure 18).

**Figure 18**

Subject:  Google
From:      "Danielle Lambert" <lambert@apple.com>
Received(Date):    Sat, 26 Feb 2005 05:28:46 +0000
To:         <usrecruitingall@group.apple.com>

All,

Please add Google to your "hands-off" list. We recently agreed not to recruit from one another so if you hear of any recruiting they are doing against us, please be sure to let me know.

Please also be sure to honor our side of the deal.

Thanks,
Danielle

---

73.     By at least early March 2005, Google's illegal non-solicitation agreement with Apple became "effective."  A Google internal memorandum lists Apple as a company having a special agreement with Google and is part of the "Do Not Call" list, effective March 6, 2005; Google's protocol was "[n]ot to directly cold call into" companies on this list (Figure 8). Google's first illegal non-solicitation agreements came on the heels of Jobs's threat to Brin to stop all recruiting at Apple (Figure 19).

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

**Figure 19**



74. Jobs continued to monitor the agreements and contacted Google's CEO about violations. The following year, in a February 13, 2006 e-mail from Jobs to Schmidt—Google's then-CEO—Jobs complained, "I am told that Googles [sic] new cell

phone software group is relentlessly recruiting in our iPod group.  If this is indeed true, can you put a stop to it?"  On the same day, Schmidt replied, "**I'm sorry to hear this**; **we have a policy of no recruiting of Apple employees**.  **I will investigate immediately**!" (emphasis added) (Figure 20).  Later that year, on August 28, 2006, Schmidt was elected to Apple's Board of Directors, where he served until August 2009 when Schmidt resigned due to conflicts of interest amid the growing competition between Apple and Google.

**Figure 20**

Subject: RE: Recruiting
Date: Mon, 13 Feb 2006 15:17:11 -0800
From: "Eric Schmidt" <eschmidt@google.com>
To: "Steve Jobs" <sjobs@apple.com>
Message-ID: <200602132317.k1DNHCf1029022@stewie.corp.google.com>

---

I'm sorry to hear this; we have a policy of no recruiting of Apple
employees. I will investigate immediately ! Eric

-----Original Message-----
From: Steve Jobs [mailto:sjobs@apple.com]
Sent: Monday, February 13, 2006 3:15 PM
To: Eric Schmidt
Subject: Recruiting

Eric,

I am told that Googles new cell phone software group is relentlessly
recruiting in our iPod group. If this is indeed true, can you put a stop to
it?

Thanks,
Steve

75.    The next year, in a March 7, 2007 e-mail from Jobs to Schmidt, Jobs again protested Google's suspected violations of its illegal non-solicitation agreement with Apple: "Eric [Schmidt], I would be very pleased if your recruiting department would stop doing this" (Figure 21) in reference to an e-mail from a recruiter for the Google.com Engineering team (Figure 22).

**Figure 21**

```
Begin forwarded message:
From: ██████████████████
Date: March 7, 2007 9:46:13 AM PST
To: ███████████████
Subject: Google.com Engineering Recruitment Team


Hello ████

My name is ████████████ and I am a Recruiter for the "Google.com
Engineering" team formerly known as the "Site Reliability Engineering"
team. I found your contact information on the Internet. I am
interested to know more about your past work experience and openness
to new opportunities. We currently have positions available at Google
that may be a good match for you. If you are open to exploring these
opportunities further please send an updated version of your resume in
word, html, or pdf form to me as soon as possible. Let me know when
would be a good time to talk, please include your phone number.
```

**Figure 22**

```
From: Steve Jobs [mailto:sjobs@apple.com]
Sent: Wednesday, March 07, 2007 10:44 PM
To: Eric Schmidt
Subject: Google Recruiting from Apple


Eric,


I would be very pleased if your recruiting department would stop doing this.


Thanks,
Steve
```

76.     In response, Schmidt e-mailed Annon Geshuri—Google's then-Chief Staffing Architect—the next day to "get this stopped and let me know why this is happening?  I will need to send a response back to Apple quickly so please let me know as soon as you can." Geshuri replied to Schmidt, reporting,

> On this specific case, **the sourcer who contacted this Apple employee should not have and will be terminated within the hour** ....  In general, we have a very clear 'do not call' policy that is given to every staffing professional and I reiterate this message in ongoing communications and staff meetings . . . for this type of violation we terminate [the employee's] relationship with Google. **Please extend my apologies as appropriate to Steve Jobs**.  This was an isolated incident and we will be very careful to make sure this does not happen again (emphasis added) (Figure 23).

77.     Schmidt's responded, "Appropriate response.  Please make a public example of this termination with the group.  Please also make it a very strong part of the new hire training for the group."  (Figure 23).

**Figure 23**



| From: | Shona Brown | Sent:3/11/2007 12:57 PM |
|---|---|---|
| To: [ - ] | Arnnon Geshuri | |
| Cc: [ - ] | Eric Schmidt; Laszlo Bock; Judy Gilbert | |
| Bcc: [ - ] | | |
| Subject: | Re: FW: Google Recruiting from Apple | |

Arnnon-
Appropriate response. Please make a public example of this termination with the group. Please also make it a very strong part of new hire training for the group. I want it clear that we have a zero-tolerance policy for violating our policies. This should (hopefully) prevent future occurences.

On 3/8/07, Arnnon Geshuri <arnnon@google.com> wrote:

Eric,

On this specific case, the sourcer who contacted this Apple employee should not have and will be terminated within the hour. We are scrubbing the sourcer's records to ensure she did not contact anyone else.

In general, we have a very clear 'do not call' policy (attached) that is given to every staffing professional and I reiterate this message in ongoing communications and staffing meetings. Unfortunately, every six months or so someone makes an error in judgment, and for this type of violation we terminate their relationship with Google.

Please extend my apologies as appropriate to Steve Jobs. This was an isolated incident and we will be very careful to make sure this does not happen again.

Thanks,
Arnnon

On 3/8/07, Eric Schmidt < eschmidt@google.com> wrote:

I believe we have a policy of no recruiting from Apple and this is a direct inbound request. Can you get this stopped and let me know why this is happening? I will need to send a response back to Apple quickly so please let me know as soon as you can.

Thanks Eric

78.     Three years later, in 2009, an Apple internal e-mail reveals that the illegal non-solicitation agreements were mutual and ongoing.  Google appeared on Apple's "Hands Off (Do Not Call List)" (Figure 24), which was attached to an e-mail from one Apple personnel to another setting forth the official Apple policy.  (Figure 25).

**Figure 24**

```
From:       David Alvarez <david.alvarez@apple.com>
To:         Jonathan Geyer <jgeyer@apple.com>
Subject:    List
Received(Date):      Thu, 9 Jul 2009 17:25:08 -0700
Handsofflist.doc
```

**Figure 25**

<u>Hands Off  (Do Not Call List) :</u>

Microsoft – Mountain View (exchange group and Mac group)
Garmin
Palm
Adobe (Software partner)
Aspyr
AMD/ATI
Best Buy
CDW
Cingular
Comp USA (product re-seller)
Foxconn
Genentech (CEO sits on our board)
Google
Ingram Micro
Intel
Intuit (Common board members)
JCrew (Common board members)
Mac Zone
Nike (Common board members)
Nvidia
PC Connection
PC Mall
Pixar
Lucas
Quanta
Tech Data
Zones

**D.    Apple Enters Into An Express Illegal Agreement with Adobe**

79.    After the successful but illegal non-solicitation agreements between Pixar

and Lucasfilm, Jobs entered into similar agreements on behalf of Apple with other

companies, including Adobe.   A May 23, 2005 solicitation e-mail from Jerry Sastri, Talent

Selection Manager of Adobe's Executive Recruiting, to an Apple employee (Figure 26) was

a catalyst for Job's e-mail to Bruce Chizen, Adobe's then-CEO, a couple days later to enter

1  into a gentlemen's agreement not to recruit each other's employees.  Jobs's e-mail is

2  concise and powerful: "**I have a standing policy with our recruiters that we don't**

3  **recruit from Adobe.  It seems you have a different policy.  One of us must**

4  **change our policy.  Please let me know who**" (emphasis added).  The post-script in

5  Job's e-mail hints that before the agreement, Adobe had an active policy of promoting the

6  competition for talent by recruiting Apple employees, referring to "many pings we've

7  gotten from Adobe" (Figure 27).

8  **Figure 26**



**From:** Jerry Sastri <jsastri@adobe.com>
**Date:** May 23, 2005 1:44:33 PM EDT (CA)
**To:** bereskin@apple.com
**Subject: Hello Ken**

Ken,

Hope you are doing well.  I am doing an executive search here at Adobe for a Director of Product Marketing.
I wanted to see if I could network with you for folks who might be looking for new opportunities.

Sincerely,


Jerry Sastri

Executive Recruiting | nasdaq: ADBE

408.536.5180 office

408.537.6313 fax

jsastri@adobe.com

 Adobe Enterprise Solutions

www.adobe.com/enterprise/main.html

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27

28

**Figure 27**



From: Steve Jobs [mailto:sjobs@apple.com]
Sent: Thursday, May 26, 2005 9:36 AM
To: Bruce Chizen
Subject: Recruiting

Bruce,

Adobe is recruiting from Apple.  They have hired one person already and are calling lots more. I have a standing policy with our recruiters that we don't recruit from Adobe.  It seems you have a different policy.  One of us must change our policy.  Please let me know who.

Steve

PS:  Here's one of the many pings we've gotten from Adobe.

80.     Chizen's reply to Jobs's e-mail infers that the gentlemen's agreement between them was in effect well before May 2005: "I thought we had agreed not to recruit any senior level employees . . . I am pretty sure your recruiters have approached more junior ones.  I would propose we keep it this way.  Open to discuss.  It would be good to agree" (Figure 28).

**Figure 28**



On May 26, 2005, at 4:15 PM, Bruce Chizen wrote:

I thought we agreed not to recruit any senior level employees (at Adobe this is Sr. Director/VP and represents about 2% of the population).   I am pretty sure your recruiters have approached ,more junior ones.

I would propose we keep it this way. Open to discuss.  It would be good to agree.

81.     Subsequent e-mails between Jobs and Chizen in May 2005 expanded the illegal non-solicitation agreement between Apple and Adobe.  Jobs responded to Chizen's e-mail, threatening to aggressively recruit Adobe's employees absent such an agreement: "Ok, I'll tell our recruiters that they are free to approach any Adobe employee who is not a Sr. Director or VP.  Am I understanding your position correctly?"  Chizen then replied with his understanding: "I'd rather agree NOT to actively solicit any employee from either company" (Figure 29).

**Figure 29**

Subject: RE: Recruiting
Date: Fri, 27 May 2005 20:53:36 -0700
From: "Bruce Chizen" <bchizen@adobe.com>
To: "Steve Jobs" <sjobs@apple.com>
Message-ID: <D7E5113BC7908A40BE31305B3E63E33A99CD89@sj-mail1.corp.adobe.com>

I'd rather agree NOT to actively solicit any employee from either company.  If employee proactively
approaches then it's acceptable.

If you are in agreement I will let my folks know.

**From:** Steve Jobs [mailto:sjobs@apple.com]
**Sent:** Thursday, May 26, 2005 6:27 PM
**To:** Bruce Chizen
**Cc:** Steve Jobs
**Subject:** Re: Recruiting

OK, I'll tell our recruiters that they are free to approach any Adobe employee who is not a Sr.
Director or VP.  Am I understanding your position correctly?

Steve

82.    That same day, on May 27, 2005, Theresa Townsley—Senior Vice President of Adobe's Human Resources—e-mailed Adobe personnel, informing, "Bruce [Chizen] and Steve Jobs have an agreement that we are not to solicit ANY Apple employees, and vice versa . . . if it looks like we have an Apple employee as a candidate for as a senior role at Adobe (Director and VP), we need to let Bruce know so he can talk to Steve."  The Apple-Adobe agreement had no geographical limitation as Townsley stated, "Please ensure all your **worldwide recruiters** know that we are not to solicit any Apple employee.  I know Jerry is soliciting one now, so he'll need to back off" (emphasis added) (Figure 30).  Chizen then forwarded Townsley's e-mail to Jobs with "fyi" (a common abbreviation of "For Your Information") to inform Jobs that Adobe was taking actions internally to ensure compliance with the agreement.

**Figure 30**

Subject: FW: Recruitment of Apple Employees
Date: Sat, 28 May 2005 06:22:46 -0700
From: "Bruce Chizen" <bchizen@adobe.com>
To: "Steve Jobs" <sjobs@apple.com>
Message-ID: <D7E5113BC7908A40BE31305B3E63E33A99CDAA@sj-mail1.corp.adobe.com>

fyi

---

**From:** Theresa Townsley [mailto:townsley@adobe.com]
**Sent:** Friday, May 27, 2005 9:49 PM
**To:** Donna Morris
**Cc:** Shantanu Narayen; Bruce Chizen; Gloria Stinson
**Subject:** Recruitment of Apple Employees

Hi Donna,

Bruce and Steve Jobs have an agreement that we are not to solicit ANY Apple employees, and vice versa.

Please ensure all your worldwide recruiters know that we are not to solicit any Apple employee. I know Jerry is soliciting one now, so he'll need to back off. Please help him with how to do that.

Let me know if you have any questions.
t

83.    Per Townsley's order, Shantanu Narayen—Adobe's then-President and Chief Operating Officer—e-mailed Adobe's "eteam" of worldwide recruiters.  "[Chizen, Townsley, and I] don't want the gloves off-it doesn't do either company any good and we don't want Steve personally recruiting our key talent.  We've agreed that we will not solicit employees" (Figure 31).

**Figure 31**

**From:** owner-eteam@adobe.com [mailto:owner-eteam@adobe.com] **On Behalf Of** Shantanu Narayen
**Sent:** Saturday, May 28, 2005 6:55 AM
**To:** eteam@adobe.com
**Subject:** FW: Recruitment of Apple Employees

I wanted to let you all know that Bruce, Theresa and I discussed the issue of recruiting with Apple.  We don't want the gloves off – it doesn't do either company any good and we don't want Steve personally recruiting our key talent.  We've agreed that we will not solicit employees.

Let us know if you have questions.

Townsley's order, based on a conversation and express agreement between Jobs and Chizen, initiated an overhaul of Adobe's worldwide recruiting policies, as shown by Figure 32.

**Figure 32**

| From: | Donna Morris <dcmorris@adobe.com> |
|---|---|
| Sent: | Sunday, May 29, 2005 10:01 AM |
| To: | 'Jeff Vijungco' <jeff@adobe.com> |
| Subject: | FW: Recruitment of Apple Employees |

Jeff - hope you are having a good long weekend - can you pls see the note below from TT to me and Shantanu to the eteam re-apple.. We need to work together/you and I to determine our route with the recruiters - lets discuss this wk, d

Donna Morris
Sr. Director, Global Talent
Adobe Systems Incorporated

Visit www.adobe.com to profile for future career opportunities

84.   The following year, one Adobe employee e-mail asked another person about possibly targeting Apple for recruiting (Figure 33).  The reply confirms the "gentleman's agreement not to poach each other's talent" between Jobs and Chizen.  Further, it reveals that the men agreed "to not do audits of each other" either.  The reply copies Conroy Shum—Adobe's then-Director of Worldwide License Compliance—"in case that agreement has changed" (Figure 34).

**Figure 33**

**To:** Ray Tum
**Subject:** Apple - Possible Target

Hi Ray,

May I target Apple?  Here is their profile:

-     Adobe ProPub Named Account
-     Adobe Sales Rep:  Mike Riley
-     Not in LCP Dashboard
-     Maker of iPod, iTunes, desktop, and laptop computers
-     2005 Employees = 16,820
-     Employees At HQ = 2,000
-     1-Year Employee Growth = 43.8%

Regards,

Martin

**Figure 34**

**From:** Ray Tum
**Sent:** Wednesday, May 10, 2006 5:42 PM
**To:** Martin Bruce
**Cc:** Conroy Shum
**Subject:** RE: Apple - Possible Target

Martin:

Apple would be a great target to look into.  Unfortunately, Bruce and Steve Jobs have a gentleman's agreement not to poach eachother's talent and to not do audits of eachother.

I'm copying Conroy in case that agreement has changed.

/Ray

85.    A June 17, 2008, e-mail from Natalie Kessler—Program Manager of Adobe's WW Talent Operations—to Adobe recruiters entitled "Off-Limit List" attaches a revised list of off-limit companies from which Adobe can recruit (Figure 35).  Apple tops Adobe's "Talent Acquisition: Companies that are off limits" list (Figure 36).  The list states, "Do not pro-actively solicit candidates from Apple."

**Figure 35**

| From: | Natalie Kessler [nkessler@adobe.com] |
| Sent: | Tuesday, June 17, 2008 3:19 PM |
| To: | DL-TA NA Recruiters |
| Cc: | DL-TA WW Recruiters |
| Subject: | Off-Limit List |
| Attachments: | Talent Acquisition-Offlimit Companies.pdf |

Hi team,

Attached is the revised list of off-limit companies that we can recruit from. Nuance and Synopsys have been taken off the list (NA team: I also removed them as off-limits in FiFi).

Best,
Nat
--------------------------------
Natalie Kessler
WW Talent Operations
Adobe Systems Incorporated
151 Almaden Blvd., MS A11-428
San Jose, CA 95110
408.536-4530 Phone, 408.537-4010 Fax
nkessler@adobe.com
www.adobe.com/careers

*This e-mail may contain confidential information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden.*

**Figure 36**



Adobe

**Talent Acquisition**
**Companies that are off limits**
(Updated: June 17, 2008)

| Company | Notes |
|---|---|
| Apple | Do not pro-actively solicit candidates from Apple. However, if a candidate from this company applies to a position, you can pursue. |
| Bell Canada | Do not hire candidates from Bell Canada until further notice. |
| EFI | Do not pro-actively solicit candidates from EFI. However, if a candidate from this company applies to a position, you can pursue. |
| EMC | Do not pro-actively solicit candidates from EMC. However, if a candidate from EMC applies to a position, you can pursue. |
| New Toronto Group (NTG) | Do not pro-actively solicit candidates from NTG. However, if a candidate from this company applies to a position, you can pursue. |
| SoftChoice | Do not pro-actively solicit candidates from SoftChoice. In the past we have hired a number of people from SoftChoice which is Adobe's 5th largest reseller. With the growth in in-side sales we have just hired another 3 in the last year. So in the last few years we have hired about 7 people from Softchoice. We need this to settle a bit. We will revisit this after Q1 of 2008. |
| SAP | Do not pro-actively solicit candidates from SAP. However, if a candidate from this company applies to a position, you can pursue. |
| Syncroquest | This company is based in the Ukraine. An absolute do-not-call/do-not-hire list. This is a company we are partnering with. As such, we agreed to a written no-hire/no-recruit agreement. |

**Note: Nuance and Synopsys have been taken off the list**

86.     A July 9, 2009, e-mail between Apple personnel attaching Apple's "Hands Off (Do Not Call List)" depicts the multi-year nature of Apple's illegal non-solicitation agreements.  Adobe still appears on this list (Figure 37) four years after the e-mail exchanges between Jobs and Chizen agreeing not to recruit each other's employees without any job function or geographic limitation.

**Figure 37**



From:       David Alvarez <david.alvarez@apple.com>
To:         Jonathan Geyer <jgeyer@apple.com>
Subject:    List
Received(Date):     Thu, 9 Jul 2009 17:25:08 -0700
Handsofflist.doc

Hands Off  (Do Not Call List) :

Microsoft – Mountain View (exchange group and Mac group)
Garmin
Palm
Adobe (Software partner)
Aspyr
AMD/ATI
Best Buy
CDW
Cingular
Comp USA (product re-seller)
Foxconn
Genentech (CEO sits on our board)
Google
Ingram Micro
Intel
Intuit (Common board members)
JCrew (Common board members)
Mac Zone
Nike (Common board members)
Nvidia
PC Connection
PC Mall
Pixar
Lucas
Quanta
Tech Data
Zones

### E.   Apple Enters Into An Express Illegal Agreement with Palm

87.   In August 2007, Jobs contacted Ed Colligan, Palm's then-President and CEO, to open discussions regarding a potential gentlemen's agreement between Apple and Palm. Colligan's August 24, 2007 e-mail to Jobs indicates that he has "thought long and hard about [their] conversation."  Colligan asserted, "**Your proposal that [they] agree that neither company will hire the other's employees, regardless of the individual's desires, is not only wrong, it is likely illegal**," which reflects that Jobs at least received peer-level communication that the agreements were unlawful (emphasis added).  Colligan also revealed, "I even thought about coming back with a proposal about limiting recruitment efforts, but frankly, I did not think it was something you would agree to do" (Figure 38).

**Figure 38**

> From: Ed Colligan
> Sent: Friday, August 24, 2007 6:30 PM
> To: 'sjobs@apple.com'
> Subject: Your proposal
>
> Steve:
>
> I have thought long and hard about our conversation on Wednesday, and
> I thought it important to let you know my position on the issues we discussed.
> I hope we can resolve our differences, but it has to be on terms that
> are right not only for our respective companies, but for the
> individuals potentially affected.  Your proposal that we agree that
> neither company will hire the other's employees, regardless of the

> individual's desires, is not only wrong, it is likely illegal. I even
> thought about coming back with a proposal about limiting recruitment
> efforts, but frankly, I did not think it was something you would agree to do.

88.     Colligan's e-mail to Jobs continues for several pages, at one point capturing the heart and soul of this shareholder derivative complaint: "**In our search for the best talent, one thing is always certain – experienced people come from somewhere else.  Palm doesn't target other companies – we look for the best people we can find.  I'd hope the same could be said about Apple's practices**" (emphasis added) (Figure 39).

**Figure 39**

> In our search for the best talent, one thing is always certain -
> experienced people come from somewhere else.  Palm doesn't target
> other companies - we look for the best people we can find. I'd hope
> the same could be said about Apple's practices.  However, during the
> last year or so, as Apple geared up to compete with Palm in the phone
> space, Apple hired at least 2% of Palm's workforce.  To put it in
> perspective, had Palm done the same, we'd have hired 300 folks from Apple.  Instead, to my
> knowledge, we've hired just three.

89.     Colligan's e-mail also exposes that Apple's tactics included threatening litigation if an agreement not to recruit employees could not be reached.  "[T]his is a small space, and it's inevitable that we will bump into each other**. Threatening Palm with a patent lawsuit in response to a decision by one employee to leave Apple is just out of line.**  A lawsuit would not serve either of our interests, and will not stop employees from migrating between our companies . . . I want to be clear that we are not intimated by your threat" (emphasis added).  Apple was considering the "litigation route" by directing a patent lawsuit at Palm unless Palm entered an illegal non-solicitation agreement with Apple.  Colligan explained, "I don't think litigation is the answer.  We will just end up paying a lot of lawyers a lot of money" (Figure 40).

**Figure 40**

> Steve, we don't want to hurt Apple.  As I said on the phone, Palm is
> focused on building the best team in the industry, and we know there
> is a lot of quality talent outside of Apple.  On the other hand, this
> is a small space, and it's inevitable that we will bump into each
> other. Threatening Palm with a patent lawsuit in response to a
> decision by one employee to leave Apple is just out of line.  A
> lawsuit would not serve either of our interests, and will not stop
> employees from migrating between our companies.  This is a very
> exciting time for both of our companies, and the market is certainly
> big enough for both of us.  We should focus on our respective businesses and not create
> unnecessary distractions.

> That said, I want to be clear that we are not intimidated by your threat.
> Palm has a very robust portfolio of patents, having been in the
> handheld and smartphone businesses since the early 90's.  In addition,
> Palm now owns the former Siemens mobile patent portfolio, most
> recently held by BenQ Corporation.  This mobile computing and
> communications portfolio includes over 1500 patent assets, the
> majority filed in Europe.  If you choose the litigation route, we can
> respond with our own claims based on these patent assets, but I don't
> think litigation is the answer.  We will both just end up paying a lot of lawyers a lot of money.

90.     A few days later, Jobs replied to Colligan, stating, "This is not satisfactory to Apple." Jobs attempted to justify a non-solicitation agreement, suggesting Palm was recruiting Apple employees "using knowledge supplied by Jon Rubenstein and Fred Anderson, with Jon personally participating in the recruiting process. **We must do whatever we can to stop this**" (emphasis added) (Figure 41).  Jobs responded that he was not satisfied with Palm's response.  Rubenstein was Senior Vice President of Apple's iPod division in April 2006 before he became Executive Chairman of Palm's Board of Directors.  Anderson was a member of Apple's Board of Directors until September 2006 before becoming a member of Palm's Board of Directors in October 2007.  Furthermore, in realizing Colligan's position against a potential non-solicitation agreement, Jobs threatened, "I'm sure you realize the asymmetry in the financial resources of our respective companies when you say: 'We will both just end up paying a lot of lawyers a lot of money.'" Jobs continued to pressure Colligan, warning of an impending patent lawsuit by Apple against Palm: "My advice is to look at our patent portfolio before you make a decision here."

///
///
///
///
///
///
///
///
///
///
///
///
///

**Figure 41**

From: "Steve Jobs" <sjobs@apple.com>

Subject: Fwd: Your proposal

Date: Sun 8/26/2007 11:42 am

Size: 4K

To: "Ed.Colligan@palm.com" <Ed.Colligan@palm.com>

Cc: "Steve Jobs" <sjobs@apple.com>

Ed,

This is not satisfactory to Apple.

It is not just a matter of our employees deciding they want to join Palm.  They are being actively recruited using knowledge supplied by Jon Rubenstein and Fred Anderson, with Jon personally participating in the recruiting process.  We must do whatever we can to stop this.

I'm sure you realize the asymmetry in the financial resources of our respective companies when you say: "We will both just end up paying a lot of lawyers a lot of money."

Just for the record, when Siemens sold their handset business to BenQ they didn't sell them their essential patents but rather just gave them a license.  The patents they did sell to BenQ are not that great.  We looked at them ourselves when they were for sale.  I guess you guys felt differently and bought them.  We are not concerned about them at all.  My advice is to take a look at our patent portfolio before you make a final decision here.

Steve

91.    The fact that Apple lists Palm on its "Hands Off (Do Not Call List)" attached to an e-mail between Apple personnel in July 2009—two years after the e-mail exchange between Jobs and Colligan—and that no patent lawsuit was filed, leads to the conclusion that Jobs and Colligan reached an agreement after Colligan folded on his position and succumbed to Jobs's threats (Figure 42).

**Figure 42**

From:      David Alvarez <david.alvarez@apple.com>
To:        Jonathan Geyer <jgeyer@apple.com>
Subject:   List
Received(Date):      Thu, 9 Jul 2009 17:25:08 -0700
Handsofflist.doc

Hands Off (Do Not Call List) :

Microsoft – Mountain View (exchange group and Mac group)
Garmin
Palm
Adobe (Software partner)
Aspyr
AMD/ATI
Best Buy
CDW
Cingular
Comp USA (product re-seller)
Foxconn
Genentech (CEO sits on our board)
Google
Ingram Micro
Intel
Intuit (Common board members)
JCrew (Common board members)
Mac Zone
Nike (Common board members)
Nvidia
PC Connection
PC Mall
Pixar
Lucas
Quanta
Tech Data
Zones

### F.   Apple Had Approximately 25 Illegal Agreements With Other Companies During the Conspiracy

92.    Apple and approximately 25 other companies agreed not to recruit each other's employees during the conspiracy.  A February 18, 2004 e-mail from EC to Jobs confirms that **Apple had illegal non-solicitation agreements with "ILM and Dreamworks which has worked quite well"** and contemplates an agreement with Sony after it "approached all of our producers trying to hire them" (emphasis added).  EC indicated that he/she "probably should go down and meet [redacted] and Sony to reach some agreement.  **Our people are become [sic] really desirable and we need to nip this in the bud**" (emphasis added) (Figure 43).

**Figure 43**

| From: | EC |
| Sent: | Wednesday, February 18, 2004 1:19 AM |
| To: | Steve Jobs <sjobs@apple.com> |
| Subject: | Sony |

Sony has approached all of our producers trying to hire them. They all just
ignored Sony, although████████ forwarded on the email from the recruiter.

Today, ████████████, one of our department managers told me that
she was offered a position as producer for Sony's first CG film and is
likely to accept. If so, she would report to ████████████

████████ was a very good department manager who some day will probably
make the leap to producer, although ████████████████████ do not
think
that she is ready yet. She has not had any experience with any of the
shot
departments which is the bulk of production.

The director of the movie is ████████ who started off as head of
story on Monsters
but burnt out. She is good but fragile. The movie is about animals
that turn the
table on hunters. ████████████████████
████████████████

████████████████████████████████████
████████████

████ will talk with her. She isn't so great that we have to keep her,
and she isn't so
bad that she would hurt Sony.

We don't have a no raid arrangement with Sony. We have set up one with
ILM and
Dreamworks which has worked quite well. I probably should go down and
meet
████████████████ and Sony to reach some agreement. Our people are
become really desirable and we need to nip this in the bud.

93.     An attachment to an e-mail between Apple personnel reveals the illegal non-solicitation agreements with other companies during the conspiracy. Apple was not allowed to recruit from any of the companies on its "Hands Off (Do Not Call List)" from July 2009 (Figure 44). Apple therefore intentionally limited its own ability to have the best employees that were in the labor market. By 2009, Apple's Hands Off (Do Not Call

List)" no longer only included technology competitors but other companies, such as J. Crew and Nike.

**Figure 44**

From:     David Alvarez <david.alvarez@apple.com>
To:       Jonathan Geyer <jgeyer@apple.com>
Subject:  List
Received(Date):      Thu, 9 Jul 2009 17:25:08 -0700
Handsofflist.doc

**Hands Off  (Do Not Call List) :**

Microsoft – Mountain View (exchange group and Mac group)
Garmin
Palm
Adobe (Software partner)
Aspyr
AMD/ATI
Best Buy
CDW
Cingular
Comp USA (product re-seller)
Foxconn
Genentech (CEO sits on our board)
Google
Ingram Micro
Intel
Intuit (Common board members)
JCrew (Common board members)
Mac Zone
Nike (Common board members)
Nvidia
PC Connection
PC Mall
Pixar
Lucas
Quanta
Tech Data
Zones

94.     This collusive scheme was incredibly effective since Apple directors served on other boards. The companies alleged to have participated in the no-recruiting conspiracy shared directors and senior advisors. Apple and Google had two directors in common: Schmidt and Defendant Levinson, then-Genentech's CEO. Brin and Page, Google's co-founders, viewed Jobs as a mentor, regularly joining him on his meditative walks. As the

e-mail above indicates, several companies on Apple's "Hands Off (Do Not Call List)" share directors with Apple, including Google, Genetech, Intuit, J.Crew, and Nike.

95.    An April 2008 e-mail also reflects that Apple and Intel had an illegal, non-solicitation agreement.  An e-mail thread between Intel personnel with the subject "Hiring from Apple" indicates Mark Mitchell—Intel's Engineering Manager—was considering hiring "someone that happens to work at Apple currently.  He inquired, "Does Intel have any agreements that would preclude me from hiring this person?"  Deborah Conrad—Vice President and General Manager of Intel's Corporate Marketing Group—replied, "We have an agreement NOT to hire top talent (esp technial) [sic] away from each other" (Figure 45).

**Figure 45**

```
From: Conrad, Deborah
Sent: Thursday, April 17, 2008 11:01 AM
To: Mitchell, Mark L
Cc: Griffen, Jeffrey L
Subject: Re: Hiring from Apple
Importance: High

We have an agreement NOT to hire top talent (esp technial) away from each other.
What is the specific job? Grade level?
/deborah

On 4/16/08 5:03 PM, "Mitchell, Mark L" <mark.l.mitchell@intel.com> wrote:
Deborah,

I currently have an open requisition for one of my people that works with Apple on-site.

Among the applicants/candidates is someone that happens to work at Apple currently.

Does Intel have any agreements that would preclude me from hiring this person?

Regards,
Mark
```

96.    A few days later, Mike Wagner of Intel followed up with his colleague Mitchell Conrad, stating, "I just recently found out that an Intel staffing person was recruiting some graphics folks from Apple, and we got our hands slapped . . . it may not be wise to move forward with trying to take one of their [Extensible Firmware Interface] guys . . ." (emphasis added) (Figure 46). Wagner's e-mail shows that the Apple and Intel agreement was not only in effect but enforced at Intel.

**Figure 46**

```
-----Original Message-----
From: Wagner, Mike J
Sent: Tuesday, April 22, 2008 3:12 PM
To: Wagner, Mike J; Conrad, Deborah; Mitchell, Mark L
Subject: RE: Hiring from Apple

Mark,

Have you gone forward with this?  I just recently found out that an Intel staffing person was
recruiting some graphics folks from Apple, and we got our hands slapped  (see attached mail).
I've shut that down, but given this example, it may not be wise to move forward with trying to
take one of their EFI guys and turn around and put him back at Apple.

Thx.
Mike
```

## G.     The DOJ Investigates and Concludes that the Agreements Were *Per Se* Unlawful

97.     In 2009, the DOJ began investigating Silicon Valley's hiring practices.  The DOJ filed a complaint against Apple, Adobe, Google, Intel, Intuit, and Pixar on September 24, 2010, alleging that these companies' private agreements restrained trade, which was *per se* unlawful under antitrust laws.  The DOJ found the agreements "facially anticompetitive because they eliminated a significant form of competition to attract high tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."  The DOJ stated that the agreements "disrupted the normal price-setting mechanisms that apply in the labor setting."  The DOJ announced a settlement of the action on its own website on September 24, 2010, though a final judgment in the action was not entered until March 17, 2011.

98.     Despite the DOJ's investigation, Apple did not disclose the details of the DOJ's investigation to shareholders.  An investor reviewing the Company's proxy statements, quarterly filings, and annual filings would not have seen any mention of the investigation, the settlement reached in September of 2010, or the final judgment signed on March 17, 2011.  The Company's proxy statement filed on January 10, 2014 makes no mention whatsoever of the DOJ investigation, settlement, or final judgment.  Similarly, the Company's 8K, 10Q, and 10K filings from October 2010 to August 2014 do not mention the DOJ's investigation, settlement, or final judgment.

99.    Furthermore, on May 4, 2011, a former Lucasfilm software engineer filed a class action lawsuit charging Apple, Adobe, Google, Intel, Intuit, and Pixar—companies subject to DOJ investigation—with violations of antitrust laws by conspiring to fix and restrict the pay of their employees and entering into non-solicitation agreements with each other.  Similar complaints were later filed by other employees, and the cases were consolidated under the caption *In re High-Tech Employee Antitrust Litigation*, Case No. 11-CV-2509-LHK (N.D. Cal.). On April 24, 2014, the parties to this action announced that they had reached a settlement, which was later reported to be $324 million.

## III.    The Individual Defendants Caused Apple to Issue False and Misleading Proxy Statements in 2014

### A.    The 2014 Proxy

100.    On January 10, 2014, Defendants Campbell, Cook, Drexler, Iger, Jung, and Levinson caused Apple to issue a definitive proxy statement (the "2014 Proxy"), soliciting Apple shareholders to vote, among other things, in favor of re-electing these Defendants as Apple's directors.

101.    The 2014 Proxy discussed in detail each of these Defendants' experience and qualifications.  The 2014 Proxy concluded that "the Board believe[d] the skills, qualities, attributes and experience of its directors provide the Company with business acumen and a diverse range of perspectives to engage each other and management to effectively address the evolving needs of the Company and represent the best interests of the Company's shareholders."  Specifically, the 2014 Proxy stated:

> Many of the current directors have senior leadership experience at major domestic and international companies.  In these positions, they have also gained significant and diverse management experience, including strategic and financial planning, public company financial reporting, compliance, risk management and leadership development.  Many of the directors also have experience serving as executive officers, or on boards of directors and board committees of other public companies, and have an understanding of corporate governance practices and trends. Other directors have experience as directors or trustees of significant academic, research, nonprofit and philanthropic institutions, which bring unique perspectives to the Board.

102.    The 2014 Proxy also affirmatively misrepresented that the Board was actively supervising management to ensure compliance with all legal and ethical obligations.  The Proxy stated:

**Role of the Board; Corporate Governance Matters**

The Board oversees the Company's CEO and other senior management in the competent and ethical operation of the Company and assures that the long-term interests of the shareholders are being served.

103.    The 2014 Proxy also affirmatively misrepresented that the Board of Directors and Audit Committee (which consisted at the time of Directors Levinson, Sugar, Campbell and Iger) were effectively reviewing the key enterprise risks facing Apple and ensuring that management's conduct did not pose an excessive risk to the Company:

**Board Oversight of Risk Management**

***The Board believes that evaluating how the executive team manages the various risks confronting the Company is one of its most important areas of oversight***. *In carrying out this critical responsibility, the Board has designated the Audit Committee with primary responsibility for overseeing enterprise risk management*. In fulfilling its oversight responsibilities with regard to risks inherent in the Company's business, including the identification, assessment, management, and monitoring of those risks, and risk management decisions, practices and activities of the Company, the Audit Committee is assisted by a Risk Oversight Committee consisting of key members of management, including the Company's Chief Financial Officer and General Counsel. The Risk Oversight Committee reports regularly to the Audit Committee, and the Audit Committee makes periodic reports to the Board. See the Audit Committee's Charter at www.apple.com/investor for more information about its risk oversight function.

In accordance with this responsibility, ***the Audit Committee monitors the Company's major financial, operational, privacy, security, business continuity, legal and regulatory, and reputational exposures, and reviews the steps management has taken to monitor and control these exposures***. With respect to privacy and data security, the Audit Committee's oversight includes, among other things, (i) review of regular reports from the Company's Chief Compliance Officer, Director of Global Privacy, Vice President of Internal Audit and other members of the Risk Oversight Committee, which include updates on the Company's privacy program and relevant legislative, regulatory and technical developments; and (ii) review of management's report on the results of the Company's annual privacy assessment. As with other matters, the Audit Committee regularly discusses these topics with the full Board.

*While the Audit Committee has primary responsibility for overseeing enterprise risk management, each of the other Board committees also considers risk within its area of responsibility. For example, the Nominating Committee reviews legal and regulatory compliance risks as they relate to corporate governance structure and processes*, and the Compensation Committee reviews risks related to compensation matters. The committee chairs periodically apprise the Board of significant risks and management's response to those risks. While the Board and its committees oversee risk management strategy, management is responsible for implementing and supervising day-to-day risk management processes and reporting to the Board and its committees on such matters.

*In establishing and reviewing the Company's executive compensation program, the Compensation Committee considers whether the program encourages unnecessary or excessive risk-taking and has concluded that it does not*. Executives' base salaries are fixed in amount and thus do not encourage risk-taking. Bonuses are capped and are tied to overall corporate performance, and also are a relatively small percentage of executive officers' total compensation opportunities. The majority of compensation provided to the executive officers is in the form of long-term equity awards that help further align executives' interests with those of the Company's shareholders. The Compensation Committee believes that these awards do not encourage unnecessary or excessive risk-taking because the ultimate value of the awards is tied to the Company's stock price and because awards are staggered and subject to long-term vesting schedules to help ensure that a significant component of executive compensation is tied to long-term stock price performance.

The Compensation Committee has also reviewed the Company's compensation programs for employees generally and has concluded these programs do not create risks that are reasonably likely to have a material adverse effect on the Company. *The Compensation Committee believes that the Company's annual cash and long-term equity awards provide an effective and appropriate mix of incentives to help ensure the Company's performance is focused on long-term shareholder value creation and do not encourage short-term risk taking* at the expense of long-term results. In general, bonus opportunities for Company employees are capped, and the Company has discretion to reduce bonus payments (or pay no bonus) based on individual performance and any other factors it may determine to be appropriate in the circumstances. As with the compensation of the Company's executive officers, a substantial portion of the compensation for employees generally is delivered in the form of equity awards that help further align the interests of employees with those of shareholders.

104.    The 2014 Proxy also urged stockholders to vote in favor of Proposal No. 7 at the Annual Meeting — the adoption of the 2014 Employee Stock Plan.  Stockholders were told that Apple's "future success depends on its ability to attract and retain high-caliber employees.  The Company's primary center for innovation is in the Silicon Valley, where it

must compete with many successful and high profile companies for a limited pool of talented people":

### PROPOSAL NO. 7

**Approval of Apple Inc. 2014 Employee Stock Plan**

During the past decade, ***the Company's investments in innovative design and engineering have resulted in the significant expansion of its product portfolio***. The Company has also expanded its distribution capabilities by opening more than 400 of its own retail stores and substantially increasing third-party resale locations. ***The Company's successful execution of its strategies has led to dramatic revenue and earnings growth. For example, in the five-year period from 2008 through 2013, the Company's annual revenue grew from $32.5 billion to $170.9 billion, while its earnings grew from $4.8 billion to $37 billion.*** The Company's success has also resulted in a significant increase in shareholder value. Between the Company's last request for an increase in shares under the 2003 Plan on February 25, 2010 and September 28, 2013, the Company added more than $250 billion in market capitalization, an increase of approximately 237%. This compares to an increase of 53% in the S&P 500 index over the same period.

***<u>The Board believes the Company's success is due to its highly talented employees and that future success depends on its ability to attract and retain high-caliber employees. The Company's primary center for innovation is in the Silicon Valley, where it must compete with many successful and high profile companies for a limited pool of talented people. The Company's ability to grant equity awards is a necessary and powerful recruiting and retention tool</u>***. Equity awards also enhance the link between shareholder and award holder interests.

The Compensation Committee, which administers the 2003 Plan and will administer the 2014 Plan, if approved, recognizes its responsibility to strike a

balance between shareholder concerns regarding the potential dilutive effect of equity awards and the ability to attract, retain and reward employees whose contributions are critical to the Company's long-term success. The 2003 Plan is currently the Company's only employee equity plan under which awards may be granted other than its Employee Stock Purchase Plan. The current number of shares remaining available for grant under the 2003 Plan is expected to last until approximately the end of 2014, based on the recent historical rate of award grants under the 2003 Plan noted under "Specific Benefits" below, and taking into account the 2:1 premium share counting rule, discussed below, for certain equity awards.

The Compensation Committee anticipates that the additional shares requested, together with the shares remaining available for new award grants under the 2003 Plan and assuming usual levels of shares becoming available for new awards as a result of forfeitures of outstanding awards, will provide the Company with flexibility to continue to grant equity awards through approximately the end of 2017 (subject to adjustment based on the factors noted under "Specific Benefits" below and taking into account the 2:1 premium share counting rule, discussed below, for certain equity awards), accommodating anticipated grants relating to the hiring, retention and promotion of employees and providing reasonable flexibility for acquisitions.

105.    These statements were false and misleading because, as discussed above, they failed to disclose that Apple's senior executives and directors had continuously caused Apple to violate antitrust laws by agreeing with competing companies to engage in anti-poaching practices.  The 2014 Proxy failed to disclose, among other things, that the Board's corporate governance policies and practices did not effectively assess or protect against the key enterprise risks facing the Company, including legal violations, that the Company's internal controls were inadequate, that the Individual Defendants caused Apple to engage in anti-poaching practices, that the DOJ had been investigating Apple's potential violations of antitrust laws, and that the Individual Defendants' conduct may lead to criminal charges and civil liability against and cause substantial damages to Apple.

106.    As a result of these false and misleading statements and the Board's recommendation, these Defendants were re-elected to Apple's Board.

107.    The false and misleading statements contained in the 2014 Proxy were material due to the substantial likelihood that a reasonable shareholder would consider the disclosed and omitted information important in deciding how to vote.

### DAMAGES TO APPLE

108.    Apple has been harmed by these illegal agreements because it was forced to enter into an agreement with the DOJ in September 2010, which caused it to expend substantial time and money to defend itself.

109.    In addition, Apple has been sued in a class action brought by its employees for antitrust and other violations alleging that their wages have been suppressed.  The action, which was initially filed against six companies, seeks damages against Apple, Google, Intel, and Adobe.  A class has been certified and trial had been set for May of 2014.  On April 24, 2014, the parties announced resolution of the lawsuit for a reported settlement of $325 million.  The Hon. Lucy Koh rejected approval of the settlement as *too low* in August 2014.  The parties thereafter reached a revised agreement to settle the action for ***$415 million***, which was subsequently approved by the Court.  Apple has had to expend substantial time and money to defend itself and to satisfy the settlement.

110.    As a result of its illegal agreements, Apple's reputation has been harmed.

111.    Further harm has come from the loss of innovation which occurred because of the illegal agreements.  Alan Hyde, a Professor and the Sidney Reitman Scholar at Rutgers University School of Law and author of *Working in Silicon Valley: Economic and Legal Analysis of a High-Velocity Labor Market* (New York: M.E. Sharpe, Inc., 2003), concluded that technological and economic growth depends upon a company's ability to hire and fire employees quickly in his theory of damages.  Professor Hyde addresses the evolving labor market by utilizing the high-technology employers in Silicon Valley as a case study.  Professor Hyde declares that the rapid and frequent turnover of employees is a key component resulting in short job tenures.  He also identifies the heavy use of temporary

labor and a lack of loyalty to individual firms as contributing factors.  Professor Hyde labels these unique components of employment in the mobile market of Silicon Valley as "high-velocity."  In an attempt to explain why high-velocity labor supports rapid technological growth, Professor Hyde effectively identifies and explains two general concepts, "flexibility" and "information diffusion."  "Flexibility" accounts for the fluid market of available employees consisting of contractors and consultants who typically move from one company to the next.  "Information diffusion" accounts for the technical know-how and advancements that travel between companies as those employees move from job to job.[10]

112.    Accordingly, Defendants impeded technological and economic growth at Apple by entering into illegal non-solicitation agreements with the Company's competitors to artificially decrease employee salaries at Apple and at other companies, which suppressed high-velocity labor by squelching flexibility and information diffusion.  The illegal agreements run contrary to what has made Silicon Valley so successful: job-hopping.  As Professor Hyde explains, "There is a fair amount of research that tech companies, particularly in California, have distinctive personnel practices."  He states, "They hire for short tenures and keep ties with former employees so there can be an exchange of information across company lines.  The companies in [a class-action lawsuit that accuses industry executives of agreeing between 2005 and 2009 not to poach one another's employee] might have been killing the golden goose."[11]

113.    The chiefs of Silicon Valley normally boast of their dedication to merit and market forces.  The acts alleged herein, however, reveal another side.  "This is one of hundreds of examples in which our economy has been corrupted by the intense

---

[10] Alan Hyde. *Working in Silicon Valley: Economic and Legal Analysis of a High-Velocity Labor Market*, New York: M.E. Sharpe, Inc., 2003. Print.

[11] David Streitfeld, *Engineers Allege Hiring Collusion in Silicon Valley,* NEW YORK TIMES, 28 Feb. 2014, http://www.nytimes.com/2014/03/01/technology/engineers-allege-hiring-collusion-in-silicon-valley.html?_r=0.

concentration of wealth," stated Roger McNamee, co-founder of Elevation Partners, a private equity firm specializing in technology and media.[12]

114.    As a direct and proximate result of Defendants' actions and omissions, Apple has expended, and will continue to expend, significant sums of money. Such expenditures include but are not limited to:

        (a)    costs incurred from years of lost opportunities to hire more qualified employees that were employed at other companies;

        (b)    costs incurred from defending and paying a settlement in the class action for violation of antitrust laws;

        (c)    costs incurred from defending and settling allegations by the Department of Justice; and

        (d)    loss of reputation.

## DERIVATIVE ALLEGATIONS

115.    Plaintiff brings this action derivatively in the right, and for the benefit, of Apple to redress injuries suffered and to be suffered by the Company as a result of the Defendants' breach of fiduciary duties, gross mismanagement, and waste of corporate assets.

116.    Plaintiff has continuously owned Apple common stock at all times since January 15, 2009 and continues to own and hold such shares.  Plaintiff has standing to bring this derivative action.

117.    Plaintiff and his counsel will adequately and fairly represent the interests of Apple in enforcing and prosecuting its rights.

118.    At the time this derivative lawsuit was commenced, Apple's Board of Directors consisted of eight individuals:  Arthur Levinson, Tim Cook, Millard ("Mickey") Drexler, Robert Iger, Albert Gore, Jr., Andrea Jung, Ronald D. Sugar, and Susan L.

---

[12] Paul M. Barrett and Brad Stone, *Apple, Google, and the Hubris of Silicon Valley's Hiring Conspiracy*, BLOOMBERG, 1 May 2014, http://www.businessweek.com/articles/2014-05-01/tech-hubris-the-silicon-valley-antitrust-hiring-conspiracy.

Wagner.  At the time this First Amended Complaint was filed, Apple's board consisted of the following nine directors:  Arthur Levinson, Tim Cook, Albert Gore, Jr., Andrea Jung, Ronald D. Sugar, James A. Bell, Alex Gorsky, Monica Lozano, and Susan L. Wagner.

**I.        Responsibilities of Corporate Directors**

119.    Corporate officers and directors owe the highest fiduciary duties of care and loyalty to the corporation they serve.  This action involves a knowing and/or reckless breach of defendants' duties of good faith, loyalty, and care.

120.    Apple frequently states that its Board is held to the highest level of ethics.  As stated above these members have formed incestuous relationships with other corporations and used these relationships to suppress innovation and employee pay.  By allowing this behavior to continue, the Board not only violated California and federal law, they also violated their own company's ethical standards and guidelines.

121.    Apple's Corporate Governance Guidelines lists the responsibility and duties of the Board.

**II.       Principal Duties of the Board of Directors**

122.    The fundamental role of the directors is to exercise their business judgment, and to act in what they reasonably believe to be the best interests of the Corporation and its shareholders.  In fulfilling that responsibility, directors reasonably may rely on the honesty and integrity of the Corporation's senior management and expert legal, accounting, financial and other advisors.

123.    The Guidelines also clearly address the high standard that board members are expected to live up to.  The Board expects its members, as well as officers and employees, to act ethically. Directors are expected to adhere to the Corporation's Business Conduct Policy and the Guidelines Regarding Director Conflicts of Interest.

124.    The Board failed to live up to its duties when they knowingly allowed Apple to conspire with competitors to restrict hiring.  As demonstrated through e-mails, members of the Board were fully aware of these "gentlemen agreements," or knowingly or

recklessly approved or acquiesced to the implementation of these illegal agreements.
These directors failed to perform and "act ethically."

125.   Additionally, the Guidelines go further to discuss the Board's responsibility in regard to conflicts of interest:

> Pursuant to the Corporate Governance Guidelines of Apple Inc. (the "Corporation"), the Board of Directors of the Corporation expects each director to act ethically at all times and to adhere to the Corporation's Business Conduct Policy.

126.   The Corporation's Business Conduct Policy states:

> Apple's success is based on creating innovative, high-quality products and services and on demonstrating integrity in every business interaction. Apple's principles of business conduct define the way we do business worldwide. These principles are:
> **Honesty.** Demonstrate honesty and high ethical standards in all business dealings.
> **Respect.** Treat customers, suppliers, employees, and others with respect and courtesy.
> **Confidentiality**. Protect the confidentiality of Apple's information and the information of our customers, suppliers, and employees.
> **Compliance**. Ensure that business decisions comply with all applicable laws and regulations.

127.   The Board is responsible for ensuring that business decisions comply with all applicable law and regulations.  It is clear from contemporaneous e-mails that the Board ratified Apple's involvement in this illegal activity and condoned the illegal agreements.  It follows that the Board either knew of these illegal activities and failed to stop them or acted in bad faith.  Either way, the Board is so heavily entrenched in these illegal transactions that any attempt to make a demand would be futile.

128.   The Apple Corporate Guidelines also address competing with other companies and competition laws.

> Laws regulating competition and trade practices vary around the world, but certain activities, such as price fixing and agreeing with a competitor to allocate customers, are almost always illegal and are absolutely prohibited under Apple policy. You should not:

- Agree with competitors or exchange information with competitors on prices, policies, contract terms, costs, inventories, marketing plans, or capacity plans.
- Agree with a competitor that the competitor will sell goods and services to Customer A (and you will not), and that you will sell goods and services to Customer B (and your competitor will not).
- Agree with resellers on the resale pricing of Apple products without legal department approval.
- Require vendors to purchase Apple products in order to sell products or services to Apple.
- Describe the products or services of competitors inaccurately to promote Apple products or services.
- Engage in any pricing or other practices that could defraud a supplier or others.
- Violate fair bidding practices, including bidding quiet periods, or provide information to benefit one vendor over other vendors.

129.    The Board is tasked with following the Corporate Guidelines.  The Guidelines state that restricting competition is absolutely prohibited under Apple policy.  Not only did Apple agree with competitors not to recruit employees but the CEO of Apple even threatened a lawsuit if Palm did not agree.  This clearly violates the Corporate Guidelines.  Entering into illegal non-solicitation agreements with competitors is contrary to this Code.  The Board of Directors violated Apple's own Corporate Guidelines.  Each member violated these standards, either by active participation or failing to stop the illegal activity through sustained and/or systematic gross failure of oversight.  These illegal agreements continued for at least five (5) years and involved the highest-level executives of Apple, who also sit on the Board of Directors.  For these reasons, demand on the Board would be futile.

130.    Additionally, each member of the Board has additional ethical responsibilities because of their respective Committees on the Board.  Apple has three board committees: Audit, Compensation, and Nominating.

131.    The Audit and Finance Committee is responsible primarily for assisting the Board in fulfilling its oversight responsibility of reviewing the financial information provided to shareholders and others, appointing the independent registered public accounting firm, reviewing the services performed by the Company's independent

registered public accounting firm and internal audit department, evaluating the

Company's accounting policies and the system of internal controls established by

management and the Board, reviewing significant financial transactions, and overseeing

enterprise risk management.  This Committee is comprised of Ronald D. Sugar, Defendant

Campbell, Defendant Iger, and Defendant Levinson.  These directors should be held to a

higher standard because of their position on this committee.  They should have been aware

by overseeing the risk management and significant financial transactions that by

performing illegal activities they were opening Apple up for liability.

132.    The Compensation Committee is responsible for primarily reviewing the

compensation arrangements for the Company's executive officers, including the CEO,

administering the Company's equity compensation plans, and reviewing the Board's

compensation. This Committee is comprised of Defendants Jung and Drexler, as well as

non-defendant Albert Gore.  These directors control other directors' income.  These

directors, in particular, control Tim Cook's compensation. Tim Cook was part of top

management during the conspiracy and it is not plausible that he was unaware of the

agreements due to his position and his close relationship to Jobs and others.

133.    The Nominating Committee assists the Board in identifying qualified

individuals to become directors, makes recommendations to the Board concerning the size,

structure and composition of the Board and its committees, monitors the process to assess

the Board's effectiveness and is primarily responsible for oversight of corporate

governance, including implementing the Company's Corporate Governance Guidelines.

The members of this Committee are Defendants Campbell and Drexler, as well as non-

defendant Albert Gore.  These members are charged with overseeing and making sure the

Corporate Governance Guidelines are being followed.  The illegal restrictive hiring

guidelines clearly violated their own competition guidelines.  Campbell knew or was

recklessly ignorant that violations were occurring.

134.    By virtue of their positions at Apple, each of the Defendants owed Apple and

its shareholders the duty to exercise a high degree of care, good faith, loyalty, and diligence

to manage and administer Apple in its best interests, to preserve its property and assets, to fairly and accurately report on its operations to the public markets, and not to seek to personally profit at Apple's expense.  The conduct of the Defendants, as complained above and herein, involves knowing, intentional, and culpable violations of their fiduciary duties to Apple and federal and California antitrust laws.  Moreover, the misconduct by Defendants was conducted or allowed by Apple's Board, which has failed to take any legal action on behalf of Apple.

135.    Despite these duties, the Defendants were grossly negligent, reckless, and/or they intentionally caused or allowed, by their actions or inactions, Apple to participate in illegal restrictive employment agreements.  Moreover, the restrictive scheme was in breach of Defendants' fiduciary duties of good faith, honesty and loyalty to Apple.

136.    By virtue of their positions at Apple, and the control and authority they had as directors and/or officers of Apple, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  These acts include their participation in and encouragement of the illegal restrictive employment agreements with competitors.  Because of their positions with Apple, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information, and was required to disclose these facts promptly and accurately to Apple shareholders and the financial markets.

137.    Instead, the Defendants continued over the course of many years to operate under these illegal agreements.  The Defendants not only actively participated in restricting employees' employment options but they also actively sought out competitors and bullied them into participating in these illegal agreements as well.

138.    Plaintiff seeks, on behalf of Apple, redress for all money lost because of the wrongful acts and omissions.

## III.    A Litigation Demand Would Be Futile and Is Thus Excused

139.    As a result of the facts set forth above and herein, Plaintiff has not made any demand on the Apple Board to institute this action against the Defendants.  Such demand

is excused because making a demand would be a futile and useless act because the board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, and because the wrongful conduct alleged herein is not subject to protection under the business judgment rule.

140.    Since Apple is a California corporation, any demand requirement is evaluated under California law.

141.    At the time this action was commenced, the Apple Board was comprised of eight directors: defendants Levinson, Cook, Drexler, Jung, Iger and non-defendant directors Albert Gore, Jr., Ronald D. Sugar, and Susan L. Wagner.  At the time this First Amended Complaint was filed, Apple's board consisted of the following nine directors: Arthur Levinson, Tim Cook, Albert Gore, Jr., Andrea Jung, Ronald D. Sugar, James A. Bell, Alex Gorsky, Monica Lozano, and Susan L. Wagner.  Where there is an odd number of board members, a plaintiff need allege that demand would be futile as to a majority of  the board members. Thus, plaintiff here needs to allege demand futility as to 5 out of Apple's 9 current directors.

142.    A majority of the Apple Board members are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

A.    **Demand Is Futile as to Levinson**

143.    Based on the allegations of Plaintiff's August 11, 2014 complaint, the Court has found that demand on Levinson is excused.  Dkt. No. 125 at 20.

144.    Levinson is incapable of considering a demand.  Levinson has been a member of the board since 2000.  Levinson maintains numerous professional and personal relationships with other members of the Board that create a reasonable doubt as to Levinson's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein.  Levinson was also on the board and CEO of Genetech since 1999.  Further, he was a director at Google from 2004-2009.  In 2007, Levinson and Eric Schmidt sat on Apple and Google's Boards.  By May 2009, the FTC launched an inquiry into whether the presence of Schmidt and Levinson on the boards of both Apple

and Google violated antitrust laws.  One of the reasons the investigation was launched was because both Levinson and Schmidt served on the boards of Apple and Google at a time when the companies were beginning to square off against each other in the mobile space. Facing a federal probe, Schmidt resigned from Apple's board in August 2009 and a few months later, Levinson resigned from Google's board.  Levinson is a founding investor and CEO of Calico, a Google-backed company, which was formed in 2013.  Lucy P. Marcus, CEO of Marcus Venture Consulting and an expert on corporate governance and board ethics, said of Levinson's role, "There is something about this that feels uncomfortable."

145.    Further still, internal documents show that Google and Genetech entered into similar agreements with each other.  Each of these companies were on Apple's do not call list and presumably subject to the same illegal restrictive hiring agreements.  Given Levinson's roles at these companies and their appearance on Apple's do not call list, it is reasonable to infer that he knew about these agreements.  Further, since he held leadership positions in each company, it is also reasonable to infer that he actively participated in these agreements.  Levinson would be incapable of considering a demand because of the substantial personal liability he would face.

**B.    Demand Is Futile as to Cook**

146.    Based on the allegations of Plaintiff's August 11, 2014 complaint, the Court has found that demand on Cook is excused.  Dkt. No. 125 at 20.

147.    Defendant Cook is incapable of considering a demand.  Cook has been Apple's CEO and board member since 2011.  He held other executive roles at Apple since 1998, including Chief Operating Officer.  Additionally, Cook has been Chairman of the Nike board of directors since 2005.  As shown above, Nike was on Apple's do not call list. There is even a note next to Nike stating that they have board members in common.  Given Cook's dual positions, his relationship with Jobs and others, and his responsibilities at Apple, it is reasonable to assume that he at least knew of the restrictive hiring agreements. It is even more reasonable to assume, since he was in positions of power at each company, that he encouraged and facilitated the creation of these illegal agreements.  This is

especially true since Nike is a retail company and would not likely do a lot of recruiting at Apple for technical positions.  It would take someone on the board of each company to make such an agreement.  It is reasonable to assume that was Tim Cook.  Therefore, Cook would be incapable of considering a demand because of the substantial liability he would face.

**C.      Demand Is Futile as to Jung**

148.    Defendant Jung has been a director at Apple since 2008.  During Jung's tenure as a director, Jung and other Individual Defendants caused Apple to engage in practices that violated antitrust laws by agreeing to refrain from hiring employees of Apple's competing companies.  In fact, the DOJ began investigating Apple's hiring practices in 2009.  Thus, Jung was aware of Apple's antitrust violations.  Indeed, Jung was familiar with government investigations from holding various senior positions at Avon Products, Inc., including serving as Avon's chairman and CEO between 1999 and 2012.[13] Jung left Avon in 2012, when Avon was subject to multiple investigations by government agencies, including the SEC, stemming from allegations of Avon's violations of U.S. laws in China and Latin America.  Upon information and belief, Avon paid hundreds of millions of dollars in connection with these investigations.

149.    Jung participated in and facilitated the scheme in her capacity as a director of Apple and a member of Apple's Compensation Committee in 2008 and 2009, while the anticompetitive agreements and "Do Not Cold Call" policy were in place at Apple and the Company was exchanging confidential information with competitors.

150.    Jung has been a member of the Board's Compensation Committee (together with Gore) since the end of 2009 and has been the Compensation Committee Chair since 2011.  According to Apple's 2014 Proxy, "[t]he Compensation Committee is responsible primarily for reviewing the compensation arrangements for the Company's executive

---

[13] Katie Marsal, *Apple board member Andrea Jung facing scrutiny at Avon*, APPLE INSIDER, Oct. 28, 2011, *available at* https://appleinsider.com/articles/11/10/28/apple_ board_member_andrea_jung_facing_scrutiny_at_avon (last visited June 26, 2023).

officers, including the CEO, administering the Company's equity compensation plans, and reviewing the Board's compensation."  As a member of the Compensation Committee, Jung is directly involved in overseeing the development of employee compensation programs and reviewing and deciding the compensation arrangements of all key employees.  For example, as stated in Apple's 2006 Proxy, the Compensation Committee has the sole discretion in deciding which "[e]xecutive officers and key employees are eligible to participate in the Performance Bonsu Plan."

151.    Jung signed Apple's November 5, 2008 Form 10-K, which disclosed that the reduction of stock-based awards issued to employees "could negatively impact the Company's ability to attract and retain key personnel."  According to a 2011 media interview given by Gore, the Compensation Committee pays "real close attention" to how Apple attracts world-class talent.[14]  Thus, Jung knew (or should have known) the same information regarding Apple's recruitment and retention issues as the rest of the Board, including the anticompetitive agreements and related practices at Apple.  Because any suit brought by Apple would expose Jung to a substantial likelihood of personal liability for her role in facilitating Apple's anticompetitive agreements, Jung lacks disinterestedness and would not impartially consider a demand.

**D.    Demand Is Futile as to Gore**

152.    Director Gore is incapable of considering a demand in a disinterested manner.  Gore has served as a Senior Advisor to Google since at least 2001, two years before he joined Apple's Board.  During his time as a Senior Advisor, Gore has maintained a close relationship with Google co-founders, Brin and Page.  Gore noted that he has known both Brin and Page since they were 27 years old.  Given this close relationship with the co-founders of Google, and Gore's simultaneous membership of Apple's Board, it is

---

[14] Peter Kafka, *Al Gore on Apple, Google, and the "Broken" U.S. Political System*, ALLTHINGSD, Oct. 20, 2011, *available at* http://allthingsd.com/20111020/former-u-s-vice-president-al-gore-live-at-asiad/ (last visited June 26, 2023).

reasonable to infer that he knew about the improper agreements, and in fact was possibly a reason that the agreement between Google and Apple came to fruition.

153.    Gore has been a member of the Board since 2003 and a member of the Board's Compensation Committee since 2004.  Gore participated in and facilitated the scheme in his capacity as a director of Apple and a member of Apple's Compensation Committee in 2008 and 2009, while the anticompetitive agreements and "Do Not Cold Call" policy were in place at Apple and the Company was exchanging confidential information with competitors.

154.    As a member of the Compensation Committee, Gore is directly involved in overseeing the development of employee compensation programs and reviewing and deciding the compensation arrangements of all key employees.

155.    Gore signed Apple's November 5, 2008 Form 10-K, which disclosed that the reduction of stock-based awards issued to employees "could negatively impact the Company's ability to attract and retain key personnel."  In fact, in a 2011 media interview, Gore admitted that the Compensation Committee paid "real close attention" to how Apple attracts world-class talent.  Thus, Gore knew (or should have known) the same information regarding Apple's recruitment and retention issues as the rest of the Board, including the anticompetitive agreements and related practices at Apple.  Because any suit brought by Apple would expose Gore to a substantial likelihood of personal liability for his role in facilitating Apple's anticompetitive agreements, Gore lacks disinterestedness and would not impartially consider a demand.

**E.    Demand Is Futile as to Wagner**

156.    Director Wagner has been an Apple director and a member of the Audit and Finance Compensation Committee since 2014.  Wagner is co-founder and a director of BlackRock, Inc. ("BlackRock"), an asset management company and Apple's second largest shareholder.  Wagner served as BlackRock's Vice Chairman between January 2006 and July 2012 and was also BlackRock's Chief Operating Officer and Head of Corporate Strategy.  On January 29, 2018, BlackRock filed a Form SC 13G/A disclosing that as of

December 31, 2017, BlackRock owned 319,715,586 shares of Apple stock, or 6.3% of Apple's total shares outstanding. Apple's 2018 Proxy Statement, filed on December 27, 2017 similarly disclosed that BlackRock owned 322,683,504 shares of Apple's common stock, or 6.34% of Apple's common stock outstanding, as of December 31, 2016, making it Apple's second largest shareholder. Due to BlackRock's material investment in Apple, Wagner faces a significant conflict of interest.

157.    Wagner's positions at Apple and BlackRock have affected the investment strategy BlackRock has adopted with respect to Apple.  Indeed, in his 2018 letter to CEOs, "A Sense of Purpose," BlackRock CEO Larry Fink noted that BlackRock places particular emphasis on the role of the company's board of directors in developing long-term strategy and in remaining involved with overseeing such strategy on an ongoing basis, warning that "[d]irectors whose knowledge is derived only from sporadic meetings are not fulfilling their duty to shareholders."[15]  He also noted BlackRock's view that diverse boardrooms are "less likely to succumb to groupthink or miss new threats to a company's business model," and "are better able to identify opportunities to promote long-term growth."  Wagner has received and continues to receive significant financial benefits as a result of her positions at BlackRock.  Thus, Wagner's affiliation with BlackRock and her current role as a director of BlackRock renders her incapable of impartially considering a demand.

**F.    Demand Is Futile as to Sugar**

158.    Director Sugar is incapable of considering a demand.  Sugar has been on the board since November 17, 2010.  Sugar maintains numerous professional and personal relationships with other members of the Board, including Jobs, that create a reasonable doubt as to Sugar's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein.  For example, Jobs gave Sugar a glowing introduction in 2010, when Sugar joined the Board:

> "Ron is an engineer at heart, who then became a very successful
> business leader.  We are very excited to welcome him to Apple's

[15] *Available at* https://www.blackrock.com/corporate/en-us/investor-relations/ larry-fink-ceo-letter (last visited June 26, 2023).

> Board," said Steve Jobs, Apple's CEO. "In addition to having
> been the CEO of a high-tech Fortune 100 company, Ron has a
> Ph.D. in engineering and has been involved in the development
> of some very sophisticated technology."

In response, Sugar stated: "I have always had enormous admiration for the people of Apple; … [i]t is a special privilege to serve on the board of such an amazing company."

### G.   Demand Is Futile as to All Current Directors

159.   Directors  Levinson, Cook, Gore, Jung, Sugar, Bell, Gorsky, Lozano, and Wagner are incapable of considering a demand in a disinterested manner.  Such directors failed to take action to preserve the claims asserted herein, including failing to obtain a tolling agreement with the Individual Defendants.  To be considered independent and objective, a director needs to remain objective about the claims that are the subject of a hypothetical litigation demand.  A director may also not exhibit antagonism towards the claims.  Failing to preserve the ability of Apple to pursue the claims by obtaining tolling agreements is the epitome of antagonism and a lack of objectivity.  Because Directors Levinson, Cook, Gore, Jung, Sugar, Bell, Gorsky, Lozano, and Wagner failed to obtain tolling agreements despite having actual knowledge of the claims asserted herein, demand is futile.

### H.   Demand by Plaintiff Is Futile and Therefore Excused Because a Majority of the Board Is Unable To Conduct an Independent and Objective Investigation of Wrongful Conduct

160.   Demanding that the Board investigate and act upon the wrongdoing alleged herein would be futile since a majority of the Board engaged in the wrongdoing alleged herein and all have interests adverse to performing a fair, unbiased investigation.  These directors breached their fiduciary duties during the relevant period.  The principal wrongdoers and beneficiaries of the wrongdoing, dominated and controlled Apple's Board of Directors and, thus, the Board can neither exercise independent, objective judgment in deciding whether to bring this action, nor could it be expected to vigorously prosecute this action.

161.    Director Defendants Levinson and Cook cannot be relied upon to reach a truly independent decision of whether to commence the demanded action against themselves and those responsible for the misconduct alleged in this Complaint because, among other things, the Board is currently dominated by the Defendants on the Board, who were personally and directly involved in the acts alleged herein and approved the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede.  Apple has made many of the director Defendants multi-millionaires.  This domination of the Board's ability to validly exercise its business judgment renders it incapable of reaching an independent decision whether to accept any demand by Plaintiff to address the wrongs detailed herein.

162.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.  Making a demand on the Board of Directors is excused if there is reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment and, therefore, are entitled to the protection of the business judgment rule.  To benefit from the protection of the business judgment rule, a director must be informed of all material information reasonably available and, being so informed, the director must act with requisite care in discharging his or her duties.  To meet the standard of care, in light of the information which the directors knew, they were obligated to take actions in the best interests of the Company, to the exclusion of the directors' personal pecuniary interests, and conduct full and adequate investigation into decisions affecting the Company and its assets.

163.    Thus, because the Director Defendants engaged in acts of misconduct and wrongdoing, as described above, those acts were not the product of a valid exercise of business judgment and not entitled to the protections of the business judgment rule.  The directors failed to act to protect the interests and business assets of Apple.  Failure to take such protections could not have been a valid exercise of business judgment.  In addition, the practice of illegally restricting hirings has subjected Apple to potentially massive

1   liability.  Further, the Defendants face a substantial likelihood of liability for their

2   individual conduct and, thus, are incapable of making a disinterested decision about

3   whether to pursue the claims asserted herein.

4         164.    Accordingly, demanding that the directors take action before this lawsuit was

5   filed would have been futile and, therefore, the demand requirement is excused.

6         165.    Demand is futile if at least a majority of Apple's Board of Directors cannot

7   fairly and independently adjudicate potential claims against themselves.  Of the current

8   Board of Directors, the majority of Directors participated in the illegal agreement

9   subjecting Apple to criminal charges and financial and reputational risk.  A majority of the

10  Board therefore engaged, and continues to engage, in the wrongdoing and has interests

11  that are adverse to performing a fair, unbiased investigation.

12                              **ADVERSE DOMINATION**

13        166.    The statute of limitations does not bar Plaintiff's shareholder derivative

14  action.  Plaintiff has brought this complaint within the applicable statute of limitations.

15        167.    Alternatively, the statute of limitations was tolled during Jobs's adverse

16  domination of Apple and the concealment by Defendants of their wrongful acts.  Here, the

17  Defendant Directors and Apple were wholly under the adverse domination of Jobs, who

18  controlled shareholder votes.  Consequently, the Director Defendants were "deemed to be

19  in the same position as an incompetent person or a minor without legal capacity either to

20  know or to act in relation to" the wrongful conduct.  *Beal v. Smith*, 46 Cal. App. 271, 279

21  (1920).  Moreover, Defendants concealed, and continue to conceal, their wrongful acts and

22  this is a continuing conspiracy.  The statute of limitations has therefore been tolled since

23  Jobs adversely dominated Apple.  The statute of limitations should not bar Plaintiff, an

24  innocent stockholder, from bringing this shareholder derivative suit.

25

26

27

28

**CLAIMS FOR RELIEF**

**Count I**
**Violations of § 14(a) of the Exchange Act**
**Against Defendants Campbell, Cook, Drexler, Iger, Jung, and Levinson**

168.     Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

169.     Defendants Campbell, Cook, Drexler, Iger, Jung, and Levinson issued, caused to be issued, and participated in the issuance of materially false and misleading written statements and material omissions to shareholders that were contained in Apple's 2014 Proxy.  These Defendants are sued herein for the false statements in Apple's 2014 Proxy due to their review, approval, and participation in the issuance of such proxy.

170.     The 2014 Proxy was materially false and misleading because it omitted information regarding these Defendants' conduct in connection with Apple's anti-poaching practices.  Specifically, the proxy statement affirmatively misrepresented that "The Board oversees the Company's CEO and other senior management in the competent and ethical operation of the Company and assures that the long-term interests of the shareholders are being served."  In reality, the Board was allowing Jobs and other members of senior management to engage in unlawful and unethical behavior that placed Apple at substantial risk of SEC and DOJ enforcement actions and hundreds of millions of dollars in damages. The Proxy also failed to disclose, among other things, that Apple lacked adequate internal controls, that Apple was keeping its labor costs at below-market levels by agreeing with its competitors not to hire employees from each other, that Defendants caused Apple to engage in anti-poaching practices, that the DOJ had been investigating Apple's potential violations of antitrust laws, and that these Defendants' conduct may lead to criminal charges and civil liability against and cause substantial damages to Apple.  Instead, the proxy statement touted these Defendants' "significant and diverse management experience, including strategic and financial planning, public company financial reporting, compliance, risk management and leadership development."  Based on the false and misleading information in the proxy statement, Apple recommended that these

Defendants be re-elected as Apple directors year after year.  As a result of their recommendations, these Defendants were re-elected to Apple's Board.

171.    By reason of the conduct alleged herein, the Defendants, who caused the issuance of the 2014 Proxy, violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, the Defendants named herein misled and/or deceived Apple's shareholders.  The false statements and material omissions were material due to the substantial likelihood that a reasonable shareholder would consider the information important in deciding how to vote with respect to the matters contained in the proxy, which were submitted for shareholder approval at the annual meetings.  Among other things, based on the false statements and material omissions contained in the 2012, 2013, and 2014 Proxies, a majority of shareholders supported the Board's recommendation and voted in favor of re-electing these Defendants to Apple's Board.

172.    Plaintiff, on behalf of the Company, seeks injunctive, declaratory, and equitable relief for these Defendants' violations of § 14(a) of the Exchange Act and their interference with the voting rights of Plaintiff and other Apple shareholders.

173.     This action was timely commenced within three years of the dissemination of the false proxy statements and within one year of the time that Plaintiff discovered or reasonably could have discovered the facts upon which this claim is based.

**Count II**
**Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty Against All Individual Defendants**

174.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

175.    Defendants, as Apple's Directors and/or Officers were and are required to use their abilities to control and manage Apple in a fair, just, and equitable manner to ensure that Apple complies with applicable laws and contractual obligations, to refrain from abusing their positions of control, and not to favor their own interests at the expense of Apple.

176.   By their actions alleged above, Defendants violated their fiduciary duties to Apple, including, without limitation, their duties of good faith, loyalty, and due care.

177.   The wrongful conduct particularized herein was not due to an honest error in judgment but rather to Defendants' wrongful acts as well as bad faith and/or reckless disregard of Apple's rights and interests and its employees, without reasonable and ordinary care which they owed to Apple.

178.   Defendants have participated in harming Apple and have breached fiduciary duties owed to the company.  Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted other Defendants in the breach of their fiduciary duties.

179.   As a result of Defendants' breach of fiduciary duties, Apple has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

180.   The acts of Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiff on behalf of Apple is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

### Count III
### Gross Mismanagement
### Against All Individual Defendants

181.   Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

182.   By their actions alleged above, Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing Apple's assets and business in a manner consistent with the operations of a publicly held corporation.

183.   As a result of the gross mismanagement, Apple has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

184.   The acts of Defendants were done maliciously, oppressively, and with intent to defraud, and Plaintiff on behalf of Apple is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

First Amended Verified Shareholder Derivative Complaint                   Page 80

**Count IV**
**Waste of Corporate Assets**
**Against All Individual Defendants**

185.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

186.    By their actions alleged above, and by failing to properly consider the interests of Apple and its public shareholders by failing to conduct proper supervision, Defendants have caused the Company to waste valuable corporate assets by paying improper compensation and bonuses to certain Directors who breached their fiduciary duties and to incur millions of dollars of legal liability or legal costs to defend Defendants' unlawful actions.

187.    As a result of the waste of corporate assets, Apple has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

188.    The acts of Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiff on behalf of Apple is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

**Count V**
**Breach of Duty of Honest Services**
**Against Defendants Estate of Steven P. Jobs, Cook, and Anderson**

189.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

190.    This claim is brought derivatively on behalf of the Company against Defendants Estate of Steven P. Jobs, Cook, and Anderson for breach of their undivided duty of loyalty to their employer, Apple.

191.     Jobs, Cook, and Anderson were employees of Apple during the relevant time period.

192.    As alleged above, Jobs, Cook, and Anderson breached their duty of loyalty to Apple by not acting solely in Apple's interests in performing their employment duties.

193.    Those breaches of duty consisted of the conduct alleged throughout this complaint including, without limitation, Defendants' causing the Company to enter into unlawful and anticompetitive employee "anti-poaching" agreements, pursuant to which Apple agreed with its competitors not to solicit each other's employees for employment. Jobs, Cook, and Anderson benefitted from their wrongdoing because they received compensation that was directly tied to the company's financial performance, which was higher than it would have been but for the wrongdoing since the wrongdoing helped reduce Apple's compensation expenses.

194.    Apple was harmed by these Defendants' breaches of their undivided duty of loyalty.

195.    By reason of the foregoing, Apple was harmed and will continue to suffer harm as described in greater detail above.

## PRAYER FOR RELIEF

Plaintiff on behalf of Apple requests judgment and relief as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Apple and that Plaintiff is an adequate representative of Apple;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Apple;

C.    Determining and awarding to Apple the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

D.    Directing Apple and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Apple and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to Apple's Bylaws or Articles of Incorporation;

1       E.     Determining and awarding to Apple exemplary damages in an amount

2   necessary to punish the Individual Defendants and to make an example of defendants to

3   the community according to proof at trial;

4       F.     Awarding Apple restitution from the Individual Defendants, and each of

5   them;

6       G.     Awarding Plaintiff the costs and disbursements of this action, including

7   reasonable attorneys' and experts' fees, costs, and expenses; and

8       H.     Granting such other and further equitable relief as this Court may deem just

9   and proper.

**DEMAND FOR JURY TRIAL**

11       Plaintiff demands a trial by jury of all issues so triable.

12   Dated:  June 27, 2023              Respectfully submitted,

13                             BOTTINI & BOTTINI, INC.
                               Francis A. Bottini, Jr. (SBN 175783)
14                             Albert Y. Chang (SBN 296065)

15

                            *s/ Francis A. Bottini, Jr.*

16                              Francis A. Bottini, Jr.

17                             7817 Ivanhoe Avenue, Suite 102
                               La Jolla, California 92037
18                             Tel:   (858) 914-2001
                               Fax:   (858) 914-2002
19                             fbottini@bottinilaw.com
                               achang@bottinilaw.com
20

21                             COTCHETT, PITRE & MCCARTHY, LLP
                               Joseph W. Cotchett (SBN 36324)
22                             Mark C. Molumphy (SBN 168009)
                               Tyson C. Redenbarger (SBN 294424)
23                             Gia Jung (SBN 340160)
                               San Francisco Airport Office Center
24                             840 Malcolm Road, Suite 200
                               Burlingame, California 94010
25                             Tel:   (650) 697-6000
                               Fax:   (650) 697-0577
26                             jcotchett@cpmlegal.com
                               mmolumphy@cpmlegal.com
27                             tredenbarger@cpmlegal.com
                               gjung@cpmlegal.com
28
                               *Attorneys for Plaintiff R. Andre Klein*

## VERIFICATION

I, R. Andre Klein, verify that I am a shareholder of Apple, Inc.  I have reviewed the allegations in this First Amended Verified Shareholder Derivative Complaint.  As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.  Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 27, 2023, at Willsboro, New York.

*R Andre Klein*

_____
R. Andre Klein

# EXHIBIT A

# EXHIBIT A

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
~~Yury A. Kolesnikov (271173)~~

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Tel:    (858) 914-2001
Fax:    (858) 914-2002
fbottini@bottinilaw.com
achang@bottinilaw.com
~~ykolesnikov@bottinilaw~~
COTCHETT, PITRE & McCARTHY, LLP
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Tel:    (650) 697-6000
Fax:    (650) 697-0577
jcotchett@cpmlegal.com

mmolumphy@cpmlegal.com
tredenbarger@cpmlegal.com
giajung@cpmlegal.com

*Attorneys for Plaintiff R. Andre Klein*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| R. ANDRE KLEIN, on behalf of himself and all other stockholders of APPLE INC.,<br><br>                                        Plaintiff,<br><br>vs.<br><br>TIMOTHY D. COOK, WILLIAM V. CAMPBELL, MILLARD ("MICKEY") DREXLER, ARTHUR D. LEVINSON, ROBERT A. IGER, ANDREA JUNG, FRED D. ANDERSON, ESTATE OF STEVEN P. JOBS, deceased, and DOES 1–30, inclusive,<br><br>                                        Defendants,<br><br>- and –<br><br>APPLE INC., a California corporation, | Case No.  14-cv-3634 EJD<br><br>**FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>**1.  VIOLATIONS OF THE EXCHANGE ACT OF 1934;**<br><br>~~1.~~**2.     BREACH OF FIDUCIARY DUTY;**<br><br>~~2.~~**3.     GROSS MISMANAGEMENT;**<br><br>~~3.~~**4.     WASTE OF CORPORATE ASSETS; AND** |

First Amended Verified Shareholder Derivative Complaint

Nominal Defendant.

**4.5.       BREACH OF THE DUTY OF HONEST SERVICES**

**DEMAND FOR JURY TRIAL**

Plaintiff R. Andre Klein, derivatively on behalf of Apple Inc. ("Apple" or the "Company"), alleges the following based upon the investigation of Plaintiff and his counsel, including a review of legal and regulatory filings, press releases, and media reports about Apple.[1]

### NATURE OF THE ACTION

1.      This is a shareholder derivative action seeking to remedy the wrongdoing committed by Apple's senior directors and officers who have caused millions of dollars in damages to Apple and its shareholders.  Plaintiff asserts claims under federal law for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and under state law for breach of fiduciary duty, gross mismanagement, corporate waste, and breach of the duty of honest services.

2.      Apple's co-founder and former Chief Executive Officer ("CEO"), Steve Jobs (now deceased), and other Apple executives and directors entered into unlawful, anti-competitive non-solicitation agreements with executives at other companies, such as Adobe Systems ("Adobe"), Google, Inc. ("Google"), and Intel Corporation ("Intel"). Pursuant to these agreements, which violated United States antitrust laws, the Individual Defendants caused Apple to agree not to recruit the employees of other companies, and *vice versa*.  In an order dated August 8, 2014 in *In re High-Tech Employee Antitrust Litigation*, No. 11-cv-2509 LHK (N.D. Cal.), the Honorable Lucy H. Koh rejected a proposed $324.5 million settlement as inadequate and unfair based in part on the strength of the evidence against Jobs.  Devoting five pages of her 32-page order to discussing the evidence against Jobs, Judge Koh identified him as "a, if not the, central figure in the alleged conspiracy" to engage in anti-poaching practices because "[s]everal witnesses, in their depositions, testified to [Jobs's] role in the anti-solicitation agreements."

---

[1] In compliance with Section III of this Court's Standing Order for Civil Cases, a copy of a red-lined document showing the changes made to the previously filed complaint is attached as **Exhibit A**.

3.      In California, non-compete agreements are generally void and unenforceable, in addition to potentially violating antitrust laws.

4.      The United States Department of Justice ("DOJ") began investigating Apple's hiring practices in 2009.  The DOJ filed a complaint against Apple, Adobe, Google, Intel, Intuit, and Pixar on September 24, 2010, alleging that these companies' private agreements restrained trade, which was *per se* unlawful under the antitrust laws.  The DOJ found the agreements "facially anticompetitive because they eliminated a significant form of competition to attract high tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."  The DOJ stated that the agreements "disrupted the normal price-setting mechanisms that apply in the labor setting."

5.      The DOJ announced a settlement of the action on its website on September 24, 2010.  (A final judgment in the action was entered on March 17, 2011.)  In its September 24, 2010 press release announcing the settlement, the DOJ noted:

> The agreements challenged here restrained competition for affected employees without any procompetitive justification and distorted the competitive process," said Molly S. Boast, Deputy Assistant Attorney General in the Department of Justice's Antitrust Division.

6.      The DOJ's press release further stated:

> In the high technology sector, there is a strong demand for employees with advanced or specialized skills, the department said.  One of the principal means by which high tech companies recruit these types of employees is to solicit them directly from other companies in a process referred to as, "cold calling."  This form of competition, when unrestrained, results in better career opportunities, the department said.

> According to the complaint, the companies engaged in a practice of agreeing not to cold call any employee at the other company.  The complaint indicates that the agreements were formed and actively managed by senior executives of these companies.

7.      Despite the DOJ's investigation, Apple did not disclose to its shareholders the details of the DOJ's investigation.  None of Apple's proxy statements, quarterly filings, and annual filings disclosed the DOJ investigation, the settlement reached in September of 2010, or the final judgment signed on March 17, 2011.  The Company's proxy ~~statements~~statement filed on ~~January 11, 2011, January 9, 2012, January 7, 2013, and~~ January 10, 2014 also failed to disclose the DOJ investigation, settlement, and final judgment.  Similarly, the Company's 8K, 10Q, and 10K filings from October 2010 to ~~the present~~August 2014 do not mention the DOJ's investigation, settlement, or final judgment.

8.      Documents in the public domain confirm the existence of illegal non-solicitation agreements between Apple and other companies and demonstrate explicit agreements to enter into illegal agreements.

9.      In February 2005, Jobs demanded that Sergey Brin, Google's co-founder, instruct his employees to stop recruiting from Apple.  According to Brin, Jobs told him, "***If you hire a single one of these people that means war***" (emphasis added) (Figure 1).

**Figure 1**



From:       Sergey Brin <sergey@google.com> on behalf of Sergey Brin
Sent:       Thursday, February 17, 2005 8:20 PM
To:         emg@google.com; joan@google.com; Bill Campbell
Cc:         arnnon@google.com
Subject:    Re: FW: [Fwd: RE: irate call from steve jobs]

So I got another irate call from jobs today.
I don't think we should let that determine our hiring strategy but thought I would let you know.
Basically, he said "if you hire a single one of these people that means war".
I said I could not promise any outcome but I would discuss it with the executive team again.
I asked if he expected us to withdraw offers and he said yes.

In reviewing the data below again, I do think this could be treated as not just an employee referral since he referred essentially a whole team.  So a compromise would be to continue with the offer we have made (to [Redacted]?) but not to make offers to any of the others unless they get permission from Apple.

In any case, lets not make any new offers or contact new people at Apple until we have had a chance to discuss.

--Sergey

10.     The next day, Bill Campbell (member of Apple's Board of Directors and Google's then-Senior Advisor and mentor to Schmidt) e-mailed Jobs to confirm that Schmidt "***got directly involved and firmly stopped all efforts to recruit anyone from Apple***" (emphasis added).  Campbell added that Jobs will be "rightfully pissed" to hear that Google had made an offer to an Apple employee (Figure 2).

**Figure 2**



Subject: google
Date: Fri, 18 Feb 2005 18:24:09 -0800
From: "Campbell, Bill" <bill_campbell@intuit.com>
To: "Steve Jobs (sjobs@apple.com)" <sjobs@apple.com>
Message-ID: <BEE0888C52AAFA4A8EE285BFD2FE4C390AE762B1@mtvex02.mv.intuit.com>

Steve

I am heading out of town in the AM (off to Montana) and wanted to give you the latest of what I heard from Google after talking to Eric Schmidt.. Eric told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple. Unfortunately (and you will be rightfully pissed), they had already extended an offer to Dave. When I talked to Eric, he simply felt that he could not rescind the offer, but felt that it was doubtful that Dave would take the offer since Google stopped recruiting the other two members of his team.

I am not leaving until 11:00AM if you want to talk.

Bill

11.     In March 2007, Eric Schmidt, then Google's CEO and member of Apple's Board of Directors, e-mailed Jobs to let him know that Google would terminate "within the hour" a recruiter who had contacted an Apple employee in violation of the "do not call" policy between Apple and Google.  Schmidt apologized, adding: "Should this ever happen again please let me know immediately and we will handle.  Thanks!!  Eric."  Jobs then forwarded this e-mail to Danielle Lambert, Apple's Vice President of Human Resources, adding a smiley face (Figure 3).

1   ///

2   ///

3   ///

4   ///

5   ~~///~~

6   ~~///~~

7   ~~///~~

8   ~~///~~

9   ~~///~~

10  ~~///~~

11

12                         **Figure 3**

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

> Date: March 9, 2007 10:05:26 AM PST
> To: Danielle Lambert <lambert@apple.com>
> Subject: Fwd: Google recruiters calling into Apple - isolated incident
>
> :)
> Steve
>
>
> Begin forwarded message:
>
> From: Eric Schmidt <eschmidt@google.com>
> Date: March 9, 2007 8:21:25 AM PST
> To: sjobs@apple.com
> Subject: Google recruiters calling into Apple - isolated incident
>
> Steve, as a followup we investigated the recruiter's actions and she violated our policies. Apologies again on this and I'm including a portion of the email I received from our head of recruiting. Should this ever happen again please let me know immediately and we will handle. Thanks !! Eric
>
> *********************
> From Google recruiting to me:
> On this specific case, the sourcer who contacted this Apple employee should not have and will be terminated within the hour. We are scrubbing the sourcer's records to ensure she did not contact anyone else.
>
> In general, we have a very clear 'do not call' policy (attached) that is given to every staffing professional and I reiterate this message in ongoing communications and staffing meetings. Unfortunately, every six months or so someone makes an error in judgment, and for this type of violation we terminate their relationship with Google.

18
19
20
21
22
23
24

     12.     An August 2007 e-mail reveals that Jobs was made aware of the illegal nature of the non-solicitation agreements.  In an e-mail from Ed Colligan—former President and CEO of Palm, Inc.—to Jobs, Colligan stated, "***Your proposal that we agree that neither company will hire the other's employees ~~. . ..~~ is not only wrong, it is likely illegal***" (emphasis added) (Figure 4).  Colligan's e-mail later revealed that Apple had threatened Palm with a patent lawsuit if an Apple employee were to accept a job offer at Palm.

25
26
27
28

-**Figure 4**

> From: Ed Colligan
> Sent: Friday, August 24, 2007 6:30 PM
> To: 'sjobs@apple.com'
> Subject: Your proposal
>
> Steve:
>
> I have thought long and hard about our conversation on Wednesday, and
> I thought it important to let you know my position on the issues we discussed.
> I hope we can resolve our differences, but it has to be on terms that
> are right not only for our respective companies, but for the
> individuals potentially affected.  Your proposal that we agree that
> neither company will hire the other's employees, regardless of the

> individual's desires, is not only wrong, it is likely illegal. I even
> thought about coming back with a proposal about limiting recruitment
> efforts, but frankly, I did not think it was something you would agree to do.

13.     Jobs's conduct is a reminder that even widely-respected businessmen can knowingly commit unlawful acts in the zealous pursuit of profits.  In this case, Jobs and the other Individual Defendants knowingly caused Apple to enter into agreements that violated California law and U.S. antitrust laws.  Jobs "was a walking antitrust violation," said Herbert Hovenkamp, a professor at the University of Iowa College of Law and an expert in antitrust law.  "I'm simply astounded by the risks he seemed willing to take." *See* Paul M. Barrett and Brad Stone, "Apple, Google, and the Hubris of Silicon Valley's Hiring Conspiracy." BLOOMBERG, May 1, 2014.  In the August 8, 2014 order denying preliminary approval of the $324.5 million proposed settlement in *High-Tech Employee Antitrust Litigation*, Judge Koh set forth evidence showing that Jobs "played a central role in enforcing the [anti-solicitation] agreements" after brokering them.  Specifically, Judge Koh identified e-mails from both Jobs and Campbell showing their direct, hands-on involvement in the anti-poaching practices.

14.     While the Individual Defendants caused Apple to violate antitrust laws, they also caused Apple to issue materially false and misleading proxy statements.  Specifically,

the Individual Defendants caused Apple to omit from its 2012, 2013, and 2014 proxy statements information regarding their misconduct in connection with Apple's anti-poaching practices.  Instead, these proxy statements touted the Individual Defendants' "significant and diverse management experience, including strategic and financial planning, public company financial reporting, compliance, risk management and leadership development."  But these proxy statements failed to disclose, among other things, that the Individual Defendants caused Apple to engage in anti-poaching practices, that the DOJ had been investigating Apple's potential violations of antitrust laws, and that the Individual Defendants' conduct may lead to criminal changes and civil liability against and cause substantial damages to Apple.  Based on the false and misleading information in those proxy statements, Apple recommended that the Individual Defendants be re-elected as Apple directors year after year.  As a result of their recommendations, the Individual Defendants were re-elected to Apple's Board.  Had the true information been revealed or disclosed to shareholders in Apple's proxy statements in 2012, 2013, and 2014, such information would have been material due to the substantial likelihood that a reasonable shareholder would consider such information important in deciding how to vote.  As discussed in detail below, the Individual Defendants violated § 14(a) of the Exchange Act.

**JURISDICTION AND VENUE**

15.     The Court has subject-matter jurisdiction in this action arising under Article III of the United States Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder.  The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.   The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state-law claims.

16.     Venue is proper pursuant to the Exchange Act.  Apple's headquarters are located in Cupertino, California, and the false statements were made in this District.  Defendants' breaches of fiduciary duties, gross mismanagement, and waste of corporate assets occurred in this District.   Each Defendant has sufficient contacts with California as

a Director and/or Officer of Apple to make proper the exercise of personal jurisdiction over them.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Apple maintains its principal executive offices in this District, one or more of the defendants resides in this District, a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts— occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### DIVISIONAL ASSIGNMENT

18.     In accordance with Local Rule 3-2(c), this action has been properly assigned to the San Jose Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of Santa Clara.

### THE PARTIES

**I.     Plaintiff**

18.19.  Plaintiff R. Andre Klein is now and has continuously been a shareholder of Apple, at the time of the transactions that form the basis of this Complaint to the present. Plaintiff first acquired Apple stock on January 15, 2009 and has continuously held such shares from such date to the present.  Plaintiff brings this action derivatively on behalf of Apple.

**II.    Nominal Defendant**

19.20.  Nominal Defendant Apple Inc. is a California corporation headquartered in Cupertino, California.  The Company's stock is publicly traded on The NASDAQ under ticker symbol "AAPL."  The Company was formerly known as Apple Computer, Inc. but changed its name to "Apple Inc." on January 9, 2007 by amending Article I of its Restated Articles of Incorporation.

### III.   The Individual Defendants

#### A.   Defendant Cook

20.21.  Defendant Timothy D. Cook ("Cook") has been Apple's CEO since August 2011 and a member of its Board of Directors since 2005.  Before being named CEO, he was Apple's Chief Operating Officer from October 2005 until August 2011; Executive Vice President of Worldwide Sales and Operations from January 2002 to October 2005; and Senior Vice President of Worldwide Operations from February 1998 to January 2002.

21.22.  Defendant Cook has also been a member of Nike, Inc. ("Nike")'s Board of Directors since 2005.  He currently servesserved as Chair of the Board's Compensation Committee and a member of the Nominating and Corporate Governance Committee.  In 2009, Apple's "Hands Off (Do Not Call List)" included not only technology companies, but also companies such as Nike.  The list reads, "Nike (Common board members)," which suggests that Cook's concurrent role on both the Boards of Apple and Nike facilitated the illegal non-solicitation agreement between the companies.

22.23.  Defendant Cook and Jobs had a very close relationship because Cook had executed Jobs's vision for Apple since 1998.  *Steve Jobs*—an authorized biography of Jobs written by Walter Issacson—"paints a picture of Cook as Jobs'[s] ideal counterpart because he was calm, decisive and didn't want to be in the public eye."  Cook joined Apple in 1998 and quickly earned the trust of Jobs, who had recently taken back control of the company he helped create after being ousted 12 years earlier.  When Jobs first returned to Apple in 1997, he oversaw Apple's supply chain, though he handed that facet of the business over to Cook to focus on a broader strategy for the company.  "I trusted him to know exactly what to do," Jobs told Isaacson, indicating that Jobs and Cook shared the same vision, allowing them to work together at a "high strategic level."[2]

---

[2] Mikey Campbell, *Steve Jobs trusted Tim Cook to "know exactly what to do,"* APPLE INSIDER, Oct. 21, 2011, *available at* http://appleinsider.com/articles/11/10/21/jobs_trusted_cook_ to_know_ exactly_what_to_do (last visited Aug. 7, 2014).

**B.      Defendant Campbell**

23.24.  Defendant William ("Bill") V. Campbell ("Campbell") served as Chairman of Apple's Board of Directors from August 1998 until his sudden resignation on July 17, 2014, and was an executive advisor to Jobs during his life.  Campbell was Jobs's neighbor.  He has also been a member of the Board's Audit and Finance Committee since August 1997 and Compensation Committee since August 2001.  Campbell has a long history with, and strong ties to, Apple.  He joined Apple as Vice President of Marketing in July 1983 and added the title of Vice President of Sales in January 1984.  He became Executive Vice President in September 1984, during which his responsibilities expanded to include distribution, service, and support.  He was named Group Executive of the United States in June 1985.  Campbell founded Claris Corporation in 1987, serving as its President and CEO until Apple acquired it in 1990.

24.25.  Defendant Campbell is also Chairman of Intuit, Inc. ("Intuit"), where he was President and CEO from April 1994 to July 1998, and Interim CEO from September 1999 to January 2000.  In 2009, Apple's "Hands Off (Do Not Call List)" included Intuit.  The list reads, "Intuit (Common board members)," which suggests that Campbell's concurrent role on both the Boards of Apple and Intuit facilitated the illegal non-solicitation agreement between the companies.  In July 2013, Intuit agreed to pay $11 million to settle the claims against it in the *High-Tech Employee* Action.

25.26.  Defendant Campbell was also Google's Senior Advisor and "consigliere" to Eric Schmidt—Google's current Executive Chairman and former CEO until 2010.[3] Campbell advised Google co-founders Sergey Brin and Larry Page to hire Schmidt as Google's CEO in 2001.  Schmidt stated, "[Campbell's] contribution to Google - it is literally not possible to overstate.  He essentially architected the organizational structure."[4]  Apple and Intuit were both on Google's "Special Agreement Hiring Policy, Protocol for 'Do Not

---

[3] Jennifer Reingold, *The Secret Coach*, CNN MONEY, July 21, 2008, *available at* http://www.kellogg.northwestern.edu/faculty/uzzi/ftp/teaching%20materials/recent%20 articles/Networks/The%20secret%20coach%20Fortune.pdf (last visited Aug. 7, 2014).

[4] *Id.*

Cold Call' and 'Sensitive Companies'" list, effectively March 6, 2005 and April 10, 2006, respectively.  Google was similarly on Apple's "Hands Off (Do Not Call List)" in 2009.  In April 2014, Apple, Google, Intel and Adobe agreed to settle the claims against them in the *High-Tech Employee* Action for what is reported to be $324 million.

26.27.  Campbell was part of a small group of intertwining high-level executives in Silicon Valley that negotiated the illegal non-solicitation agreements between Apple, Google, Intel, and Intuit, among other companies.  For example: (1) Campbell informed Jobs that "Eric Schmidt told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple"; (2) Campbell suggested that Google agree to enter into an illegal non-solicitation agreement with Intuit, of which Campbell was Chairman of the Board; (3) Campbell e-mailed Google's co-founder Sergey Brin to report, "Steve Jobs called me again and is pissed that we are still recruiting his browser guy"; (4) Schmidt e-mailed Campbell indicating that he directed a for-cause termination of another Google recruiter who had attempted to recruit an executive of eBay, which was on Google's do-not-cold-call list; and (5) Campbell enforced the Google-Intel agreement when he agreed by e-mail with Google's executives that they should call Paul Otellini (CEO of Intel and member of Google's Board of Directors) before making an offer to an Intel employee.

### C.    Defendant Drexler

27.28.  Defendant Millard ("Mickey") Drexler ("Drexler") has beenwas a Member of Apple's Board of Directors sincefrom 1999 to 2015 and was on the Board's Compensation Committee since November 2002.  Drexler and Jobs had a close working relationship.  Drexler helped design the layout of the Apple stores seen around the world.  "At the time of Jobs'[s] death in October [2011], the pair had worked together for more than a decade, with each serving on each other's board, sharing advice and insights."

28.29.  Defendant Drexler has also been the CEO and Chairman of J.Crew's Board of Directors since 2003.  In 2009, Apple's "Hands Off (Do Not Call List)" not only included technology companies but other companies, such as J.Crew.  The list reads, "JCrew (Common board members)," which suggests that Drexler's concurrent role as Chairman on

both the Boards of Apple and J.Crew facilitated the illegal non-solicitation agreement between the companies.

29.30. Before J.Crew, Defendant Drexler was the CEO of The Gap, Inc. ("Gap") from 1995 until 2002, and Gap's President from 1987 to 1995.  In 1999, Jobs tapped Drexler to build a retail presence for Apple.  At the time, trying to sell computers in a lust-worthy retail environment was presumed ridiculous, so Jobs tracked down his most important weapon, Drexler, who was considered the smartest executive in retail.  When Drexler joined Apple's Board in 1999, Jobs announced, "We've got a great board and Mickey's going to make it even better."

30.31. The working relationship between Defendant Drexler and Jobs expanded when Jobs joined Gap's Board later in 1999 during Drexler's leadership at the company. Drexler and Jobs served on Gap's Board together for three years until 2002.   It was Jobs who informed Drexler that he was about to be fired from Gap in May 2002.  "He was so empathetic with me when I got fired, 'cause he was on the Gap board,'" Drexler recalled. "And ... he said, 'It happened to me.  I feel badly for you'" in reference to the Apple Board's decision to oust him from the Company in 1985.   In 2012, after Jobs'[s] death, Drexler offered an insider's perspective on Jobs'[s] vision, suggesting that the two remained close until the end of Jobs'[s] life.  Speaking at an Innovation Uncensored conference, he stated, "Look at the car industry; it's a tragedy in America.  Who is designing the cars?  [Jobs's] dream before he died was to design an iCar."

**D.     Defendant Levinson**

31.32. Defendant Arthur D. Levinson ("Levinson") has been Chairman of Apple's Board of Directors since November 2011, replacing Jobs upon his death; Co-Lead Director of the Board since 2005; and a member of the Board since 2000.  He was a member of the Board's Audit Committee since 2000 and a member of the Board's Compensation Committee from August 2001 through 2003 and from 2020 to 2023.  Levinson was a close

friend and colleague of Jobs.[5]  Jobs asked Levinson to join Apple's Board when Levinson was Chairman and CEO of Genentech Inc. ("Genentech"), a biotechnology corporation, and has been one of the Company's most visible leaders for a long time.[6]

32.33. Defendant Levinson has also been Chairman of Genentech's Board of Directors since 1999 and was its CEO between 1995 and 1999.  Levinson has therefore concurrently served on the boards of Apple and Genentech for 15 years.  In 2009, Apple's "Hands Off (Do Not Call List)" not only included technology companies but other companies, such as Genentech.  The list reads, "Genentech (CEO sits on our board)," which suggests that Levinson's concurrent role as on both the Boards of Apple and Genentech facilitated the illegal non-solicitation agreement between the companies.

33.34. Levinson has a long history and close ties with Google.  Levinson is a founding investor and the current CEO of Calico, an independent biotech company and Google venture, established in 2013.  Levinson was also a member of Google's Board of Directors from 2004 to 2009 while he was a Director of Apple and Genentech.  Apple and Genentech were both on Google's "Special Agreement Hiring Policy, Protocol for 'Do Not Cold Call' and 'Sensitive Companies'" list, effectively March 6, 2005 and April 10, 2006, respectively.  Google was similarly on Apple's "Hands Off (Do Not Call List)" in 2009.

34.35. Levinson and Eric Schmidt—Google's current Executive Chairman and then-CEO—served on the boards of Apple and Google together from 2006 to 2009.  In 2009, the FTC launched an investigation into whether Levinson's and Schmidt's membership on the two boards violated antitrust laws.  Facing a federal probe, Schmidt resigned from Apple's Board in August 2009, and Levinson resigned from Google's Board in October 2009. When Levinson resigned from Google's Board, Schmidt stated, "Art [Levinson] has been a

---

[5] Kurt Wagner, *Art Levinson, Apple's Chairman, Talks Life After Steve Jobs*, CNN MONEY, Feb. 20, 2013, *available at* http://tech.fortune.cnn.com/2013/02/20/apples-chairman-talks-life-after-steve/ (last visited Aug. 7, 2014).

[6] Ben Parr, *Meet Art Levinson, Apple's New Chairman*, MASHABLE, Nov. 14, 2011, *available at* http://mashable.com/2011/11/15/arthur-levinson-apple/ (last visited Aug. 7, 2014).

key part of Google's success these past five years, offering unvarnished advice and vital

counsel on every big issue and opportunity Google has faced."

35.36. Lucy P. Marcus, CEO of Marcus Venture Consulting and an expert on

corporate governance and board ethics, said of Levinson's dual role as Apple Director and

Calico's CEO: "There is something about this that feels uncomfortable . . . If there is a

conflict of interest, Levinson would have to step out of Apple's boardroom during those

discussions."[7]  Marcus' comment echoes concerns surrounding illegal non-solicitation

agreements made possible by board intermixing.

### E.      Defendant Iger

36.37. Defendant Robert A. Iger ("Iger") has beenwas a member of Apple's Board of

Directors since Novemberfrom 2011 to 2019.  He has also been the Chairman and CEO of

The Walt Disney Company ("Disney") since 2012 and its President and CEO since 2005.

He was its Chief Operating Officer from 2000 to 2005.  Disney acquired Pixar in 2006.

Pixar was established in 1979 as part of the computer division of Lucasfilm before it spun

out as a corporation in 1986 with funding by Jobs, who became its majority shareholder.

37.38. Iger and Jobs developed a friendship over the years that deepened when

Disney acquired Pixar.  In March 2005, when Iger found out he would become the next

CEO of Disney but before it was made public, he called his family and then Jobs.  Iger said,

"I didn't know him very well at the time.  But there was something that struck me that it

would be important to tell him before the world knew."[8]  Iger worked closely with Jobs,

first securing the rights for distribution of Disney/ABC Television Group programming in

Apple iTunes and later spearheading Disney's $7.4 billion acquisition of Pixar when Jobs

was its CEO.  The acquisition solidified Iger's and Jobs's friendship and turned Jobs into

---

[7] Sam Gustin, *Google's Calico Could Pose a Conflict for Apple Chairman Arthur Levinson*, TIME, Sept. 18, 2013, *available at* business.time.com/2013/09/18/googles-calico-could-pose-a-conflict-for-apple-chairman-arthur-levinson/ (last visited Aug. 7, 2014).

[8] Brook Barnes, *Iger on Steve Jobs: "He Pushed You,"* THE NEW YORK TIMES, Oct. 6, 2011, available at http://mediadecoder.blogs.nytimes.com/2011/10/06/iger-on-steve-jobs-he-pushed-you/?_php=true&_type=blogs&_r=0 (last visited Aug. 7, 2014).

Disney's largest shareholder with a 7.4 percent stake and seat on its Board of Directors.[9] During Jobs's lifetime, Iger would call Jobs on Saturdays to see if a Disney movie Jobs saw the night before had "sucked"—a phrase Jobs was not afraid to use.  When Jobs died, Iger released this statement: "Jobs was a great friend as well as a trusted advisor . . . Disney has lost a member of our family, and I have lost a great friend."

38.39. Defendants Cook, Campbell, Drexler, Levinson, Iger, Jung, Anderson, and Jobs are collectively referred to as the "Individual Defendants."  The Individual Defendants and Apple are sometimes collectively referred to as "Defendants."

**F.    Defendant Jung**

39.40. Defendant Andrea Jung ("Jung") is a Director of Apple and has been a director since January 2008.  Jung was Apple's co-lead director from 2009 to 2011.  Jung knowingly or recklessly approved Apple's anti-competitive "no poaching" policies, despite knowledge that such agreements were unlawful and would subject Apple to significant harm.  Jung has been a member of the Board's Compensation Committee since the end of 2009 and has been the Compensation Committee Chair since 2011.

**G.    Defendant Anderson**

40.41. Defendant Fred D. Anderson ("Anderson") was an Apple Director from June 2004 to October 2006, and served as Apple's Executive Vice President and Chief Financial Officer from April 1996 to June 2004.  Anderson knowingly or recklessly approved Apple's anti-competitive "no poaching" policies, despite knowledge that such agreements were unlawful and would subject Apple to significant harm.

**H.    Defendant Jobs**

41.42.  Defendant the Estate of Steven P. Jobs, deceased ("Jobs") is Steve Jobs's estate.  Jobs was a co-founder of Apple and served as an executive officer and director of Apple for most of the Company's existence, up until his death on October 5, 2011.  While

---

[9] Kim Herrera, *Apple Leadership Post-Steve Jobs: What Art Levinson & Bob Iger's Bring to the Board*, ARRIVE PREPARED, Nov. 16, 2011, *available at* http://blog.highbeambusiness.com /2011 /11/apple-leadership-post-steve-jobs-what-art-levinson-bob-iger%2%80%99s-bring-to-the-board/ (Aug. 7, 2014).

serving as Chief Executive Officer and a director of Apple, Jobs personally spear-headed the unlawful anti-poaching agreements described herein, despite ~~knowing~~knowingly or recklessly disregarding the fact that the agreements were unlawful and would expose Apple to significant liability and damages.  The claims asserted herein against Jobs's estate are brought <u>only</u> against the insurance companies that maintained the applicable directors' and officers' liability policies that covered Jobs during the applicable time he served as an executive officer and director of Apple.  Plaintiff seeks only a recovery up to the applicable limits of such policies, and does not seek any amounts from the Estate of Steven P. Jobs.  In accordance with applicable California law, the summons and complaint in this case ~~will be~~were served on such insurance companies.

## IV.   Doe Defendants

~~42.~~43. Except as described herein, Plaintiff lacks sufficient knowledge of the true names of Defendants sued as Does 1 through 30, inclusive, and, therefore, Plaintiff sues these Defendants by such fictitious names.  Following further investigation and discovery, Plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained.  These fictitiously named Defendants are Apple's officers, other members of management, employees and/or consultants or third parties who were involved in the wrongdoing detailed herein.  These Defendants aided and abetted, and participated with and/or conspired with the named Defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## V.   Unnamed Participants

~~43.~~44. Numerous individuals and entities participated actively during the course of and in furtherance of the wrongdoing described herein.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals, to advance the objectives of the scheme and to provide the scheme to benefit Defendants and themselves to the detriment of Apple.

## VI.   Aiding and Abetting

44.45. At all relevant times, Defendants were agents of the remaining Defendants, and in doing the acts alleged herein, were acting within the course of scope of such agency. Defendants ratified and/or authorized the wrongful acts of each of the other Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

45.46. At all relevant times, Defendants pursued a conspiracy, common enterprise, and common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy, common enterprise, and common course of conduct complained of was, *inter alia*, to benefit the defendants personally to the detriment of Apple, by engaging in illegal, fraudulent, and wrongful activities.  Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of therein, and was aware of his/her overall contribution to, and furtherance of, the conspiracy, common enterprise and common course of conduct.  Defendants' acts of conspiracy include, *inter alia*, all of the acts that Defendants are alleged to have committed in furtherance of the wrongful conduct complained of herein.

## STATEMENT OF FACTS

## I.   The Individual Defendants' Conduct Stifled the Market for Labor in Silicon Valley, thus Impairing Innovation

46.47. In the high technology sector, there is a strong demand for employees with advanced or specialized skills.   One of the principal means by which high tech companies like Apple recruit these types of employees is to solicit them directly from other companies in a process referred to as, "cold calling."  This form of competition, when unrestrained, results in better career opportunities.

47.48. During the relevant time period, Apple engaged in a practice of agreeing not to cold call any employee at the other companies.  The agreements were formed and actively managed by senior executives of Apple and the other companies.

48.49. Apple and the other companies' actions reduced their ability to compete for high tech workers and interfered with the proper functioning of the price-setting mechanism that otherwise would have prevailed in competition for employees.   None of the agreements was limited by geography, job function, product group or time period.  Thus, they were broader than reasonably necessary for any collaboration between the companies, the department said.

## II.   In Order to Benefit Themselves, the Individual Defendants Agreed with Their Counterparts from Competing Companies to Refrain from Recruiting from Each Other

49.50.  Jobs did not like the active movement of employees because he did not want to lose good employees and have to pay new employees more money.  As a result, some of the biggest names in Silicon Valley, including Defendants sued herein, entered into agreements where they agreed not to compete in the market for highly skilled employees by halting the practice of recruiting each other's employees.  These agreements were *per se* illegal under the antitrust laws.  Jobs directly called the top executives at other companies if he had evidence or suspicions that their companies were poaching employees from Apple.  Jobs controlled, or had an Apple Director sit on, the board of each company that was actively involved or participated in the conspiracy.

50.51.  By at least early 2004 until at least 2010, Apple, through its highest-ranking executives, entered into agreements with its competitors not to directly solicit each other's employees.  These agreements were concealed from the public, including the companies' shareholders, and the public pronouncements from Defendants were that they aggressively pursued talent.  The agreements not to recruit from other firms were enforced by the highest-level employees and Board members at Apple.

51.52.  Apple's illegal non-solicitation agreements with other companies were not limited by geography, job function, product group, or time period.  For example, an e-mail from one Apple personnel to another suggests that illegal non-solicitation agreements covered all positions, including Sous Chef, which is not considered a high-skilled job traditionally.  The e-mail states Apple personnel discussed the "sensitivity" of this issue

and decided, "We are not recruiting these folks, they are actively seeking us out."
Additionally, the e-mail confirms the existence of an illegal non-solicitation agreement
between Google and Apple by revealing, "I have heard some rumblings in the last couple of
months that Google may not necessarily be honoring their part of the hands-off policy . . ."
(Figure 5).

**Figure 5**



Subject: Fwd: Sous Chef application
Date: Tue, 03 Jun 2008 08:21:39 -0700
From: Mark Bentley <mbentley@apple.com>
To: Danielle Lambert <lambert@apple.com>
Message-ID: <C85278AC-622D-4543-AD67-56F386FB2D3E@apple.com>

Heads up that we are getting a few folks from Google submitting their resumes to our website ( for
the Dickman openings ).   I spoke to Julie Gaither about the sensitivity around this a few weeks
ago, and she gets it loud & clear ( as does John evidently ).   We are not recruiting these folks,
they are actively seeking us out.

Please let me know if you want recruiting to be handling this differently?   Also, just as a side note,
I have heard some rumblings the last couple of months that Google may not necessarily be
honoring their part of the hands-off policy, although I don't have any hard evidence.   I know we
have lost a couple of people recently from HW to them, but I believe both were fairly unhappy
folks, so it's hard to say how things actually got initiated.

Mark

### A.   The Conspiracy Began with Express Illegal Agreements Between Pixar and Lucasfilm

~~52.~~53.  The illegal non-solicitation agreements did not begin with Apple.  In fact,
they began with an agreement between senior executives of Pixar and Lucasfilm.  Apple's
co-founder and former CEO Jobs, however, has a long history with Pixar.  Jobs purchased
Lucasfilm's computer graphics division, established it as an independent company, and
called it Pixar in 1986.  Jobs was also Pixar's CEO until 2006.

~~53.~~54.  Beginning no later than January 2005, while Jobs was Pixar's CEO, senior
executives at Pixar and Lucasfilm entered into various illegal non-compete agreements.
For example, they agreed not to cold call each other's employees; notify each other when

making an offer to an employee of the other company, if that employee applied on his or her own; and if either ~~a~~ company made an offer to such an employee of the other company, neither company would counteroffer above the initial offer.  The latter agreement had the intent and effect of eliminating "bidding wars," in which an employee could use multiple rounds of bidding between Pixar and Lucasfilm to increase his or her total compensation.

~~54.~~55.  In July 2005, Sharon Coker—Lucasfilm's Director of Human Services—e-mailed Lori McAdams—Pixar's then-Vice President of Human Resources and Administration, asking for confirmation that Pixar made an offer to one of Lucasfilm's systems engineers.  Coker also sought confirmation of McAdam's understanding that Pixar could not make a counteroffer once it made an offer (Figure 6).

**Figure 6**

| | |
|---|---|
| **From:** | Sharon Coker <Sharon.Coker@lucasfilm.com> |
| **Sent:** | Thursday, July 28, 2005 2:33 PM |
| **To:** | Lori McAdams |
| **Subject:** | Need confirmation |

Cliff believes that one of our systems engineers, Robert Molholm, has been extended an offer by Pixar.  Can you confirm?  And can I also confirm your understanding that once you have extended an offer, you will not counter?  Thanks!


Sharon Coker

Director, Human Resources

Lucasfilm Entertainment Co. Ltd.

415-662-7785

~~55.~~56.  An e-mail from one Lucasfilm personnel to another ~~a~~ several years later in April 2007 confirms that the agreement between Pixar and Lucasfilm was in effect for years: "***We have a standing agreement with Pixar, which I believe to be an informal 'gentleman's agreement' forged a few years ago*** . . . to call each other, HR to HR, whenever we extend an offer to someone who works for the other company . . .

1  ***We have agreed that we want to avoid bidding wars.***  Pixar will give our

2  employee their final best offer before calling us" (emphasis added) (Figure 7).

6  **Figure 7**



From: Sharon Coker
Sent: Tuesday, April 17, 2007 2:55 PM
To: Jan van der Voort
Subject: Pixar agreement

We have a standing agreement with Pixar, which I believe to be an informal "gentleman's agreement" forged a few years ago (Mich knows the history of it), to call each other, HR to HR, whenever we extend an offer to someone who works for the other company. At the point that I receive that call, in the instance where Pixar is job offering a Lucas employee, I notify the Exec, HRM and manager of our employee that an offer has been made. We are free to approach the employee (or not) and have a "save" conversation with them if we want to retain them. Pixar will not give us details on the comp or job role they have offered, but if the employee shares it and we want to counter, we can do so, and Pixar will not give the employee a different or additional offer. We have agreed that we want to avoid bidding wars. So Pixar will give our employee their final best offer before calling us.
Other:
-Lori MacAdams is the VP of HR at Pixar. She is my contact and her telephone number is 510-922-3564. Her e-mail address is lmacadams@pixar.com. Lori is a former head of HR at Lucas...about 7 or 8 years ago, and still has many friends here, including Steve C and Lori Aultman.
-The other value in this call is that we will sometimes lose the employee to Pixar, but can negotiate release date if we need to. There is sometimes flexibility on this issue, and sometimes not.
-We do not have this arrangement with any other studio
-Recruiting here should be made familiar with this agreement, so that if we offer a Pixar employee, we follow the protocol. (This was one of those things that probably fell through the crack when we split HR and Recruiting here...at one time the recruiters knew this, but we have made so many changes...not sure it ever even came up between BZ and me). We should also inform the candidate that we will be making that call, so that they can talk to their manager at Pixar first if they want to.
-Part of the agreement is not to solicit each other's employees. These guidelines are intended for the situation where a Pixar employee has responded on their own to one of our job postings directly (or visa versa). Our employees are hands off to each other in terms of soliciting talent.

Jan, let me know if you want to get the calls from Lori (and visa versa) or if you want BZ to assume that role, and then I will make an e-mail introduction and handoff.

19  56.57.  Later that year, in December 2007, McAdams e-mailed Jan van der Voort of

20  Lucasfilm clarifying the illegal non-solicitation agreement between Pixar and Lucasfilm:

21  "it's ok for us to interview and make offers to each other's employees, we just don't ever

22  directly solicit talent . . . we just have a courtesy call when the offer is made, and then we

23  don't counter each other" (Figure 8).  McAdams also attached Pixar's hiring policy with

24  respect to Lucasfilm candidates, which refers to the two companies' "gentleman's

25  agreement" (Figure 9).

26  ///

27  ///

28  ///

1   ///

2   ///

3   ///

4   ~~///~~

5   ~~///~~

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Figure 8**

1

**Figure 8**

| | |
|---|---|
| **From:** | Lori McAdams <lmcadams@pixar.com> |
| **Sent:** | Tuesday, December 11, 2007 9:50 PM |
| **To:** | jan.vandervoort@lucasfilm.com |
| **Subject:** | |
| **Attach:** | Lucasfilm candidates.doc;ATT00686.htm |

Hi Jan,

I hope this message finds you well.  Funny that we went for so long without finding a reason to connect, and here it turns out I have a second item for you.  At least this time I think it'll sound like good news to you.

We have a current intern,          who is interested in being considered for a position with Lucasfilm.          let his managers know that he'd need an okay from us to be hired at LFL.  I wanted to let you know that of course it's fine with us for you to consider      .  His specific situation is that he'll be finished with his work on our 2008 film in April, and unfortunately we don't have a regular fulltime position to offer him.  With our full support, we hope he'll explore other studios and find a spot that's right.  If you could please let your Associate Recruiter Rosie Server know we're okay with your considering him, that'd be great (I assume that's a real person and not an applicant bot! :-) )

What I wanted to highlight in general is that it's okay for us to interview and make offers to each other's employees, we just don't ever directly solicit talent.  So if someone applies to LFL on their own from Pixar, by all means you should consider them.  We just have a courtesy call when the offer is made, and then we don't counter each other.  The same is true in reverse.  In case it's helpful, attached is a document I wrote up awhile back to help our team here know how it works.  Feel free to read it and know that we know that LFL reciprocates.

If you have any questions, please give me a call.  I hope we can meet in person in the new year.  Thanks much,

--Lori

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

**Figure 9**



> ### Lucasfilm candidate process
>
> Our gentleman's agreement with the Lucas companies has been as follows:
>
> - When we receive a resume and/or reel from a current Lucasfilm employee, our Recruiting team reviews it and if we feel they are qualified for an open position, we contact the candidate, usually by phone. (Many of our Lucas candidates come through Pixar employee referrals since it's a small world here in Northern California.) HR/Recruiting never solicits Lucas employees ourselves.
>
> - In that initial phone conversation, we let the candidate know that we will consider them, but if it should turn out that we want to make them an offer, they will need to notify their manager at Lucasfilm, and we will follow up with a phone call to Lucasfilm HR (or in some cases particular senior managers) to let them know we have made an offer to the candidate. We let the candidates know this up front because if they are apprehensive about this process, we don't want to waste their time or ours in interviewing them.
>
> - If the candidate wishes to be considered, we then put them through our regular interview process and make a decision on whether or not we want to extend an offer.
>
> - When an offer is made, we ask the Lucasfilm employee to notify their manager and then we follow up with a call to Lucasfilm HR (usually the HR Director) and/or in many cases, Colum Slevin, Dir. of CG at ILM (since most the candidates are from ILM), or Gail Currey at Lucasfilm Animation.
>
> - Once we have had the conversation with LFL, we never counter if the candidate comes back to us with a better offer from Lucasfilm.
>
> - Lucasfilm honors this process & agreement in return (the calls from LFL come to Lori)

57.58. Pixar and Lucasfilm entered into illegal non-solicitation agreements through direct and explicit communications among senior executives. Pixar even drafted the written terms of the agreements and sent those terms to Lucasfilm. Pixar and Lucasfilm provided these written terms to management and certain senior employees with the relevant hiring or recruiting responsibilities.

58.59. After entering into the agreements, senior executives of both Pixar and Lucasfilm monitored compliance and policed violations. For example, in 2007, Pixar twice contacted Lucasfilm regarding suspected violations of their agreement. Lucasfilm

1  responded by changing its conduct to confirm to its illegal non-solicitation agreements

2  with Pixar.  During the conspiracy, ~~Jobs's~~Jobs' position as both Apple's CEO and Pixar's

3  CEO paved the road for the conspiracy between Pixar and Lucasfilm to spread to Apple

4  and approximately other companies.

5  **B.    Apple Enters Into an Express Illegal Agreement with Pixar**

6  ~~59.~~60. Steve Jobs was a major player in entering into and monitoring the illegal

7  agreement.  Jobs had a long history with Pixar.  Jobs had purchased Pixar—Lucasfilm's

8  computer graphics division—and established it as an independent company called Pixar in

9  1986.  He became and remained Pixar's CEO until 2006.  While Jobs was Pixar's CEO, he

10  and other senior executives at Pixar entered into at least three non-solicitation agreements

11  with Lucasfilm's senior executives.  Beginning no later than February 2004, Apple entered

12  into an illegal non-recruit agreement with Pixar.  Senior executives of both companies

13  agreed not to cold call each other's companies.  Jobs continued to exert substantial control

14  over Pixar when it entered into the agreement with Apple.  When Jobs died, John Lasseter

15  and Ed Catmull of Pixar issued a joint statement, saying, Jobs "was an extraordinary

16  visionary, our very dear friend and the guiding light of the Pixar family . . . He will forever

17  be part of the Pixar's DNA."

18  ~~60.~~61. An e-mail from Rob Cook—Pixar's then-Vice President of Software

19  Engineering—to Jobs in February 2004 first sheds documentary evidence on their

20  agreement not to recruit each other's employees.  Cook's e-mail informed Jobs that "[a]n

21  Apple employee has applied for the job of project coordinator . . . Since she's a support

22  person instead of an engineer, I'm hoping this won't be a problem.  Would it be OK for us

23  to make her an offer?"  Jobs consented.  (Figure 10).

24  ///

25  ///

26  ///

27  ///

28  ///

1   ///

2   ///

3   ///

**Figure 10**



>> From: Steve Jobs <sjobs@apple.com>
>> Date: February 8, 2004 3:32:21 PM PST
>> To: Rob Cook <rob@pixar.com>
>> Subject: Re: Renee Adam
>>
>> Yea, its fine.
>>
>> Steve
>>
>>
>>
>> On Feb 8, 2004, at 3:30 PM, Rob Cook wrote:
>>
>> Steve,
>>
>> An Apple employee has applied for the job of project coordinator,
>> which is basically an administrative assistant to our project
>> managers. Since she's a support person instead of an engineer, I'm
>> hoping this won't be a problem.
>>
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
>>
>> Would it be OK for us to make her an offer?
>>
>> Rob
>>

61.62. Rob expressed excitement over Jobs's authorization and hinted that Pixar was facing difficulties with, and not looking forward to, the idea of recruiting another project manager in light of the illegal non-solicitation agreement:  "Hooray!  I know this doesn't sound like a big deal, but sometimes it can be surprisingly hard to find great support people, and we weren't cherishing the thought of having to keep looking."  A subsequent e-mail from "EC" in the same e-mail thread between Jobs—probably from an Apple employee—stressed, "The key is to stay away from the engineers" (Figure 11).

///

///

///

///

///

///

1

**Figure 11**

| From: | EC |
| Sent: | Sunday, February 8, 2004 6:46 PM |
| To: | Rob Cook <rob@pixar.com> |
| Subject: | ██████████ |

The key is to stay away from the engineers.

On Feb 8, 2004, at 3:41 PM, Rob Cook wrote:

> Hooray!
>
> I know this doesn't sound like a big deal, but sometimes it can be
> surprisingly hard to find great support people, and we weren't
> cherishing the thought of having to keep looking.
>
> Rob
>
>
> Begin forwarded message:
>
>> From: Steve Jobs <sjobs@apple.com>
>> Date: February 8, 2004 3:32:21 PM PST
>> To: Rob Cook <rob@pixar.com>
>> Subject: Re: Renee Adam
>>
>> Yea, its fine.
>>
>> Steve
>>

62.63. The following year, Howard Look—Pixar's then-Vice-President of Software—e-mailed Apple personnel in November 2005, confirming that the illegal non-solicitation agreement between Apple and Pixar was still in effect and suggesting that Pixar was facing continued difficulties with recruiting due to the agreement.  Look informed Apple that Pixar was "**having a hard time finding world class s/w dev candidates** with Objective-C/Cocoa experience, and **we of course cannot recruit out of Apple**.  Do you have any leads on candidates?" (emphasis added) (Figure 12).

**Figure 12**

| From: | Howard Look <howard@pixar.com> |
|---|---|
| Sent: | Wednesday, November 9, 2005 11:39 AM |
| To: | William Stein <wstein@apple.com>; Scott Forstall <forstall@apple.com>; Brett Halle <brett@apple.com> |
| Bcc: | Howard Look <howard@pixar.com> |
| Subject: | Rock star Objective-C/Cocoa people? |

Hi Will, Scott and Brett,

We having a hard time finding world-class s/w dev candidates with Objective-C/Cocoa experience, and we of course cannot recruit out of Apple.

Do you have any leads on candidates?

Any leads on great contractors that might want to do some quick & dirty UI prototypes for us, maybe a 6 month stint?

Thanks,
Howard

63.64. The illegal non-solicitation agreement between Apple and Pixar was still going strong in April 2007.  An e-mail between from Lori McAdams—Pixar's then-Vice President of Human Resources and Administration—to others at Pixar with the subject "Apple gentleman's agreement" stated, "I just got off the phone with Danielle Lambert [Apple's Vice President of Human Resources], and we agreed that effective now, **we'll follow ~~the~~ a gentleman's agreement with Apple that is similar to our Lucasfilm agreement** ~~. . .~~....  Danielle will ask her Recruiting team to follow the same procedure." This e-mail confirms the mutuality of the Apple-Pixar express illegal agreement and the existence of Pixar-Lucasfilm express illegal agreement.  The e-mail also explains the agreement between Apple and Pixar in detail, as shown by the substance of the emails (Figure 13).

**Figure 13**

| From: | Lori McAdams <lmcadams@pixar.com> |
|---|---|
| Sent: | Monday, April 30, 2007 1:44 PM |
| To: | recruitingdivas <recruitingdivas@pixar.com> |
| Cc: | Erica Perkins-Youman <ericapy@pixar.com>; Jannine Hemphill <jhemphill@pixar.com>; Stephanie Sheehy <ssheehy@pixar.com> |
| Subject: | Apple gentleman's agreement |

Hi all,

I just got off the phone with Danielle Lambert, and we agreed that effective now, we'll follow a gentleman's agreement with Apple that is similar to our Lucasfilm agreement.

That is:

* we won't directly solicit any Apple employee (including outside recruiters if we use them)
* if a current Apple employee submits a resume, we will consider them like any other candidate
* any candidate we bring in for interviews should be told of our gentleman's agreement early on in the process
* at the point we make an offer, I'll call Danielle and let her know who was made an offer and where he/she works
* we should keep a good paper/digital trail to demonstrate the person approached us in case we need it

Danielle will ask her Recruiting team to follow the same procedure, but given their scale, this isn't likely to apply to the retail organizations.

I will talk with Ed about this at my next 1-1 to confirm he's comfortable with it, but feel free to work this way unless/until you hear differently.

Thanks!

--Lori

64.65. In July 2009, Pixar appeared on Apple's "Hands Off (Do Not Call List),"
attached to an e-mail between Apple personnel, which demonstrates that the illegal non-solicitation agreement between Apple and Pixar had been going on for at least five years (Figure 14).  The competition for talent in Silicon Valley between Apple and Pixar was effectively squelched for at least half a decade.

**Figure 14**

From:    David Alvarez <david.alvarez@apple.com>
To:      Jonathan Geyer <jgeyer@apple.com>
**Subject:**  List
**Received(Date):**    Thu, 9 Jul 2009 17:25:08 -0700
Handsofflist.doc

---

**Hands Off (Do Not Call List) :**

Microsoft – Mountain View (exchange group and Mac group)
Garmin
Palm
Adobe (Software partner)
Aspyr
AMD/ATI
Best Buy
CDW
Cingular
Comp USA (product re-seller)
Foxconn
Genentech (CEO sits on our board)
Google
Ingram Micro
Intel
Intuit (Common board members)
JCrew (Common board members)
Mac Zone
Nike (Common board members)
Nvidia
PC Connection
PC Mall
Pixar
Lucas
Quanta
Tech Data
Zones

## C.    Apple Enters Into an Express Illegal Agreement with Google

65.66. Google and Apple agreed in early 2005 not to recruit each other's employees. At the time, Defendant Campbell was a member of Apple's Board of Directors and Google's Senior Advisor (not to mention Chairman of Intuit's Board of Directors).

66.67. The earliest public documentation of the illegal non-solicitation agreement between Apple and Google are e-mails from Sergey Brin—Google's co-founder—to Google's Executive Management Group and Joan Braddi—Google's VP of Search Services—

describing threats that Jobs had made against Google upon suspicion that Google was recruiting Apple employees working on the Safari browser.

~~67.~~68.  In Brin's February 13, 2005 e-mail with the subject "**irate call from steve jobs**" to the Executive Management Group and Braddi, Brin reported that he "got a call from steve jobs today who was very agitated . . . it was about us recruiting from the safari team.  he was sure we were building a browser and were trying to get the safari team" (emphasis added).  Brin revealed that **Jobs "made various veiled threats,"** and Brin soothed him by telling him "we were not building a browser and that to my knowledge we were not systematically going after the safari team in particular" (emphasis added).  Brin's e-mail served to confirm "what we want to do about partners/friendly companies and recruiting . . . [Jobs] told me he was cool with us hiring anyone who came to us but was angry about systematic solicitation.  i don't know if there is some systematic safari recruiting effort htat [sic] we have" (Figure 15).  Brin's e-mail suggests that Jobs initiated Apple's illegal non-solicitation agreement with Google in early 2005.  (Figure 16).

**Figure 15**



From: Sergey Brin [mailto:sergey@google.com]
Sent: Sunday, February 13, 2005 1:06 AM
To: Emg@Google. Com; Joan Braddi
Subject: irate call from steve jobs

so i got a call from steve jobs today who was very agitated.
it was about us recruiting from the safari team.
he was sure we were building a browser and were trying to get the safari team.
he made various veiled threats too though i am not inclined to hold them against him too much
as he seemed beside himself (as eric would say).

anyhow, i told him we were not building a browser and that to my knowledge we were not systematically
going after the safari team in particular.  and that we should talk about various opportunities.
i also said i would follow up and check on our recruiting strategies wrt apple and safari.  he seemed soothed.

so i just wanted to check what our status was in various respects and what we want to do about partners/friendly
companies and recruiting.  on the browser, i know and told him that we have mozilla people working here ...
largely on firefox.  i did not mention we may release an enhanced version but i am not sure we are going to yet.
on recruiting i have heard recently of one candidate out of apple that had browser expertise so i guess he would
be on safari.  i mentioned this to steve and he told me he was cool with us hiring anyone who came to us but was
angry about systematic solicitation.  i don't know if there is some systematic safari recruiting effort htat we have.

so please update me on what you know here and on what you think we should have as policy.
on another note, [                                    Redacted - Not Responsive                                    ]

68.69. Later that month, on February 13, 2005, Jobs again called Brin with a threat, as a result, Brin agreed to stop recruiting from Apple.  In another e-mail from Brin to the Executive Management Group and Braddi, Brin memorializes that he "got another irate call from jobs today," threatening **"if you hire a single one of these [Apple] people that means war"** (emphasis added).  Additionally, Brin asked Jobs if he "expected [Google] to withdraw offers and he said yes."  Brin's e-mail reveals that he told Jobs that he will "discuss it with the executive team again."  Brin instructed the Executive Management Group and Braddi not to "make any new offers or contact new people at Apple until we had a chance to discuss."

**Figure 16**



From:        Sergey Brin <sergey@google.com> on behalf of Sergey Brin
Sent:        Thursday, February 17, 2005 8:20 PM
To:          emg@google.com; joan@google.com; Bill Campbell
Cc:          arnnon@google.com
Subject:     Re: FW: [Fwd: RE: irate call from steve jobs]

So I got another irate call from jobs today.
I don't think we should let that determine our hiring strategy but thought I would let you know.
Basically, he said "if you hire a single one of these people that means war".
I said I could not promise any outcome but I would discuss it with the executive team again.
I asked if he expected us to withdraw offers and he said yes.

In reviewing the data below again, I do think this could be treated as not just an employee referral since he
referred essentially a whole team.  So a compromise would be to continue with the offer we have made (to [Redacted]?)
but not to make offers to any of the others unless they get permission from Apple.

In any case, lets not make any new offers or contact new people at Apple until we have had a chance to discuss.

--Sergey

69.70. To ensure compliance with the agreement, Google placed Apple on its internal "Do Not Call" list, which instructed Google employees not to cold call Apple employees.  Apple also informed its relevant personnel about its agreement with Google and instructed them not to cold call Google employees.  Senior executives of Google and Apple monitored compliance with the agreement and policed violations.

70.71.  On February 18, 2005, Defendant Campbell (member of Apple's Board of Directors, Google's Senior Advisor and mentor to its then-CEO, Eric Schmidt, and

Chairman of Intuit's Board of Directors) e-mailed Jobs from his Intuit e-mail account to provide an update on Apple's illegal hiring agreement with Google.  Defendant Campbell's e-mail stated that **Schmidt** "**told [Campbell] that he got directly involved and firmly stopped all efforts [at Google] to recruit anyone from Apple**" (Figure 17).

**Figure 17**

Subject: google
Date: Fri, 18 Feb 2005 18:24:09 -0800
From: "Campbell, Bill" <bill_campbell@intuit.com>
To: "Steve Jobs (sjobs@apple.com)" <sjobs@apple.com>
Message-ID: <BEE0888C52AAFA4A8EE285BFD2FE4C390AE762B1@mtvex02.mv.intuit.com>

Steve

I am heading out of town in the AM (off to Montana) and wanted to give you the latest of what I heard from Google after talking to Eric Schmidt.. Eric told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple. Unfortunately (and you will be rightfully pissed), they had already extended an offer to Dave. When I talked to Eric, he simply felt that he could not rescind the offer, but felt that it was doubtful that Dave would take the offer since Google stopped recruiting the other two members of his team.

I am not leaving until 11:00AM if you want to talk.

Bill

71.72.  The next day, Danielle Lambert—Apple's Vice President of Human Resources—circulated an internal memorandum to all of Apple's recruiters in the U.S., reflecting that Apple and Google agreed not to recruit each other's employees.  Lambert instructed, "Please add Google to your 'hands-off' list," and requested recruiters to apprise her of any violations by Google (Figure 18).

**Figure 18**

Subject:  Google
From:    "Danielle Lambert" <lambert@apple.com>
Received(Date):    Sat, 26 Feb 2005 05:28:46 +0000
To:       <usrecruitingall@group.apple.com>

All,

Please add Google to your "hands-off" list. We recently agreed not to recruit from one another so if you hear of any recruiting they are doing against us, please be sure to let me know.

Please also be sure to honor our side of the deal.

Thanks,
Danielle

72.73.  By at least early March 2005, Google's illegal non-solicitation agreement with Apple became "effective."  A Google internal memorandum lists Apple as a company having a special agreement with Google and is part of the "Do Not Call" list, effective March 6, 2005; Google's protocol was "[n]ot to directly cold call into" companies on this list (Figure 8). Google's first illegal non-solicitation agreements came on the heels of Jobs's threat to Brin to stop all recruiting at Apple (Figure 19).

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

**Figure 19**



73.74. Jobs continued to monitor the agreements and contacted Google's CEO about violations.  The following year, in a February 13, 2006 e-mail from Jobs to Schmidt—Google's then-CEO—Jobs complained, "I am told that Googles [sic] new cell

phone software group is relentlessly recruiting in our iPod group.  If this is indeed true, can you put a stop to it?"  On the same day, Schmidt replied, "**I'm sorry to hear this**; **we have a policy of no recruiting of Apple employees**.  **I will investigate immediately**!" (emphasis added) (Figure 20).  Later that year, on August 28, 2006, Schmidt was elected to Apple's Board of Directors, where he served until August 2009 when Schmidt resigned due to conflicts of interest amid the growing competition between Apple and Google.

**Figure 20**



Subject: RE: Recruiting
Date: Mon, 13 Feb 2006 15:17:11 -0800
From: "Eric Schmidt" <eschmidt@google.com>
To: "Steve Jobs" <sjobs@apple.com>
Message-ID: <200602132317.k1DNHCf1029022@stewie.corp.google.com>

I'm sorry to hear this; we have a policy of no recruiting of Apple
employees. I will investigate immediately ! Eric

-----Original Message-----
From: Steve Jobs [mailto:sjobs@apple.com]
Sent: Monday, February 13, 2006 3:15 PM
To: Eric Schmidt
Subject: Recruiting

Eric,

I am told that Googles new cell phone software group is relentlessly
recruiting in our iPod group. If this is indeed true, can you put a stop to
it?

Thanks,
Steve

75.    The next year, in a March 7, 2007 e-mail from Jobs to Schmidt, Jobs again protested Google's suspected violations of its illegal non-solicitation agreement with Apple: "Eric [Schmidt], I would be very pleased if your recruiting department would stop doing this" (Figure 21) in reference to an e-mail from a recruiter for the Google.com Engineering team (Figure 22).

74.

**Figure 21**

Begin forwarded message:
From: ████████████████
Date: March 7, 2007 9:46:13 AM PST
To: ███████████████
Subject: Google.com Engineering Recruitment Team

Hello ██████

My name is ████████████ and I am a Recruiter for the "Google.com
Engineering" team formerly known as the "Site Reliability Engineering"
team. I found your contact information on the Internet. I am
interested to know more about your past work experience and openness
to new opportunities. We currently have positions available at Google
that may be a good match for you. If you are open to exploring these
opportunities further please send an updated version of your resume in
word, html, or pdf form to me as soon as possible. Let me know when
would be a good time to talk, please include your phone number.

**Figure 22**

From: Steve Jobs [mailto:sjobs@apple.com]
Sent: Wednesday, March 07, 2007 10:44 PM
To: Eric Schmidt
Subject: Google Recruiting from Apple

Eric,

I would be very pleased if your recruiting department would stop doing this.

Thanks,
Steve

~~75.~~76.  In response, Schmidt e-mailed Annon Geshuri—Google's then-Chief Staffing
Architect—the next day to "get this stopped and let me know why this is happening?  I will
need to send a response back to Apple quickly so please let me know as soon as you can."
Geshuri replied to Schmidt, reporting,

> On this specific case, **the sourcer who contacted this
> Apple employee should not have and will be
> terminated within the hour** ~~. . .~~.  In general, we have a
> very clear 'do not call' policy that is given to every staffing
> professional and I reiterate this message in ongoing
> communications and staff meetings . . . for this type of violation
> we terminate [the employee's] relationship with Google.
> **Please extend my apologies as appropriate to Steve
> Jobs**.  This was an isolated incident and we will be very careful
> to make sure this does not happen again (emphasis added)
> (Figure 23).

76.77.  Schmidt's responded, "Appropriate response.  Please make a public example of this termination with the group.  Please also make it a very strong part of the new hire training for the group."  (Figure 23).

**Figure 23**

| From: | Shona Brown | Sent:3/11/2007 12:57 PM |
|---|---|---|
| To: [ - ] | Arnnon Geshuri | |
| Cc: [ - ] | Eric Schmidt; Laszlo Bock; Judy Gilbert | |
| Bcc: [ - ] | | |
| Subject: | Re: FW: Google Recruiting from Apple | |

Arnnon-
Appropriate response. Please make a public example of this termination with the group. Please also make it a very strong part of new hire training for the group. I want it clear that we have a zero-tolerance policy for violating our policies. This should (hopefully) prevent future occurences.

On 3/8/07, Arnnon Geshuri <arnnon@google.com> wrote:

Eric,

On this specific case, the sourcer who contacted this Apple employee should not have and will be terminated within the hour. We are scrubbing the sourcer's records to ensure she did not contact anyone else.

In general, we have a very clear 'do not call' policy (attached) that is given to every staffing professional and I reiterate this message in ongoing communications and staffing meetings. Unfortunately, every six months or so someone makes an error in judgment, and for this type of violation we terminate their relationship with Google.

Please extend my apologies as appropriate to Steve Jobs. This was an isolated incident and we will be very careful to make sure this does not happen again.

Thanks,
Arnnon

On 3/8/07, Eric Schmidt < eschmidt@google.com> wrote:

I believe we have a policy of no recruiting from Apple and this is a direct inbound request. Can you get this stopped and let me know why this is happening? I will need to send a response back to Apple quickly so please let me know as soon as you can.

Thanks Eric

77.78.  Three years later, in 2009, an Apple internal e-mail reveals that the illegal non-solicitation agreements were mutual and ongoing.  Google appeared on Apple's "Hands Off (Do Not Call List)" (Figure 24), which was attached to an e-mail from one Apple personnel to another setting forth the official Apple policy.  (Figure 25).

**Figure 24**

From:      David Alvarez <david.alvarez@apple.com>
To:        Jonathan Geyer <jgeyer@apple.com>
Subject:   List
Received(Date):      Thu, 9 Jul 2009 17:25:08 -0700
Handsofflist.doc

**Figure 25**

**Hands Off (Do Not Call List) :**

Microsoft – Mountain View (exchange group and Mac group)
Garmin
Palm
Adobe (Software partner)
Aspyr
AMD/ATI
Best Buy
CDW
Cingular
Comp USA (product re-seller)
Foxconn
Genentech (CEO sits on our board)
Google
Ingram Micro
Intel
Intuit (Common board members)
JCrew (Common board members)
Mac Zone
Nike (Common board members)
Nvidia
PC Connection
PC Mall
Pixar
Lucas
Quanta
Tech Data
Zones

**D.    Apple Enters Into An Express Illegal Agreement with Adobe**

78.79. After the successful but illegal non-solicitation agreements between Pixar and Lucasfilm, Jobs entered into similar agreements on behalf of Apple with other companies, including Adobe.   A May 23, 2005 solicitation e-mail from Jerry Sastri, Talent Selection Manager of Adobe's Executive Recruiting, to an Apple employee (Figure 26) was a catalyst for Job's e-mail to Bruce Chizen, Adobe's then-CEO, a couple days later to enter

into a gentlemen's agreement not to recruit each other's employees.  Jobs's e-mail is concise and powerful: "**I have a standing policy with our recruiters that we don't recruit from Adobe.  It seems you have a different policy.  One of us must change our policy.  Please let me know who**" (emphasis added).  The post-script in Job's e-mail hints that before the agreement, Adobe had an active policy of promoting the competition for talent by recruiting Apple employees, referring to "many pings we've gotten from Adobe" (Figure 27).

**Figure 26**



**From:** Jerry Sastri <jsastri@adobe.com>
**Date:** May 23, 2005 1:44:33 PM EDT (CA)
**To:** bereskin@apple.com
**Subject: Hello Ken**

Ken,

Hope you are doing well.  I am doing an executive search here at Adobe for a Director of Product Marketing. I wanted to see if I could network with you for folks who might be looking for new opportunities.

Sincerely,


Jerry Sastri

Executive Recruiting | nasdaq: ADBE

408.536.5180 office

408.537.6313 fax

jsastri@adobe.com

 Adobe Enterprise Solutions

www.adobe.com/enterprise/main.html

///

///

///

///

///

**Figure 27**



From: Steve Jobs [mailto:sjobs@apple.com]
Sent: Thursday, May 26, 2005 9:36 AM
To: Bruce Chizen
Subject: Recruiting

Bruce,

Adobe is recruiting from Apple.  They have hired one person already and are calling lots more.  I have a standing policy with our recruiters that we don't recruit from Adobe.  It seems you have a different policy.  One of us must change our policy.  Please let me know who.

Steve

PS:  Here's one of the many pings we've gotten from Adobe.

79.80. Chizen's reply to Jobs's e-mail infers that the gentlemen's agreement between them was in effect well before May 2005: "I thought we had agreed not to recruit any senior level employees . . . I am pretty sure your recruiters have approached more junior ones.  I would propose we keep it this way.  Open to discuss.  It would be good to agree" (Figure 28).

**Figure 28**



On May 26, 2005, at 4:15 PM, Bruce Chizen wrote:

I thought we agreed not to recruit any senior level employees (at Adobe this is Sr. Director/VP and represents about 2% of the population).  I am pretty sure your recruiters have approached ,more junior ones.

I would propose we keep it this way. Open to discuss.  It would be good to agree.

80.81. Subsequent e-mails between Jobs and Chizen in May 2005 expanded the illegal non-solicitation agreement between Apple and Adobe.  Jobs responded to Chizen's e-mail, threatening to aggressively recruit Adobe's employees absent such an agreement: "Ok, I'll tell our recruiters that they are free to approach any Adobe employee who is not a Sr. Director or VP.  Am I understanding your position correctly?"  Chizen then replied with his understanding: "I'd rather agree NOT to actively solicit any employee from either company" (Figure 29).

**Figure 29**

Subject: RE: Recruiting
Date: Fri, 27 May 2005 20:53:36 -0700
From: "Bruce Chizen" <bchizen@adobe.com>
To: "Steve Jobs" <sjobs@apple.com>
Message-ID: <D7E5113BC7908A40BE31305B3E63E33A99CD89@sj-mail1.corp.adobe.com>

I'd rather agree NOT to actively solicit any employee from either company.  If employee proactively approaches then it's acceptable.

If you are in agreement I will let my folks know.

**From:** Steve Jobs [mailto:sjobs@apple.com]
**Sent:** Thursday, May 26, 2005 6:27 PM
**To:** Bruce Chizen
**Cc:** Steve Jobs
**Subject:** Re: Recruiting

OK, I'll tell our recruiters that they are free to approach any Adobe employee who is not a Sr. Director or VP.  Am I understanding your position correctly?

Steve

~~81.~~82. That same day, on May 27, 2005, Theresa Townsley—Senior Vice President of Adobe's Human Resources—e-mailed Adobe personnel, informing, "Bruce [Chizen] and Steve Jobs have an agreement that we are not to solicit ANY Apple employees, and vice versa . . . if it looks like we have an Apple employee as a candidate for as a senior role at Adobe (Director and VP), we need to let Bruce know so he can talk to Steve."  The Apple-Adobe agreement had no geographical limitation as Townsley stated, "Please ensure all your **worldwide recruiters** know that we are not to solicit any Apple employee.  I know Jerry is soliciting one now, so he'll need to back off" (emphasis added) (Figure 30).  Chizen then forwarded Townsley's e-mail to Jobs with "fyi" (a common abbreviation of "For Your Information") to inform Jobs that Adobe was taking actions internally to ensure compliance with the agreement.

**Figure 30**

Subject: FW: Recruitment of Apple Employees
Date: Sat, 28 May 2005 06:22:46 -0700
From: "Bruce Chizen" <bchizen@adobe.com>
To: "Steve Jobs" <sjobs@apple.com>
Message-ID: <D7E5113BC7908A40BE31305B3E63E33A99CDAA@sj-mail1.corp.adobe.com>

fyi

From: Theresa Townsley [mailto:townsley@adobe.com]
Sent: Friday, May 27, 2005 9:49 PM
To: Donna Morris
Cc: Shantanu Narayen; Bruce Chizen; Gloria Stinson
Subject: Recruitment of Apple Employees

Hi Donna,

Bruce and Steve Jobs have an agreement that we are not to solicit ANY Apple employees, and vice versa.

Please ensure all your worldwide recruiters know that we are not to solicit any Apple employee. I know Jerry is soliciting one now, so he'll need to back off. Please help him with how to do that.

Let me know if you have any questions.
t

82.83. Per Townsley's order, Shantanu Narayen—Adobe's then-President and Chief Operating Officer—e-mailed Adobe's "eteam" of worldwide recruiters. "[Chizen, Townsley, and I] don't want the gloves off-it doesn't do either company any good and we don't want Steve personally recruiting our key talent.  We've agreed that we will not solicit employees" (Figure 31).

**Figure 31**

From: owner-eteam@adobe.com [mailto:owner-eteam@adobe.com] On Behalf Of Shantanu Narayen
Sent: Saturday, May 28, 2005 6:55 AM
To: eteam@adobe.com
Subject: FW: Recruitment of Apple Employees

I wanted to let you all know that Bruce, Theresa and I discussed the issue of recruiting with Apple.  We don't want the gloves off – it doesn't do either company any good and we don't want Steve personally recruiting our key talent.  We've agreed that we will not solicit employees.

Let us know if you have questions.

—Townsley's order, based on a conversation and express agreement between Jobs and Chizen,

— initiated an overhaul of Adobe's worldwide recruiting policies, as shown by Figure 32.

**Figure 32**

| From: | Donna Morris <dcmorris@adobe.com> |
| Sent: | Sunday, May 29, 2005 10:01 AM |
| To: | 'Jeff Vijungco' <jeff@adobe.com> |
| Subject: | FW: Recruitment of Apple Employees |

Jeff - hope you are having a good long weekend - can you pls see the note below from TT to me and Shantanu to the eteam re-apple.. We need to work together/you and I to determine our route with the recruiters - lets discuss this wk, d

Donna Morris
Sr. Director, Global Talent
Adobe Systems Incorporated

Visit www.adobe.com to profile for future career opportunities

~~83.~~84. The following year, one Adobe employee e-mail asked another person about possibly targeting Apple for recruiting (Figure 33).  The reply confirms the "gentleman's agreement not to poach each other's talent" between Jobs and Chizen.  Further, it reveals that the men agreed "to not do audits of each other" either.  The reply copies Conroy Shum—Adobe's then-Director of Worldwide License Compliance ~~"~~—"in case that agreement has changed" (Figure 34).

**Figure 33**

**To:** Ray Tum
**Subject:** Apple - Possible Target

Hi Ray,

May I target Apple?  Here is their profile:

- Adobe ProPub Named Account
- Adobe Sales Rep:  Mike Riley
- Not in LCP Dashboard
- Maker of iPod, iTunes, desktop, and laptop computers
- 2005 Employees = 16,820
- Employees At HQ = 2,000
- 1-Year Employee Growth = 43.8%

Regards,

Martin

**Figure 34**

> **From:** Ray Tum
> **Sent:** Wednesday, May 10, 2006 5:42 PM
> **To:** Martin Bruce
> **Cc:** Conroy Shum
> **Subject:** RE: Apple - Possible Target
>
> Martin:
>
> Apple would be a great target to look into.  Unfortunately, Bruce and Steve Jobs have a gentleman's agreement not to poach eachother's talent and to not do audits of eachother.
>
> I'm copying Conroy in case that agreement has changed.
>
> /Ray

84.85. A June 17, 2008, e-mail from Natalie Kessler—Program Manager of Adobe's WW Talent Operations—to Adobe recruiters entitled "Off-Limit List" attaches a revised list of off-limit companies from which Adobe can recruit (Figure 35).  Apple tops Adobe's "Talent Acquisition: Companies that are off limits" list (Figure 36).  The list states, "Do not pro-actively solicit candidates from Apple."

**Figure 35**

> **From:**       Natalie Kessler [nkessler@adobe.com]
> **Sent:**       Tuesday, June 17, 2008 3:19 PM
> **To:**          DL-TA NA Recruiters
> **Cc:**          DL-TA WW Recruiters
> **Subject:**    Off-Limit List
> **Attachments:** Talent Acquisition-Offlimit Companies.pdf
>
> Hi team,
>
> Attached is the revised list of off-limit companies that we can recruit from. Nuance and Synopsys have been taken off the list (NA team: I also removed them as off-limits in FiFi).
>
> Best,
> Nat
> ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
> Natalie Kessler
> WW Talent Operations
> Adobe Systems Incorporated
> 151 Almaden Blvd., MS A11-428
> San Jose, CA 95110
> 408.536-4530 Phone, 408.537-4010 Fax
> nkessler@adobe.com
> www.adobe.com/careers
>
> *This e-mail may contain confidential information. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden.*

**Figure 36**



**Talent Acquisition**
**Companies that are off limits**
(Updated: June 17, 2008)

| Company | Notes |
|---|---|
| Apple | Do not pro-actively solicit candidates from Apple. However, if a candidate from this company applies to a position, you can pursue. |
| Bell Canada | Do not hire candidates from Bell Canada until further notice. |
| EFI | Do not pro-actively solicit candidates from EFI. However, if a candidate from this company applies to a position, you can pursue. |
| EMC | Do not pro-actively solicit candidates from EMC. However, if a candidate from EMC applies to a position, you can pursue. |
| New Toronto Group (NTG) | Do not pro-actively solicit candidates from NTG. However, if a candidate from this company applies to a position, you can pursue. |
| SoftChoice | Do not pro-actively solicit candidates from SoftChoice. In the past we have hired a number of people from SoftChoice which is Adobe's 5th largest reseller. With the growth in in-side sales we have just hired another 3 in the last year. So in the last few years we have hired about 7 people from Softchoice. We need this to settle a bit. We will revisit this after Q1 of 2008. |
| SAP | Do not pro-actively solicit candidates from SAP. However, if a candidate from this company applies to a position, you can pursue. |
| Syncroquest | This company is based in the Ukraine. An absolute do-not-call/do-not-hire list. This is a company we are partnering with. As such, we agreed to a written no-hire/no-recruit agreement. |

*Note: Nuance and Synopsys have been taken off the list*

85.86. A July 9, 2009, e-mail between Apple personnel attaching Apple's "Hands Off (Do Not Call List)" depicts the multi-year nature of Apple's illegal non-solicitation agreements.  Adobe still appears on this list (Figure 37) four years after the e-mail exchanges between Jobs and Chizen agreeing not to recruit each other's employees without any job function or geographic limitation.

**Figure 37**



From:       David Alvarez <david.alvarez@apple.com>
To:          Jonathan Geyer <jgeyer@apple.com>
Subject:   List
Received(Date):      Thu, 9 Jul 2009 17:25:08 -0700
Handsofflist.doc

**Hands Off (Do Not Call List) :**

Microsoft – Mountain View (exchange group and Mac group)
Garmin
Palm
Adobe (Software partner)
Aspyr
AMD/ATI
Best Buy
CDW
Cingular
Comp USA (product re-seller)
Foxconn
Genentech (CEO sits on our board)
Google
Ingram Micro
Intel
Intuit (Common board members)
JCrew (Common board members)
Mac Zone
Nike (Common board members)
Nvidia
PC Connection
PC Mall
Pixar
Lucas
Quanta
Tech Data
Zones

### E.      Apple Enters Into An Express Illegal Agreement with Palm

86.87. In August 2007, Jobs contacted Ed Colligan, Palm's then-President and CEO, in to open discussions regarding a potential gentlemen's agreement between Apple and Palm.  Colligan's August 24, 2007 e-mail to Jobs indicates that he has "thought long and hard about [their] conversation."  Colligan asserted, "**Your proposal that [they] agree that neither company will hire the other's employees, regardless of the individual's desires, is not only wrong, it is likely illegal**," which reflects that Jobs at least received peer-level communication that the agreements were unlawful (emphasis added).  Colligan also revealed, "I even thought about coming back with a proposal about limiting recruitment efforts, but frankly, I did not think it was something you would agree to do" (Figure 38).

**Figure 38**

> From: Ed Colligan
> Sent: Friday, August 24, 2007 6:30 PM
> To: 'sjobs@apple.com'
> Subject: Your proposal
>
> Steve:
>
> I have thought long and hard about our conversation on Wednesday, and
> I thought it important to let you know my position on the issues we discussed.
> I hope we can resolve our differences, but it has to be on terms that
> are right not only for our respective companies, but for the
> individuals potentially affected.  Your proposal that we agree that
> neither company will hire the other's employees, regardless of the

> individual's desires, is not only wrong, it is likely illegal. I even
> thought about coming back with a proposal about limiting recruitment
> efforts, but frankly, I did not think it was something you would agree to do.

87.88. Colligan's e-mail to Jobs continues for several pages, at one point capturing the heart and soul of this shareholder derivative complaint: "**In our search for the best talent, one thing is always certain – experienced people come from somewhere else.  Palm doesn't target other companies – we look for the best people we can find.  I'd hope the same could be said about Apple's practices**" (emphasis added) (Figure 39).

**Figure 39**

> In our search for the best talent, one thing is always certain -
> experienced people come from somewhere else.  Palm doesn't target
> other companies - we look for the best people we can find. I'd hope
> the same could be said about Apple's practices.  However, during the
> last year or so, as Apple geared up to compete with Palm in the phone
> space, Apple hired at least 2% of Palm's workforce.  To put it in
> perspective, had Palm done the same, we'd have hired 300 folks from Apple.  Instead, to my
> knowledge, we've hired just three.

88.89. Colligan's e-mail also exposes that Apple's tactics included threatening litigation if an agreement not to recruit employees could not be reached.  "this"[T]his is a small space, and it's inevitable that we will bump into each other.  **Threatening Palm with a patent lawsuit in response to a decision by one employee to leave Apple is just out of line.**  A lawsuit would not serve either of our interests, and will not stop employees from migrating between our companies . . . I want to be clear that we are not intimated by your threat" (emphasis added).  Apple was considering the "litigation route" by directing a patent lawsuit at Palm unless Palm entered an illegal non-solicitation agreement with Apple.  Colligan explained, "I don't think litigation is the answer.  We will just end up paying a lot of lawyers a lot of money" (Figure 40).

**Figure 40**

> Steve, we don't want to hurt Apple.  As I said on the phone, Palm is
> focused on building the best team in the industry, and we know there
> is a lot of quality talent outside of Apple.  On the other hand, this
> is a small space, and it's inevitable that we will bump into each
> other. Threatening Palm with a patent lawsuit in response to a
> decision by one employee to leave Apple is just out of line.  A
> lawsuit would not serve either of our interests, and will not stop
> employees from migrating between our companies.  This is a very
> exciting time for both of our companies, and the market is certainly
> big enough for both of us.  We should focus on our respective businesses and not create
> unnecessary distractions.

> That said, I want to be clear that we are not intimidated by your threat.
> Palm has a very robust portfolio of patents, having been in the
> handheld and smartphone businesses since the early 90's.  In addition,
> Palm now owns the former Siemens mobile patent portfolio, most
> recently held by BenQ Corporation.  This mobile computing and
> communications portfolio includes over 1500 patent assets, the
> majority filed in Europe.  If you choose the litigation route, we can
> respond with our own claims based on these patent assets, but I don't
> think litigation is the answer.  We will both just end up paying a lot of lawyers a lot of money.

89.90. A few days later, Jobs replied to Colligan, stating, "This is not a satisfactory to Apple."  Jobs attempted to justify a non-solicitation agreement, suggesting Palm was recruiting Apple employees "using knowledge supplied by Jon Rubenstein and Fred Anderson, with Jon personally participating in the recruiting process. **We must do whatever we can to stop this**" (emphasis added) (Figure 41).  Jobs responded that he was not satisfied with Palm's response.  Rubenstein was Senior Vice President of Apple's iPod division in April 2006 before he became Executive Chairman of Palm's Board of Directors.  Anderson was a member of Apple's Board of Directors until September 2006 before becoming a member of Palm's Board of Directors in October 2007.  Furthermore, in realizing Colligan's position against a potential non-solicitation agreement, Jobs threatened, "I'm sure you realize the asymmetry in the financial resources of our respective companies when you say: 'We will both just end up paying a lot of lawyers a lot of money.'" Jobs continued to pressure Colligan, warning of an impending patent lawsuit by Apple against Palm: "My advice is to look at our patent portfolio before you make a decision here."

///

///

///

///

///

///

///

///

///

///

///

///

1  ///

2  ///

**Figure 41**

From: "Steve Jobs" <sjobs@apple.com>

Subject: Fwd: Your proposal

Date: Sun 8/26/2007 11:42 am

Size: 4K

To: "Ed.Colligan@palm.com" <Ed.Colligan@palm.com>

Cc: "Steve Jobs" <sjobs@apple.com>


Ed,

This is not satisfactory to Apple.

It is not just a matter of our employees deciding they want to join Palm. They are being actively recruited using knowledge supplied by Jon Rubenstein and Fred Anderson, with Jon personally participating in the recruiting process. We must do whatever we can to stop this.

I'm sure you realize the asymmetry in the financial resources of our respective companies when you say: "We will both just end up paying a lot of lawyers a lot of money."

Just for the record, when Siemens sold their handset business to BenQ they didn't sell them their essential patents but rather just gave them a license. The patents they did sell to BenQ are not that great. We looked at them ourselves when they were for sale. I guess you guys felt differently and bought them. We are not concerned about them at all. My advice is to take a look at our patent portfolio before you make a final decision here.

Steve

~~90.~~91. The fact that Apple lists Palm on its "Hands Off (Do Not Call List)" attached to an e-mail between Apple personnel in July 2009—two years after the e-mail exchange between Jobs and Colligan—and that no patent lawsuit was filed, leads to the conclusion that Jobs and Colligan reached an agreement after Colligan folded on his position and succumbed to Jobs's threats (Figure 42).

**Figure 42**

From:        David Alvarez <david.alvarez@apple.com>
To:           Jonathan Geyer <jgeyer@apple.com>
Subject:   List
Received(Date):        Thu, 9 Jul 2009 17:25:08 -0700
Handsofflist.doc

**Hands Off (Do Not Call List) :**

Microsoft – Mountain View (exchange group and Mac group)
Garmin
Palm
Adobe (Software partner)
Aspyr
AMD/ATI
Best Buy
CDW
Cingular
Comp USA (product re-seller)
Foxconn
Genentech (CEO sits on our board)
Google
Ingram Micro
Intel
Intuit (Common board members)
JCrew (Common board members)
Mac Zone
Nike (Common board members)
Nvidia
PC Connection
PC Mall
Pixar
Lucas
Quanta
Tech Data
Zones

### F.   Apple Had Approximately 25 Illegal Agreements With Other Companies During the Conspiracy

91.92. Apple and approximately 25 other companies agreed not to recruit each other's employees during the conspiracy.  A February 18, 2004 e-mail from EC to Jobs confirms that **Apple had illegal non-solicitation agreements with "ILM and Dreamworks which has worked quite well"** and contemplates an agreement with Sony after it "approached all of our producers trying to hire them" (emphasis added).  EC indicated that he/she "probably should go down and meet [redacted] and Sony to reach some agreement.  **Our people are become [sic] really desirable and we need to nip this in the bud**" (emphasis added) (Figure 43).

1

**Figure 43**

| From: | EC |
| Sent: | Wednesday, February 18, 2004 1:19 AM |
| To: | Steve Jobs <sjobs@apple.com> |
| Subject: | Sony |

Sony has approached all of our producers trying to hire them. They all just
ignored Sony, although█████ forwarded on the email from the recruiter.

Today, ███████████, one of our department managers told me that
she was offered a position as producer for Sony's first CG film and is
likely to accept. If so, she would report to ██████████

██████ was a very good department manager who some day will probably
make the leap to producer, although ████████████████ do not think
that she is ready yet. She has not had any experience with any of the shot
departments which is the bulk of production.

The director of the movie is ████████ who started off as head of story on Monsters
but burnt out. She is good but fragile. The movie is about animals that turn the
table on hunters. ███████████████████

████████████████████████████

███████████████████████████████████

██████ will talk with her. She isn't so great that we have to keep her,
and she isn't so
bad that she would hurt Sony.

We don't have a no raid arrangement with Sony. We have set up one with ILM and
Dreamworks which has worked quite well. I probably should go down and meet
██████████████ and Sony to reach some agreement. Our people are
become really desirable and we need to nip this in the bud.

~~92.~~93. An attachment to an e-mail between Apple personnel reveals the illegal non-

solicitation agreements with other companies during the conspiracy. Apple was not

allowed to recruit from any of the companies on its "Hands Off (Do Not Call List)" from

July 2009 (Figure 44). Apple therefore intentionally limited its own ability to have the

best employees that were in the labor market. By 2009, Apple's Hands Off (Do Not Call

List)" no longer only included technology competitors but other companies, such as J. Crew and Nike.

**Figure 44**

From:      David Alvarez <david.alvarez@apple.com>
To:        Jonathan Geyer <jgeyer@apple.com>
Subject:   List
Received(Date):     Thu, 9 Jul 2009 17:25:08 -0700
Handsofflist.doc

**Hands Off (Do Not Call List) :**

Microsoft – Mountain View (exchange group and Mac group)
Garmin
Palm
Adobe (Software partner)
Aspyr
AMD/ATI
Best Buy
CDW
Cingular
Comp USA (product re-seller)
Foxconn
Genentech (CEO sits on our board)
Google
Ingram Micro
Intel
Intuit (Common board members)
JCrew (Common board members)
Mac Zone
Nike (Common board members)
Nvidia
PC Connection
PC Mall
Pixar
Lucas
Quanta
Tech Data
Zones

93.94. This collusive scheme was incredibly effective since Apple directors served on other boards.  The companies alleged to have participated in the no-recruiting conspiracy shared directors and senior advisors.  Apple and Google had two directors in common: Schmidt and Defendant Levinson, then-Genentech's CEO.  Brin and Page, Google's co-founders, viewed Jobs as a mentor, regularly joining him on his meditative walks.  As the

e-mail above indicates, several companies on Apple's "Hands Off (Do Not Call List)" share directors with Apple, including Google, Genetech, Intuit, J. Crew, and Nike.

94.95. An April 2008 e-mail also reflects that Apple and Intel had an illegal, non-solicitation agreement.  An e-mail thread between Intel personnel with the subject "Hiring from Apple" indicates Mark Mitchell—Intel's Engineering Manager—was considering hiring "someone that happens to work at Apple currently.  He inquired, "Does Intel have any agreements that would preclude me from hiring this person?"  Deborah Conrad—Vice President and General Manager of  Intel's Corporate Marketing Group—replied, "We have an agreement NOT to hire top talent (esp technial) [sic] away from each other" (Figure 45).

**Figure 45**

```
From: Conrad, Deborah
Sent: Thursday, April 17, 2008 11:01 AM
To: Mitchell, Mark L
Cc: Griffen, Jeffrey L
Subject: Re: Hiring from Apple
Importance: High

We have an agreement NOT to hire top talent (esp technial) away from each other.
What is the specific job? Grade level?
/deborah

On 4/16/08 5:03 PM, "Mitchell, Mark L" <mark.l.mitchell@intel.com> wrote:
Deborah,

I currently have an open requisition for one of my people that works with Apple on-site.

Among the applicants/candidates is someone that happens to work at Apple currently.

Does Intel have any agreements that would preclude me from hiring this person?

Regards,
Mark
```

95.96. A few days later, Mike Wagner of Intel followed up with his colleaguescolleague Mitchell Conrad, stating, "I just recently found out that an Intel staffing person was recruiting some graphics folks from Apple, and we got our hands slapped . . . it may not be wise to move forward with trying to take one of their [Extensible Firmware Interface] guys . . ." (emphasis added) (Figure 46). Wagner's e-mail shows that the Apple and Intel agreement was not only in effect but enforced at Intel.

**Figure 46**



```
-----Original Message-----
From: Wagner, Mike J
Sent: Tuesday, April 22, 2008 3:12 PM
To: Wagner, Mike J; Conrad, Deborah; Mitchell, Mark L
Subject: RE: Hiring from Apple

Mark,

Have you gone forward with this?  I just recently found out that an Intel staffing person was
recruiting some graphics folks from Apple, and we got our hands slapped  (see attached mail).
I've shut that down, but given this example, it may not be wise to move forward with trying to
take one of their EFI guys and turn around and put him back at Apple.

Thx.
Mike
```

### G. The DOJ Investigates and Concludes that the Agreements Were *Per Se* Unlawful

~~96.~~97.  In 2009, the DOJ began investigating Silicon Valley's hiring practices.  The DOJ filed a complaint against Apple, Adobe, Google, Intel, Intuit, and Pixar on September 24, 2010, alleging that these companies' private agreements restrained trade, which was *per se* unlawful under antitrust laws.  The DOJ found the agreements "facially anticompetitive because they eliminated a significant form of competition to attract high tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."  The DOJ stated that the agreements "disrupted the normal price-setting mechanisms that apply in the labor setting."  The DOJ announced a settlement of the action on its own website on September 24, 2010, though a final judgment in the action was not entered until March 17, 2011.

~~97.~~98.  Despite the DOJ's investigation, Apple did not disclose the details of the DOJ's investigation to shareholders.  An investor reviewing the Company's proxy statements, quarterly filings, and annual filings would not have seen any mention of the investigation, the settlement reached in September of 2010, or the final judgment signed on March 17, 2011.  The Company's proxy ~~statements~~statement filed on January ~~11, 2011, January 9, 2012, January 7, 2013, and January~~ 10, 2014 ~~make~~makes no mention whatsoever of the DOJ investigation, settlement, or final judgment.  Similarly, the

Company's 8K, 10Q, and 10K filings from October 2010 to ~~the present~~August 2014 do not mention the DOJ's investigation, settlement, or final judgment.

~~98.~~99. Furthermore, on May 4, 2011, a former Lucasfilm software engineer filed a class action lawsuit charging Apple, Adobe, Google, Intel, Intuit, and Pixar—companies subject to DOJ investigation—with violations of antitrust laws by conspiring to fix and restrict the pay of their employees and entering into non-solicitation agreements with each other.  Similar complaints were later filed by other employees, and the cases were consolidated under the caption *In re High-Tech Employee Antitrust Litigation*, Case No. 11-CV-2509-LHK (N.D. Cal.). On April 24, 2014, the parties to this action announced that they had reached a settlement, which was later reported to be $324 million.

**III.    The Individual Defendants Caused Apple to Issue False and Misleading Proxy Statements in ~~2012, 2013, and~~ 2014**

~~H.     The 2012 Proxy~~

~~99.    On January 9, 2012, Defendants Campbell, Cook, Drexler, Iger, Jung, and Levinson caused Apple to issue a definitive proxy statement (the "2012 Proxy"), soliciting Apple shareholders to vote, among other things, in favor of re-electing these Defendants as Apple's directors.~~

~~100.   The 2012 Proxy discussed in detail each of these Defendants' experience and qualifications.  The 2012 Proxy concluded that "the Board believe[d] the skills, qualities, attributes and experience of its directors provide the Company with business acumen and a diverse range of perspectives to engage each other and management to effectively address the evolving needs of the Company and represent the best interests of the Company's shareholders."  Specifically, the 2012 Proxy stated:~~

~~Many of the current directors have senior leadership experience at major domestic and international companies.  In these positions, they have also gained significant and diverse management experience, including strategic and financial planning, public company financial reporting, compliance, risk management and leadership development.  Many of the directors also have experience serving as executive officers, or on boards of directors and board committees of other public companies, and have an understanding of corporate governance practices and trends. Other directors have~~

experience as directors or trustees of significant academic, research, nonprofit and philanthropic institutions, which bring unique perspectives to the Board.

101.    These statements were false and misleading because, as discussed above, these Defendants continuously caused Apple to violate antitrust laws by agreeing with competing companies to engage in anti-poaching practices.  The 2012 Proxy failed to disclose, among other things, that the Individual Defendants caused Apple to engage in anti-poaching practices, that the DOJ had been investigating Apple's potential violations of antitrust laws, and that the Individual Defendants' conduct may lead to criminal charges and civil liability against and cause substantial damages to Apple.

102.    As a result of these false and misleading statements and the Board's recommendation, these Defendants were re-elected to Apple's Board.

103.    *The* false and misleading statements contained in the 2012 Proxy were material due to the substantial likelihood that a reasonable shareholder would consider the disclosed and omitted information important in deciding how to vote.

I.    **The 2013 Proxy**

104.    On January 7, 2013, Defendants Campbell, Cook, Drexler, Iger, Jung, and Levinson caused Apple to issue a definitive proxy statement (the "2013 Proxy"), soliciting Apple shareholders to vote, among other things, in favor of re-electing these Defendants as Apple's directors.

105.    The 2013 Proxy discussed in detail each of these Defendants' experience and qualifications.  The 2013 Proxy concluded that "the Board believe[d] the skills, qualities, attributes and experience of its directors provide the Company with business acumen and a diverse range of perspectives to engage each other and management to effectively address the evolving needs of the Company and represent the best interests of the Company's shareholders."  Specifically, the 2013 Proxy stated:

Many of the current directors have senior leadership experience at major domestic and international companies.  In these positions, they have also gained significant and diverse management experience, including strategic and financial planning, public company financial reporting, compliance, risk management and leadership development.  Many of the directors also have experience serving as executive officers, or

on boards of directors and board committees of other public
companies, and have an understanding of corporate
governance practices and trends. Other directors have
experience as directors or trustees of significant academic,
research, nonprofit and philanthropic institutions, which bring
unique perspectives to the Board.

106.   These statements were false and misleading because, as discussed above,
these Defendants continuously caused Apple to violate antitrust laws by agreeing with
competing companies to engage in anti-poaching practices.  The 2013 Proxy failed to
disclose, among other things, that the Individual Defendants caused Apple to engage in
anti-poaching practices, that the DOJ had been investigating Apple's potential violations of
antitrust laws, and that the Individual Defendants' conduct may lead to criminal charges
and civil liability against and cause substantial damages to Apple.

107.       As a result of these false and misleading statements and the Board's
recommendation, these Defendants were re-elected to Apple's Board.

108.   The false and misleading statements contained in the 2013 Proxy were
material due to the substantial likelihood that a reasonable shareholder would consider the
disclosed and omitted information important in deciding how to vote.

### A.      The 2014 Proxy

109.100.   On January 10, 2014, Defendants Campbell, Cook, Drexler, Iger, Jung,
and Levinson caused Apple to issue a definitive proxy statement (the "2014 Proxy"),
soliciting Apple shareholders to vote, among other things, in favor of re-electing these
Defendants as Apple's directors.

110.101.   The 2014 Proxy discussed in detail each of these Defendants' experience
and qualifications.  The 2014 Proxy concluded that "the Board believe[d] the skills,
qualities, attributes and experience of its directors provide the Company with business
acumen and a diverse range of perspectives to engage each other and management to
effectively address the evolving needs of the Company and represent the best interests of
the Company's shareholders."  Specifically, the 2014 Proxy stated:

Many of the current directors have senior leadership experience
at major domestic and international companies.  In these
positions, they have also gained significant and diverse
management experience, including strategic and financial

planning, public company financial reporting, compliance, risk management and leadership development.  Many of the directors also have experience serving as executive officers, or on boards of directors and board committees of other public companies, and have an understanding of corporate governance practices and trends. Other directors have experience as directors or trustees of significant academic, research, nonprofit and philanthropic institutions, which bring unique perspectives to the Board.

102.    The 2014 Proxy also affirmatively misrepresented that the Board was actively supervising management to ensure compliance with all legal and ethical obligations.  The Proxy stated:

**Role of the Board; Corporate Governance Matters**

The Board oversees the Company's CEO and other senior management in the competent and ethical operation of the Company and assures that the long-term interests of the shareholders are being served.

103.    The 2014 Proxy also affirmatively misrepresented that the Board of Directors and Audit Committee (which consisted at the time of Directors Levinson, Sugar, Campbell and Iger) were effectively reviewing the key enterprise risks facing Apple and ensuring that management's conduct did not pose an excessive risk to the Company:

**Board Oversight of Risk Management**

***The* Board believes that evaluating how the executive team manages the various risks confronting the Company is one of its most important areas of oversight***. *In carrying out this critical responsibility, the Board has designated the Audit Committee with primary responsibility for overseeing enterprise risk management.* In fulfilling its oversight responsibilities with regard to risks inherent in the Company's business, including the identification, assessment, management, and monitoring of those risks, and risk management decisions, practices and activities of the Company, the Audit Committee is assisted by a Risk Oversight Committee consisting of key members of management, including the Company's Chief Financial Officer and General Counsel. The Risk Oversight Committee reports regularly to the Audit Committee, and the Audit Committee makes periodic reports to the Board. See the Audit Committee's Charter at www.apple.com/investor for more information about its risk oversight function.

In accordance with this responsibility, *the Audit Committee monitors the Company's major financial, operational, privacy, security, business continuity, legal and regulatory, and reputational exposures, and*

*reviews the steps management has taken to monitor and control these exposures*. With respect to privacy and data security, the Audit Committee's oversight includes, among other things, (i) review of regular reports from the Company's Chief Compliance Officer, Director of Global Privacy, Vice President of Internal Audit and other members of the Risk Oversight Committee, which include updates on the Company's privacy program and relevant legislative, regulatory and technical developments; and (ii) review of management's report on the results of the Company's annual privacy assessment. As with other matters, the Audit Committee regularly discusses these topics with the full Board.

*While the Audit Committee has primary responsibility for overseeing enterprise risk management, each of the other Board committees also considers risk within its area of responsibility. For example, the Nominating Committee reviews legal and regulatory compliance risks as they relate to corporate governance structure and processes*, and the Compensation Committee reviews risks related to compensation matters. The committee chairs periodically apprise the Board of significant risks and management's response to those risks. While the Board and its committees oversee risk management strategy, management is responsible for implementing and supervising day-to-day risk management processes and reporting to the Board and its committees on such matters.

*In establishing and reviewing the Company's executive compensation program, the Compensation Committee considers whether the program encourages unnecessary or excessive risk-taking and has concluded that it does not*. Executives' base salaries are fixed in amount and thus do not encourage risk-taking. Bonuses are capped and are tied to overall corporate performance, and also are a relatively small percentage of executive officers' total compensation opportunities. The majority of compensation provided to the executive officers is in the form of long-term equity awards that help further align executives' interests with those of the Company's shareholders. The Compensation Committee believes that these awards do not encourage unnecessary or excessive risk-taking because the ultimate value of the awards is tied to the Company's stock price and because awards are staggered and subject to long-term vesting schedules to help ensure that a significant component of executive compensation is tied to long-term stock price performance.

The Compensation Committee has also reviewed the Company's compensation programs for employees generally and has concluded these programs do not create risks that are reasonably likely to have a material adverse effect on the Company. *The Compensation Committee believes that the Company's annual cash and long-term equity awards provide an effective and appropriate mix of incentives to help ensure the Company's performance is focused on long-term shareholder value creation and do not encourage short-term risk taking* at the expense of long-term results. In general, bonus opportunities for Company employees are capped, and the Company has discretion to reduce bonus payments (or pay no bonus) based on individual performance and any other factors it may determine to be appropriate in the circumstances. As with the compensation of the Company's executive officers, a substantial portion of the

compensation for employees generally is delivered in the form of equity awards that help further align the interests of employees with those of shareholders.

104.    The 2014 Proxy also urged stockholders to vote in favor of Proposal No. 7 at the Annual Meeting — the adoption of the 2014 Employee Stock Plan.  Stockholders were told that Apple's "future success depends on its ability to attract and retain high-caliber employees.  The Company's primary center for innovation is in the Silicon Valley, where it must compete with many successful and high profile companies for a limited pool of talented people":

**PROPOSAL NO. 7**

**Approval of Apple Inc. 2014 Employee Stock Plan**

    During the past decade, ***the Company's investments in innovative design and engineering have resulted in the significant expansion of its product portfolio***. The Company has also expanded its distribution capabilities by opening more than 400 of its own retail stores and substantially increasing third-party resale locations. ***The Company's successful execution of its strategies has led to dramatic revenue and earnings growth. For example, in the five-year period from 2008 through 2013, the Company's annual revenue grew from $32.5 billion to $170.9 billion, while its earnings grew from $4.8 billion to $37 billion.*** The Company's success has also resulted in a significant increase in shareholder value. Between the Company's last request for an increase in shares under the 2003 Plan on February 25, 2010 and September 28, 2013, the Company added more than $250 billion in market capitalization, an increase of approximately 237%. This compares to an increase of 53% in the S&P 500 index over the same period.

    ***The Board believes the Company's success is due to its highly talented employees and that future success depends on its ability to attract and retain high-caliber employees. The Company's primary center for innovation is in the Silicon Valley, where it must compete with many successful and high profile companies for a limited pool of***

*talented people. The Company's ability to grant equity awards is a*
*necessary and powerful recruiting and retention tool*. Equity awards also
enhance the link between shareholder and award holder interests.

The Compensation Committee, which administers the 2003 Plan and will
administer the 2014 Plan, if approved, recognizes its responsibility to strike a
balance between shareholder concerns regarding the potential dilutive effect of
equity awards and the ability to attract, retain and reward employees whose
contributions are critical to the Company's long-term success. The 2003 Plan is
currently the Company's only employee equity plan under which awards may be
granted other than its Employee Stock Purchase Plan. The current number of shares
remaining available for grant under the 2003 Plan is expected to last until
approximately the end of 2014, based on the recent historical rate of award grants
under the 2003 Plan noted under "Specific Benefits" below, and taking into account
the 2:1 premium share counting rule, discussed below, for certain equity awards.

The Compensation Committee anticipates that the additional shares requested,
together with the shares remaining available for new award grants under the 2003
Plan and assuming usual levels of shares becoming available for new awards as a
result of forfeitures of outstanding awards, will provide the Company with flexibility
to continue to grant equity awards through approximately the end of 2017 (subject
to adjustment based on the factors noted under "Specific Benefits" below and taking
into account the 2:1 premium share counting rule, discussed below, for certain
equity awards), accommodating anticipated grants relating to the hiring, retention
and promotion of employees and providing reasonable flexibility for acquisitions.

111.105.   These statements were false and misleading because, as discussed above,
these Defendants they failed to disclose that Apple's senior executives and directors had
continuously caused Apple to violate antitrust laws by agreeing with competing companies
to engage in anti-poaching practices.  The 2014 Proxy failed to disclose, among other
things, that the Board's corporate governance policies and practices did not effectively

1  assess or protect against the key enterprise risks facing the Company, including legal

2  violations, that the Company's internal controls were inadequate, that the Individual

3  Defendants caused Apple to engage in anti-poaching practices, that the DOJ had been

4  investigating Apple's potential violations of antitrust laws, and that the Individual

5  Defendants' conduct may lead to criminal charges and civil liability against and cause

6  substantial damages to Apple.

7      112.106.   As a result of these false and misleading statements and the Board's

8  recommendation, these Defendants were re-elected to Apple's Board.

9      113.107.   The false and misleading statements contained in the 2014 Proxy were

10  material due to the substantial likelihood that a reasonable shareholder would consider the

11  disclosed and omitted information important in deciding how to vote.

12                              **DAMAGES TO APPLE**

13      114.108.   Apple has been harmed by these illegal agreements because it was forced

14  to enter into an agreement with the DOJ in September 2010, which caused it to expend

15  substantial time and money to defend itself.

16      115.109.   In addition, Apple has been sued in a class action brought by its

17  employees for antitrust and other violations alleging that their wages have been

18  suppressed.  The action, which was initially filed against six companies, seeks damages

19  against Apple, Google, Intel, and Adobe.  A class has been certified and trial had been set

20  for May of 2014.  On April 24, 2014, the parties announced resolution of the lawsuit for a

21  reported settlement of $324 million.325 million.  The Hon. Lucy Koh rejected approval of

22  the settlement as *too low* in August 2014.  The parties thereafter reached a revised

23  agreement to settle the action for ***$415 million***, which was subsequently approved by the

24  Court.  Apple has had to expend substantial time and money to defend itself and to satisfy

25  the settlement.

26      116.110.   As a result of its illegal agreements, Apple's reputation has been harmed.

27      117.111.   Further harm has come from the loss of innovation which occurred

28  because of the illegal agreements.  Alan Hyde, a Professor and the Sidney Reitman Scholar

at Rutgers University School of Law and author of *Working in Silicon Valley: Economic and Legal Analysis of a High-Velocity Labor Market* (New York: M.E. Sharpe, Inc., 2003), concluded that technological and economic growth depends upon a company's ability to hire and fire employees quickly in his theory of damages. Professor Hyde addresses the evolving labor market by utilizing the high-technology employers in Silicon Valley as a case study. Professor Hyde declares that the rapid and frequent turnover of employees is a key component resulting in short job tenures. He also identifies the heavy use of temporary labor and a lack of loyalty to individual firms as contributing factors. Professor Hyde labels these unique components of employment in the mobile market of Silicon Valley as "high-velocity." In an attempt to explain why high-velocity labor supports rapid technological growth, Professor Hyde effectively identifies and explains two general concepts, "flexibility" and "information diffusion." "Flexibility" accounts for the fluid market of available employees consisting of contractors and consultants who typically move from one company to the next. "Information diffusion" accounts for the technical know-how and advancements that travel between companies as those employees move from job to job.[10]

118.112.   Accordingly, Defendants impeded technological and economic growth at Apple by entering into illegal non-solicitation agreements with the Company's competitors to artificially decrease employee salaries at Apple and at other companies, which suppressed high-velocity labor by squelching flexibility and information diffusion. The illegal agreements run contrary to what has made Silicon Valley so successful: job-hopping. As Professor Hyde explains, "There is a fair amount of research that tech companies, particularly in California, have distinctive personnel practices." He states, "They hire for short tenures and keep ties with former employees so there can be an exchange of information across company lines. The companies in [a class-action lawsuit

---

[10] Alan Hyde. *Working in Silicon Valley: Economic and Legal Analysis of a High-Velocity Labor Market*., New York: M.E. Sharpe, Inc., 2003. Print.

1   that accuses industry executives of agreeing between 2005 and 2009 not to poach one

2   another's employee] might have been killing the golden goose."[11]

3   ~~119.~~113.   The chiefs of Silicon Valley normally boast of their dedication to merit

4   and market forces.  The acts alleged herein, however, reveal another side.  "This is one of

5   hundreds of examples in which our economy has been corrupted by the intense

6   concentration of wealth," stated Roger McNamee, co-founder of Elevation Partners, a

7   private equity firm specializing in technology and media.[12]

8   ~~120.~~114.   As a direct and proximate result of Defendants' actions and omissions,

9   Apple has expended, and will continue to expend, significant sums of money. Such

10  expenditures include but are not limited to:

11          (a)     costs incurred from years of lost opportunities to hire more qualified

12  employees that were employed at other companies;

13          (b)     costs incurred from defending and paying a settlement in the class

14  action for violation of antitrust laws;

15          (c)     costs incurred from defending and settling allegations by the

16  Department of Justice; and

17          (d)     loss of reputation.

18                         **DERIVATIVE ALLEGATIONS**

19  ~~121.~~115.   Plaintiff brings this action derivatively in the right, and for the benefit, of

20  Apple to redress injuries suffered and to be suffered by the Company as a result of the

21  Defendants' breach of fiduciary duties, gross mismanagement, and waste of corporate

22  assets.

23

24  _____

25  [11] David Streitfeld, *Engineers Allege Hiring Collusion in Silicon Valley*, NEW YORK
    TIMES, 28 Feb. 2014, http://www.nytimes.com/2014/03/01/technology/engineers-allege-
    hiring-collusion-in-silicon-valley.html?_r=0.

26  [12] Paul M. Barrett and Brad Stone, *Apple, Google, and the Hubris of Silicon
27  Valley's Hiring Conspiracy*, BLOOMBERG, 1 May 2014,
    http://www.businessweek.com/articles/2014-05-01/tech-hubris-the-silicon-valley-
28  antitrust-hiring-conspiracy.

122.116.   Plaintiff is the owner of Apple common stock, was the owner ofhas continuously owned Apple common stock at all times relevant hereto,since January 15, 2009 and continues to own and hold such shares.  Plaintiff has standing to bring this derivative action.

123.117.   Plaintiff and his counsel will adequately and fairly represent the interests of Apple in enforcing and prosecuting its rights.

124.118.   At the time this derivative lawsuit was commenced, Apple's Board of Directors consisted of eight individuals:  Arthur Levinson, Tim Cook, Millard ("Mickey") Drexler, Robert Iger, Albert Gore, Jr., Andrea Jung, Ronald Sugar, and Susan Wagner.D. Sugar, and Susan L. Wagner.  At the time this First Amended Complaint was filed, Apple's board consisted of the following nine directors:  Arthur Levinson, Tim Cook, Albert Gore, Jr., Andrea Jung, Ronald D. Sugar, James A. Bell, Alex Gorsky, Monica Lozano, and Susan L. Wagner.

**I.      Responsibilities of Corporate Directors**

125.119.   Corporate officers and directors owe the highest fiduciary duties of care and loyalty to the corporation they serve.  This action involves a knowing and/or reckless breach of defendant'sdefendants' duties of good faith, loyalty, and care.

126.120.   Apple frequently states that its Board is held to the highest level of ethics. As stated above these members have formed incestuous relationships with other corporations and used these relationships to suppress innovation and employee pay.  By allowing this behavior to continue, the Board not only violated California and federal law, they also violated their own company's ethical standards and guidelines.

127.121.   Apple's Corporate Governance Guidelines lists the responsibility and duties of the Board.

**II.     Principal Duties of the Board of Directors**

128.122.   The fundamental role of the directors is to exercise their business judgment, and to act in what they reasonably believe to be the best interests of the Corporation and its shareholders.  In fulfilling that responsibility, directors reasonably

1    may rely on the honesty and integrity of the Corporation's senior management and expert

2    legal, accounting, financial and other advisors.

3         129.123.   The Guidelines also clearly address the high standard that board

4    members are expected to live up to.  The Board expects its members, as well as officers and

5    employees, to act ethically. Directors are expected to adhere to the Corporation's Business

6    Conduct Policy and the Guidelines Regarding Director Conflicts of Interest.

7         130.124.   The Board failed to live up to its duties when they knowingly allowed

8    Apple to conspire with competitors to restrict hiring.  As demonstrated through e-mails,

9    members of the Board were fully aware of these "gentlemen agreements," or knowingly or

10   recklessly approved or acquiesced to the implementation of these illegal agreements.

11   These directors failed to perform and "act ethically."

12        131.125.   Additionally, the Guidelines goesgo further to discuss the Board's

13   responsibility in regard to conflicts of interest:

14             Pursuant to the Corporate Governance Guidelines of Apple Inc.
               (the "Corporation"), the Board of Directors of the Corporation
15             expects each director to act ethically at all times and to adhere
               to the Corporation's Business Conduct Policy.
16

17        132.126.   The Corporation's Business Conduct Policy states:

18             Apple's success is based on creating innovative, high-quality
               products and services and on demonstrating integrity in every
19             business interaction. Apple's principles of business conduct
               define the way we do business worldwide. These principles are:
20             **Honesty.** Demonstrate honesty and high ethical standards in
               all business dealings.
21             **Respect.** Treat customers, suppliers, employees, and others
               with respect and courtesy.
22             **Confidentiality**. Protect the confidentiality of Apple's
               information and the information of our customers, suppliers,
23             and employees.
24             **Compliance**. Ensure that business decisions comply with all
               applicable laws and regulations.
25

26        133.127.   The Board is responsible for ensuring that business decisions comply with

27   all applicable law and regulations.  It is clear from contemporaneous e-mails that the

28   Board ratified Apple's involvement in this illegal activity and condoned the illegal

agreements.  It follows that the Board either knew of these illegal activities and failed to stop them or acted in bad faith.  Either way, the Board is so heavily entrenched in these illegal transactions that any attempt to make a demand would be futile.

134.128.   The Apple Corporate Guidelines also addressesaddress competing with other companies and competition laws.

> Laws regulating competition and trade practices vary around the world, but certain activities, such as price fixing and agreeing with a competitor to allocate customers, are almost always illegal and are absolutely prohibited under Apple policy. You should not:
> - Agree with competitors or exchange information with competitors on prices, policies, contract terms, costs, inventories, marketing plans, or capacity plans.
> - Agree with a competitor that the competitor will sell goods and services to Customer A (and you will not), and that you will sell goods and services to Customer B (and your competitor will not).
> - Agree with resellers on the resale pricing of Apple products without legal department approval.
> - Require vendors to purchase Apple products in order to sell products or services to Apple.
> - Describe the products or services of competitors inaccurately to promote Apple products or services.
> - Engage in any pricing or other practices that could defraud a supplier or others.
> - Violate fair bidding practices, including bidding quiet periods, or provide information to benefit one vendor over other vendors.

135.129.   The Board is tasked with following the Corporate Guidelines.  The Guidelines state that restricting competition is absolutely prohibited under Apple policy. Not only did Apple agree with competitors not to recruit employees but the CEO of Apple even threatedthreatened a lawsuit if Palm did not agree.  This clearly violates the Corporate Guidelines.  Entering into illegal non-solicitation agreements with competitors is contrary to this Code.  The Board of Directors violated Apple's own Corporate Guidelines.  Each member violated these standards, either by active participation or failing to stop the illegal activity through sustained and/or systematic gross failure of oversight. These illegal agreements continued for at least five (5) years and involved the highest -level

executives of Apple, who also sit on the Board of Directors.  For these reasons, demand on the Board would be futile.

136.130.   Additionally, each member of the Board has additional ethical and responsibilities because of their respective Committees on the Board.  Apple has three board committees: Audit, Compensation, and Nominating.

137.131.   The Audit and Finance Committee is responsible primarily for assisting the Board in fulfilling its oversight responsibility of reviewing the financial information provided to shareholders and others, appointing the independent registered public accounting firm, reviewing the services performed by the Company's independent registered public accounting firm and internal audit department, evaluating the Company's accounting policies and the system of internal controls established by management and the Board, reviewing significant financial transactions, and overseeing enterprise risk management.  This Committee is comprised of Ronald D. Sugar, Defendant Campbell, Defendant Iger, and Defendant Levinson.  These directors should be held to a higher standard because of their position on this committee.  They should have been aware by overseeing the risk management and significant financial transactions that by performing illegal activities they were opening Apple up for liability.

138.132.   The Compensation Committee is responsible for primarily reviewing the compensation arrangements for the Company's executive officers, including the CEO, administering the Company's equity compensation plans, and reviewing the Board's compensation. This Committee is comprised of Defendants Jung and Drexler, as well as non-defendant Albert Gore.  These directors control other director'sdirectors' income. These directors, in particular, control Tim Cook's compensation. Tim Cook was part of top management during the conspiracy and it is not plausible that he was unaware of the agreements due to his position and his close relationship to Jobs and others.

139.133.   The Nominating Committee assists the Board in identifying qualified individuals to become directors, makes recommendations to the Board concerning the size, structure and composition of the Board and its committees, monitors the process to assess

the Board's effectiveness and is primarily responsible for oversight of corporate governance, including implementing the Company's Corporate Governance Guidelines. The members of this Committee are Defendants Campbell and Drexler, as well as non-defendant Albert Gore.  These members are charged with overseeing and making sure the Corporate Governance Guidelines are being followed.  The illegal restrictive hiring guidelines clearly violated their own competition guidelines.  Campbell knew or was recklessly ignorant that violations were occurring.

140.134.   By virtue of their positions at Apple, each of the Defendants owed Apple and its shareholders the duty to exercise a high degree of care, good faith, loyalty, and diligence to manage and administer Apple in its best interests, to preserve its property and assets, to fairly and accurately report on its operations to the public markets, and not to seek to personally profit at Apple's expense.  The conduct of the Defendants, as complained above and herein, involves knowing, intentional, and culpable violations of their fiduciary duties to Apple and federal and California anti-trustantitrust laws. Moreover, the misconduct by Defendants was conducted or allowed by Apple's Board, which has failed to take any legal action on behalf of Apple.

141.135.   Despite these duties, the Defendants were grossly negligent, reckless, and/or they intentionally caused or allowed, by their actions or inactions, Apple to participate in illegal restrictive employment agreements.  Moreover, the restrictive scheme was in breach of Defendants' fiduciary duties of good faith, honestlyhonesty and loyalty to Apple.

142.136.   By virtue of their positions at Apple, and the control and authority they had as directors and/or officers of Apple, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  These acts include their participation in and encouragement of the illegal restrictive employment agreements with competitors.  Because of their positions with Apple, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information, and was required to

1  disclose these facts promptly and accurately to Apple shareholders and the financial
2  markets.

3      143.137.   Instead, the Defendants continued over the course of many years to
4  operate under these illegal agreements.  The Defendants not only actively participated in
5  restricting employee'semployees' employment options but they also actively sought out
6  competitors and bullied them into participating in these illegal agreements as well.

7      144.138.   Plaintiff seeks, on behalf of Apple, redress for all money lost because of
8  the wrongful acts and omissions.

9  **III.    A Litigation Demand Would Be Futile and Is Thus Excused**

10     145.139.   As a result of the facts set forth above and herein, Plaintiff has not made
11  any demand on the Apple Board to institute this action against the Defendants.  Such
12  demand is excused because making a demand would be a futile and useless act because the
13  board is incapable of making an independent and disinterested decision to institute and
14  vigorously prosecute this action, and because the wrongful conduct alleged herein is not
15  subject to protection under the business judgment rule.

16     146.140.   Since Apple is a California corporation, any demand requirement is
17  evaluated under California law.

18     147.141.   At the time this action was commenced, the Apple Board was comprised
19  of eight directors: defendants Levinson, Cook, Drexler, Jung, Iger and non-defendant
20  directors Albert Gore, Jr.,., Ronald D. Sugar, and Susan L. Wagner.  At the time this First
21  Amended Complaint was filed, Apple's board consisted of the following nine directors:
22  Arthur Levinson, Tim Cook, Albert Gore, Jr., Andrea Jung, Ronald D. Sugar, James A. Bell,
23  Alex Gorsky, Monica Lozano, and Susan L. Wagner.  Where there is an evenodd number of
24  board members, a plaintiff need only allege that demand would be futile as to halfa
25  majority of the board members. Thus, plaintiff here need onlyneeds to allege demand
26  futility as to 45 out of Apple's 89 current directors.

27
28

148.142.   A majority of the Apple Board members are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

### A.   Demand ~~Would Be~~Is Futile ~~Against Arthur~~as to Levinson

143.   Based on the allegations of Plaintiff's August 11, 2014 complaint, the Court has found that demand on Levinson is excused.  Dkt. No. 125 at 20.

149.144.   Levinson is incapable of considering a demand.  Levinson has been a member of the board since 2000.  Levinson maintains numerous professional and personal relationships with other members of the Board that create a reasonable doubt as to Levinson's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein.  Levinson was also on the board and CEO of Genetech since 1999.  Further, he was a director at Google from 2004-2009.  In 2007, Levinson and Eric Schmidt sat on Apple and Google's ~~Board~~Boards.  By May 2009, the FTC launched an inquiry into whether the presence of Schmidt and Levinson on the boards of both Apple and Google violated antitrust laws.  One of the reasons the investigation was launched was because both Levinson and Schmidt served on the boards of Apple and Google at a time when the companies were beginning to square off against each other in the mobile space.  Facing a federal probe, Schmidt resigned from Apple's board in August 2009 and a few months later, Levinson resigned from Google's board.  Levinson is a founding investor and CEO of Calico, a Google-backed company, which was formed in 2013.  Lucy P. Marcus, CEO of Marcus Venture Consulting and an expert on corporate governance and board ethics, said of Levinson's role, "There is something about this that feels uncomfortable."

150.145.   Further still, internal documents show that Google and Genetech entered into similar agreements with each other.  Each of these companies were on Apple's do not call list and presumably subject to the same illegal restrictive hiring agreements.  Given Levinson's roles at these companies and their appearance on Apple's do not call list, it is reasonable to infer that he knew about these agreements.  Further, since he held leadership positions in each company, it is also reasonable to infer that he actively participated in

these agreements.  Levinson would be incapable of considering a demand because of the substantial personal liability he would face.

**B.** **Demand ~~Would Be~~Is Futile ~~Against Tim~~as to Cook**

146.    Based on the allegations of Plaintiff's August 11, 2014 complaint, the Court has found that demand on Cook is excused.  Dkt. No. 125 at 20.

~~151.~~147.    Defendant Cook is incapable of considering a demand.  Cook has been Apple's CEO and board member since 2011.  He held other executive roles at Apple since 1998, including Chief Operating Officer.  Additionally, Cook has been Chairman of the Nike board of directors since 2005.  As shown above, Nike was on Apple's do not call list. There is even a note next to Nike stating that they have board members in common.  Given Cook's dual positions, his relationship with Jobs and others, and his responsibilities at Apple, it is reasonable to assume that he at least knew of the restrictive hiring agreements. It is even more reasonable to assume, since he was in positions of power at each company, that he ~~encourage~~encouraged and facilitated the creation of these illegal agreements.  This is especially true since Nike is a retail company and would not likely do a lot of recruiting at Apple for technical positions.  It would take someone on the board of each company to make such an agreement.  It is reasonable to assume that was Tim Cook.  Therefore, Cook would be incapable of considering a demand because of the substantial liability he would face.

**C.** **Demand ~~would be~~Is Futile ~~Against Millard Drexler~~as to Jung**

~~152.    Defendant Drexler is incapable of considering a demand.  Drexler has been on the board since 1999.  Drexler maintains numerous professional and personal relationships with other members of the Board that create a reasonable doubt as to Drexler's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein.  For example, Drexler was appointed to Apple's Board only four months after Jobs was also appointed to the Gap board of directors.  Both Drexler and Jobs sat on the Gap board of directors until early October 2002 when both Drexler and Jobs abruptly resigned within the span of eight days.  It is worth noting that on September~~

7, 2006, Gap announced that it had discovered unrecorded compensation expenses associated with previous stock option grants.

153.    Drexler has also been the CEO and Chairman of the Board of J.Crew since 2003.  As noted above, J.Crew was on Apple's "do not call" list, even with a note next to his name stating that they were common board members.  Given Drexler's roles at both companies, and the agreements between the companies, it is reasonable to infer that he played a part in creating and/or ratifying the illegal agreements.  Drexler would be incapable of considering a demand because of the substantial personal liability he would face.

**D.    Demand Would Be Futile Against Robert Iger**

154.    Defendant Iger is incapable of considering a demand.  Iger is the CEO and board member of The Walt Disney Company and has been since 2005.  One of Disney's acquisitions was Pixar in 2006.  Not only was Steve Jobs also at Pixar but as shown above, Pixar and Apple entered into an illegal restrictive hiring agreement.  In fact, Pixar's was the strictest of all the illegal agreements.  Additionally, Pixar entered into other illegal hiring agreements while Iger was on the Disney Board.  It is reasonable to infer that Iger was aware of these illegal agreements before even joining the Apple Board.  Additionally, it is reasonable to assume that as CEO he was aware of the restrictive agreement with Pixar and Apple when Pixar was acquired.  Cook allowed this agreement to go on and facilitated and encouraged others as well.  His close relationship with Jobs makes him incapable of taking action against Jobs.  Any suit by Apple to recover for the wrongdoings listed above would expose Iger to personal liability for the illegal agreements he ratified while at Disney.

**E.    Demand Would Be Futile Against Andrea Jung**

155.148.    Defendant Jung has been a director at Apple since 2008.  During Jung's tenure as a director, Jung and other Individual Defendants caused Apple to engage in practices that violated antitrust laws by agreeing to refrain from hiring employees of Apple's competing companies.  In fact, the DOJ began investigating Apple's hiring practices in 2009.  Thus, Jung was aware of Apple's antitrust violations.  Indeed, Jung was

familiar with government investigations from holding various senior positions at Avon

Products, Inc., including serving as Avon's chairman and CEO between 1999 and 2012.[13]

Jung left Avon in 2012, when Avon was subject to multiple investigations by government

agencies, including the SEC, stemming from allegations of Avon's ~~violation~~violations of

U.S. laws in China and Latin America.  Upon information and belief, Avon paid hundreds

of millions of dollars in connection with these investigations.

149.    Jung participated in and facilitated the scheme in her capacity as a director

of Apple and a member of Apple's Compensation Committee in 2008 and 2009, while the

anticompetitive agreements and "Do Not Cold Call" policy were in place at Apple and the

Company was exchanging confidential information with competitors.

150.    Jung has been a member of the Board's Compensation Committee (together

with Gore) since the end of 2009 and has been the Compensation Committee Chair since

2011.  According to Apple's 2014 Proxy, "[t]he Compensation Committee is responsible

primarily for reviewing the compensation arrangements for the Company's executive

officers, including the CEO, administering the Company's equity compensation plans, and

reviewing the Board's compensation."  As a member of the Compensation Committee,

Jung is directly involved in overseeing the development of employee compensation

programs and reviewing and deciding the compensation arrangements of all key

employees.  For example, as stated in Apple's 2006 Proxy, the Compensation Committee

has the sole discretion in deciding which "[e]xecutive officers and key employees are

eligible to participate in the Performance Bonsu Plan."

151.    Jung signed Apple's November 5, 2008 Form 10-K, which disclosed that the

reduction of stock-based awards issued to employees "could negatively impact the

Company's ability to attract and retain key personnel."  According to a 2011 media

interview given by Gore, the Compensation Committee pays "real close attention" to how

---

[13] Katie Marsal, *Apple board member Andrea Jung facing scrutiny at Avon*, APPLE INSIDER, Oct. 28, 2011, *available at* ~~http~~https://appleinsider.com/articles/11/10/28/apple__board__member__andrea_jung_facing_scrutiny_at_avon (last visited ~~Aug. 7, 2014~~June 26, 2023).

Apple attracts world-class talent.[14]  Thus, Jung knew (or should have known) the same information regarding Apple's recruitment and retention issues as the rest of the Board, including the anticompetitive agreements and related practices at Apple.  Because any suit brought by Apple would expose Jung to a substantial likelihood of personal liability for her role in facilitating Apple's anticompetitive agreements, Jung lacks disinterestedness and would not impartially consider a demand.

**D.      Demand Is Futile as to Gore**

152.    Director Gore is incapable of considering a demand in a disinterested manner.  Gore has served as a Senior Advisor to Google since at least 2001, two years before he joined Apple's Board.  During his time as a Senior Advisor, Gore has maintained a close relationship with Google co-founders, Brin and Page.  Gore noted that he has known both Brin and Page since they were 27 years old.  Given this close relationship with the co-founders of Google, and Gore's simultaneous membership of Apple's Board, it is reasonable to infer that he knew about the improper agreements, and in fact was possibly a reason that the agreement between Google and Apple came to fruition.

153.    Gore has been a member of the Board since 2003 and a member of the Board's Compensation Committee since 2004.  Gore participated in and facilitated the scheme in his capacity as a director of Apple and a member of Apple's Compensation Committee in 2008 and 2009, while the anticompetitive agreements and "Do Not Cold Call" policy were in place at Apple and the Company was exchanging confidential information with competitors.

154.    As a member of the Compensation Committee, Gore is directly involved in overseeing the development of employee compensation programs and reviewing and deciding the compensation arrangements of all key employees.

---

[14] Peter Kafka, *Al Gore on Apple, Google, and the "Broken" U.S. Political System*, ALLTHINGSD, Oct. 20, 2011, *available at* http://allthingsd.com/20111020/former-u-s-vice-president-al-gore-live-at-asiad/ (last visited June 26, 2023).

155.    Gore signed Apple's November 5, 2008 Form 10-K, which disclosed that the reduction of stock-based awards issued to employees "could negatively impact the Company's ability to attract and retain key personnel."  In fact, in a 2011 media interview, Gore admitted that the Compensation Committee paid "real close attention" to how Apple attracts world-class talent.  Thus, Gore knew (or should have known) the same information regarding Apple's recruitment and retention issues as the rest of the Board, including the anticompetitive agreements and related practices at Apple.  Because any suit brought by Apple would expose Gore to a substantial likelihood of personal liability for his role in facilitating Apple's anticompetitive agreements, Gore lacks disinterestedness and would not impartially consider a demand.

**E.    Demand Is Futile as to Wagner**

156.    Director Wagner has been an Apple director and a member of the Audit and Finance Compensation Committee since 2014.  Wagner is co-founder and a director of BlackRock, Inc. ("BlackRock"), an asset management company and Apple's second largest shareholder.  Wagner served as BlackRock's Vice Chairman between January 2006 and July 2012 and was also BlackRock's Chief Operating Officer and Head of Corporate Strategy.  On January 29, 2018, BlackRock filed a Form SC 13G/A disclosing that as of December 31, 2017, BlackRock owned 319,715,586 shares of Apple stock, or 6.3% of Apple's total shares outstanding. Apple's 2018 Proxy Statement, filed on December 27, 2017 similarly disclosed that BlackRock owned 322,683,504 shares of Apple's common stock, or 6.34% of Apple's common stock outstanding, as of December 31, 2016, making it Apple's second largest shareholder. Due to BlackRock's material investment in Apple, Wagner faces a significant conflict of interest.

157.    Wagner's positions at Apple and BlackRock have affected the investment strategy BlackRock has adopted with respect to Apple.  Indeed, in his 2018 letter to CEOs, "A Sense of Purpose," BlackRock CEO Larry Fink noted that BlackRock places particular emphasis on the role of the company's board of directors in developing long-term strategy and in remaining involved with overseeing such strategy on an ongoing basis, warning that

"[d]irectors whose knowledge is derived only from sporadic meetings are not fulfilling their duty to shareholders."[15]  He also noted BlackRock's view that diverse boardrooms are "less likely to succumb to groupthink or miss new threats to a company's business model," and "are better able to identify opportunities to promote long-term growth."  Wagner has received and continues to receive significant financial benefits as a result of her positions at BlackRock.  Thus, Wagner's affiliation with BlackRock and her current role as a director of BlackRock renders her incapable of impartially considering a demand.

**F.    Demand Is Futile as to Sugar**

158.    Director Sugar is incapable of considering a demand.  Sugar has been on the board since November 17, 2010.  Sugar maintains numerous professional and personal relationships with other members of the Board, including Jobs, that create a reasonable doubt as to Sugar's ability to independently and disinterestedly consider a demand on the Board to pursue the relief sought herein.  For example, Jobs gave Sugar a glowing introduction in 2010, when Sugar joined the Board:

> "Ron is an engineer at heart, who then became a very successful business leader.  We are very excited to welcome him to Apple's Board," said Steve Jobs, Apple's CEO.  "In addition to having been the CEO of a high-tech Fortune 100 company, Ron has a Ph.D. in engineering and has been involved in the development of some very sophisticated technology."

In response, Sugar stated: "I have always had enormous admiration for the people of Apple; … [i]t is a special privilege to serve on the board of such an amazing company."

**G.    Demand Is Futile as to All Current Directors**

159.    Directors  Levinson, Cook, Gore, Jung, Sugar, Bell, Gorsky, Lozano, and Wagner are incapable of considering a demand in a disinterested manner.  Such directors failed to take action to preserve the claims asserted herein, including failing to obtain a tolling agreement with the Individual Defendants.  To be considered independent and objective, a director needs to remain objective about the claims that are the subject of a

---

[15] *Available at* https://www.blackrock.com/corporate/en-us/investor-relations/larry-fink-ceo-letter (last visited June 26, 2023).

hypothetical litigation demand.  A director may also not exhibit antagonism towards the claims.  Failing to preserve the ability of Apple to pursue the claims by obtaining tolling agreements is the epitome of antagonism and a lack of objectivity.  Because Directors Levinson, Cook, Gore, Jung, Sugar, Bell, Gorsky, Lozano, and Wagner failed to obtain tolling agreements despite having actual knowledge of the claims asserted herein, demand is futile.

### F.H.   Demand by Plaintiff Is Futile and Therefore Excused Because a Majority of the Board Is Unable To Conduct an Independent and Objective Investigation of Wrongful Conduct

156.160.   Demanding that the Board investigate and act upon the wrongdoing alleged herein would be futile since a majority of the Board engaged in the wrongdoing alleged herein and all have interests adverse to performing a fair, unbiased investigation. These directors breached their fiduciary duties during the relevant period.  The principal wrongdoers and beneficiaries of the wrongdoing, dominated and controlled Apple's Board of Directors and, thus, the Board can neither exercise independent, objective judgment in deciding whether to bring this action, nor could it be expected to vigorously prosecute this action.

157.161.   The Director Defendants, Campbell, Levinson, Cook and Iger,Cook cannot be relied upon to reach a truly independent decision of whether to commence the demanded action against themselves and those responsible for the misconduct alleged in this Complaint because, among other things, the Board is currently dominated by the Defendants on the Board, who were personally and directly involved in the acts alleged herein and approved the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede.  Apple has made many of the director Defendants multi-millionaires.  This domination of the Board's ability to validly exercise its business judgment renders it incapable of reaching an independent decision whether to accept any demand by Plaintiff to address the wrongs detailed herein.

158.162.   Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.

Making a demand on the Board of Directors is excused if there is reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment and, therefore, are entitled to the protection of the business judgment rule.  To benefit from the protection of the business judgment rule, a director must be informed of all material information reasonably available and, being so informed, the director must act with requisite care in discharging his or her duties.  To meet the standard of care, in light of the information which the directors knew, they were obligated to take actions in the best interests of the Company, to the exclusion of the directors' personal pecuniary interests, and conduct full and adequate investigation into decisions affecting the Company and its assets.

159.163.   Thus, because the Director Defendants engaged in acts of misconduct and wrongdoing, as described above, those acts were not the product of a valid exercise of business judgment and not entitled to the protections of the business judgment rule.  The directors failed to act to protect the interests and business assets of Apple.  Failure to take such protections could not have been a valid exercise of business judgment.  In addition, the practice of illegally restricting hirings has subjected Apple to potentially massive liability.  Further, the Defendants face a substantial likelihood of liability for their individual conduct and, thus, are incapable of making a disinterested decision about whether to pursue the claims asserted herein.

160.164.   Accordingly, demanding that the directors take action before this lawsuit was filed would have been futile and, therefore, the demand requirement is excused.

161.165.   Demand is futile if at least a majority of Apple's Board of Directors cannot fairly and independently adjudicate potential claims against themselves.  Of the current Board of Directors, the majority of Directors participated in the illegal agreement subjecting Apple to criminal charges and financial and reputational risk.  A majority of the Board therefore engaged, and continues to engage, in the wrongdoing and has interests that are adverse to performing a fair, unbiased investigation.

### ADVERSE DOMINATION

~~162.~~166.   The statute of limitations does not bar Plaintiff's shareholder derivative action.  Plaintiff has brought this complaint within the applicable statute of limitations.

~~163.~~167.   Alternatively, the statute of limitations was tolled during Jobs's adverse domination of Apple and the concealment by Defendants of their wrongful acts.  Here, the Defendant Directors and Apple were wholly under the adverse domination of Jobs, who controlled shareholder votes.  Consequently, the Director Defendants were "deemed to be in the same position as an incompetent person or a minor without legal capacity either to know or to act in relation to" the wrongful conduct.  *Beal v. Smith*, 46 Cal. App. 271, 279 (1920).  Moreover, Defendants concealed, and continue to conceal, their wrongful acts and this is a continuing conspiracy.  The statute of limitations has therefore been tolled since Jobs adversely dominated Apple.  The statute of limitations should not bar Plaintiff, an innocent stockholder, from bringing this shareholder derivative suit.

### CLAIMS FOR RELIEF

#### Count I
#### ~~Violation~~Violations of § 14(a) of the Exchange Act
#### Against Defendants Campbell, Cook, Drexler, Iger, Jung, and Levinson

~~164.~~168.   Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

~~165.~~169.   Defendants Campbell, Cook, Drexler, Iger, Jung, and Levinson issued, caused to be issued, and participated in the issuance of materially false and misleading written statements and material omissions to shareholders that were contained in Apple's ~~2012, 2013, and~~ 2014 ~~Proxies~~Proxy.  These Defendants are sued herein for the false statements in Apple's ~~2012, 2013, and~~ 2014 ~~Proxies~~Proxy due to their review, approval, and participation in the issuance of such ~~proxies~~proxy.

~~166.~~170.   The ~~2012, 2013, and~~ 2014 ~~Proxies were~~Proxy was materially false and misleading because ~~they~~it omitted information regarding these Defendants' conduct in connection with Apple's anti-poaching practices.  ~~Specifically, the proxy statements failed to disclose, among other things, that these~~Specifically, the proxy statement affirmatively

1   misrepresented that "The Board oversees the Company's CEO and other senior
2   management in the competent and ethical operation of the Company and assures that the
3   long-term interests of the shareholders are being served."  In reality, the Board was
4   allowing Jobs and other members of senior management to engage in unlawful and
5   unethical behavior that placed Apple at substantial risk of SEC and DOJ enforcement
6   actions and hundreds of millions of dollars in damages.  The Proxy also failed to disclose,
7   among other things, that Apple lacked adequate internal controls, that Apple was keeping
8   its labor costs at below-market levels by agreeing with its competitors not to hire
9   employees from each other, that Defendants caused Apple to engage in anti-poaching
10  practices, that the DOJ had been investigating Apple's potential violations of antitrust
11  laws, and that these Defendants' conduct may lead to criminal charges and civil liability
12  against and cause substantial damages to Apple.  Instead, the proxy ~~statements~~statement
13  touted these Defendants' "significant and diverse management experience, including
14  strategic and financial planning, public company financial reporting, compliance, risk
15  management and leadership development."  Based on the false and misleading
16  information in the proxy ~~statements~~statement, Apple recommended that these Defendants
17  be re-elected as Apple directors year after year.  As a result of their recommendations,
18  these Defendants were re-elected to Apple's Board.

19          ~~167.~~171.    By reason of the conduct alleged herein, the Defendants, who caused the
20  issuance of the ~~2012, 2013, and~~ 2014 ~~Proxies~~Proxy, violated Section 14(a) of the Exchange
21  Act.  As a direct and proximate result of these Defendants' wrongful conduct, the
22  Defendants named herein misled and/or deceived ~~its~~Apple's shareholders.  The false
23  statements and material omissions were material due to the substantial likelihood that a
24  reasonable shareholder would consider the information important in deciding how to vote
25  with respect to the matters contained in the proxy, which were submitted for shareholder
26  approval at the annual meetings.  Among other things, based on the false statements and
27  material omissions contained in the 2012, 2013, and 2014 Proxies, a majority of

28

1    shareholders supported the Board's recommendation and voted in favor of re-electing

2    these Defendants to Apple's Board.

3        168.172.    Plaintiff, on behalf of the Company, seeks injunctive, declaratory, and

4    equitable relief for these Defendants' violations of § 14(a) of the Exchange Act and their

5    interference with the voting rights of Plaintiff and other Apple shareholders.

6        169.173.    This action was timely commenced within three years of the

7    dissemination of the false proxy statements and within one year of the time that Plaintiff

8    discovered or reasonably could have discovered the facts upon which this claim is based.

9                                    **Count II**
10    **Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty**
      **Against All Individual Defendants**

11        170.174.    Plaintiff incorporates by reference the allegations set forth above as

12    though fully restated herein.

13        171.175.    Defendants, as Apple's Directors and/or Officers were and are required to

14    use their abilities to control and manage Apple in a fair, just, and equitable manner to

15    ensure that Apple complies with applicable laws and contractual obligations, to refrain

16    from abusing their positions of control, and not to favor their own interests at the expense

17    of Apple.

18        172.176.    By their actions alleged above, Defendants violated their fiduciary duties

19    to Apple, including, without limitation, their duties of good faith, loyalty, and due care.

20        173.177.    The wrongful conduct particularized herein was not due to an honest

21    error in judgment but rather to Defendants' wrongful acts as well as bad faith and/or

22    reckless disregard of Apple's rights and interests and its employees, without reasonable

23    and ordinary care which they owed to Apple.

24        174.178.    Defendants have participated in harming Apple and have breached

25    fiduciary duties owed to the company.  Defendants knowingly aided, encouraged,

26    cooperated and/or participated in, and substantially assisted other Defendants in the

27    breach of their fiduciary duties.

28

175.179.   As a result of Defendants' breach of fiduciary duties, Apple has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

176.180.   The acts of Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiff on behalf of Apple is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

**Count III**
**Gross Mismanagement**
**Against All Individual Defendants**

177.181.   Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

178.182.        By their actions alleged above, Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing Apple's assets and business in a manner consistent with the operations of a publicly held corporation.

179.183.   As a result of the gross mismanagement, Apple has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

180.184.   The acts of Defendants were done maliciously, oppressively, and with intent to defraud, and Plaintiff on behalf of Apple is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

**Count IV**
**Waste of Corporate Assets**
**Against All Individual Defendants**

181.185.   Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

182.186.   By their actions alleged above, and by failing to properly consider the interests of Apple and its public shareholders by failing to conduct proper supervision, Defendants have caused the Company to waste valuable corporate assets by paying improper compensation and bonuses to certain Directors who breached their fiduciary

duties and to incur millions of dollars of legal liability or legal costs to defend Defendants' unlawful actions.

183.187.   As a result of the waste of corporate assets, Apple has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

184.188.   The acts of Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiff on behalf of Apple is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

**Count V**
**Breach of Duty of Honest Services**
**Against Defendants Estate of Steven P. Jobs, Cook, and Anderson**

185.189.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.190.   This claim is brought derivatively on behalf of the Company against Defendants Estate of Steven P. Jobs, Cook, and Anderson for breach of their undivided duty of loyalty to their employer, Apple.

187.191.    Jobs, Cook, and Anderson were employees of Apple during the relevant time period.

188.192.   As alleged above, Jobs, Cook, and Anderson breached their duty of loyalty to Apple by not acting solely in Apple's interests in performing their employment duties.

189.193.   Those breaches of duty consisted of the conduct alleged throughout this complaint including, without limitation, Defendants' causing the Company to enter into unlawful and anticompetitive employee "anti-poaching" agreements, pursuant to which Apple agreed with its competitors not to solicit each other's employees for employment. Jobs, Cook, and Anderson— benefitted from their wrongdoing because they received compensation that was directly tied to the company's financial performance, which was higher than it would have been but for the wrongdoing since the wrongdoing helphelped reduce Apple's compensation expenses.

190.194.   Apple was harmed by these Defendants' breaches of their undivided duty of loyalty.

191.195.   By reason of the foregoing, Apple was harmed and will continue to suffer harm as described in greater detail above.

**PRAYER FOR RELIEF**

Plaintiff on behalf of Apple requests judgment and relief as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Apple and that Plaintiff is an adequate representative of Apple;

B.      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Apple;

C.      Determining and awarding to Apple the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

D.      Directing Apple and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Apple and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to Apple's Bylaws or Articles of Incorporation;

E.      Determining and awarding to Apple exemplary damages in an amount necessary to punish the Individual Defendants and to make an example of defendants to the community according to proof at trial;

F.      Awarding Apple restitution from the Individual Defendants, and each of them;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

1

**DEMAND FOR JURY TRIAL DEMAND**

2

Plaintiff demands a trial by jury of all issues so triable.

3     ///

4     ///

5     ///

6     ///

7

Dated: August 11, 2014 June 27, 2023          Respectfully submitted,

8                                             BOTTINI & BOTTINI, INC.
                                              Francis A. Bottini, Jr. (SBN 175783)
9                                             Albert Y. Chang
                                              Yury A. Kolesnikov (SBN 296065)

10

11                                                     *s/ Francis A. Bottini, Jr.*
                                                      Francis A. Bottini, Jr.

12

13                                            7817 Ivanhoe Avenue, Suite 102
                                              La Jolla, California 92037
                                              Tel:    (858) 914-2001
14                                            Fax:    (858) 914-2002
                                              fbottini@bottinilaw.com
15                                            achang@bottinilaw.com
                                              ykolesnikov@bottinilaw.com

16
                                              COTCHETT, PITRE & MCCARTHY, LLP
17                                            Joseph W. Cotchett (SBN 36324)
                                              Mark C. Molumphy (SBN 168009)
18                                            Tyson C. Redenbarger (SBN 294424)
                                              Gia Jung (SBN 340160)
19                                            San Francisco Airport Office Center
                                              840 Malcolm Road, Suite 200
20                                            Burlingame, California 94010
                                              Tel:    (650) 697-6000
21                                            Fax:    (650) 697-0577
                                              jcotchett@cpmlegal.com
22                                            mmolumphy@cpmlegal.com
                                              tredenbarger@cpmlegal.com
23                                            gjung@cpmlegal.com

24                                            *Attorneys for Plaintiff R. Andre Klein*

25

26

27

28

**PROOF OF SERVICE**

I am employed in the County of San Diego.  I am over the age of eighteen years and am not a party to the above-captioned action.  My business address is 7817 Ivanhoe Avenue, Suite 102, La Jolla, CA 92037.

On June 27, 2023, I served copies of the following:

**First Amended Verified Shareholder Derivative Complaint**

☒ [BY ELECTRONIC ACCESS] I hereby certify that the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties on the electronic service list maintained for this case.

☒ [BY FIRST CLASS MAIL] I hereby certify that the foregoing document was served via First Class Mail to the following address: Kim W. West, Clyde & Co. US, LLP, 101 2nd Street, Ste. 3400, San Francisco, CA 94105.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 27, 2023, in La Jolla, California.

*s/ Francis A. Bottini, Jr.*
Francis A. Bottini, Jr.